CLARK HILL, PLLC
CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
3800 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone No. (702) 862-8300
Facsimile No. (702) 862-8400
Email: ccarlyon@clarkhill.com
*Counsel for Scott Lyle Graves Canarelli*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In Re:

American West Development, Inc.,

Reorganized Debtor.

Case No.: BK-S-12-12349-MKN
Chapter: 11

**OPPOSITION TO REORGANIZED DEBTOR'S MOTION (I) TO REOPEN CHAPTER 11 CASE; AND (II) FOR AN ORDER TO SHOW CAUSE WHY SCOTT LYLE GRAVES CANARELLI AND HIS COUNSEL SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING PLAN DISCHARGE, EXCULPATION, RELEASE AND INJUNCTIVE PROVISIONS**

DATE: March 21, 2018

TIME: 9:30 a.m.

## Table of Contents

I. INTRODUCTION ..... 1
II. FACTS ..... 3
A. The Filing and Closing of the Bankruptcy Case ..... 3
B. The Petition and Order Granting the Petition for the Probate Court to Assume Jurisdiction over the Trust ..... 3
C. The Petition to Surcharge the Trustees For Actions Relating to the (Post Effective Date) Purchase Agreement Entered Into by the Trustees ..... 5
III. ARGUMENT ..... 9
A. The Surcharge Petition Seeks Damages From the Former Trustees For Their Breach of Fiduciary Duty Stemming From The Purchase Agreement Entered Into After The Effective Date Of The Plan. ..... 9
B. The Plan, Appropriately And Repeatedly, Recognizes That Any Discharge Provisions Are Applicable Only To Claims Arising Before The Effective Date. ..... 11
1. The Discharge Applies only to Pre-Effective Date Conduct ..... 12
2. The §12.2 Injunction Applies Only to Pre-Effective Date Claims ..... 12
3. The Exculpation Applies Only to Conduct Related to the Plan, and Therefore Not to Post-Effective Date Actions by the Trustees ..... 13
4. The Release Provision Applies only to Pre-Effective Date Claims ..... 14
5. The §12.5 Injunction Applies Only to Pre-Effective Date Claims ..... 15
6. Nor Could a Plan Discharge Post-Effective Date Claims ..... 15
C. The Plan Does Not and Could Not Discharge Claims Against Third Parties ..... 15
D. The Surcharge Petition Does Not Raise Claims Which Are Subject to the Plan ..... 18
E. Any Defense Based Upon the Bankruptcy Has Been Waived ..... 19
F. AWDI is Subject to Discovery in the Probate Court Proceedings ..... 20
G. The Case Should Not be Reopened As It Has Been Fully Administered ..... 20
H. The Court Lacks Jurisdiction Over the Claims Raised in the Surcharge Petition ..... 21
III. CONCLUSION ..... 23

## EXHIBIT LIST

1. Docket No. 714: Debtors Amended Chapter11 Plan of Reorganization

2. State Court Order Granting Petition to Assume Jurisdiction over the Scott Lulye Graves Canarelli

3. Docket No. 963: Amended Motion for Final Decree to Close case

4. Docket No. 1039: Order Entering Final Decree

5. Docket No. 1062: American West's Opposition to Motion to Determine and Declare that Debtor's Discharge does not Extend to Certain Identified Non-Debtors or in the Alternative to Modify Discharge Injunction

6. State Court Stipulation and Order Tolling Time Period to Assert Claims

7. Order Regarding Petition to Surcharge Trustee and Former Trustees

8. Docket No. 1071: Order on Motion to Determine and Declare that Debtor's Discharge does not extend to certain identified Non- Debtors or in the Alternative to Modify Discharge Injunction

## Table of Authorities

Cases

*In re Elias*, 215 B.R. 600, 604 (9th Cir. BAP 1997), *aff'd*, 188 F. 3d 1160 (9th Cir. 1999).......... 20
*In re Lowenschuss*, 67 F.3d 1394, 1402 (9th Cir.1995)........ 16
*In re Miller*, 262 B.R. 499, 505 (9th Cir. BAP 2001)........ 20
*In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005)........ 21
*In re Ray*, 624 F.3d 1124, 1135 (9th Cir. 2010)........ 22
*In re S. Edge LLC*, 478 B.R. 403, 414 (D. Nev. 2012)........ 14, 16
*In re Traylor*, 94 B.R. 292, 293 (Bankr.E.D.N.Y.1989)........ 20
*In re Valdez Fisheries Dev. Ass'n, Inc.*, 439 F.3d 545, 548 (9th Cir. 2006)........ 21
*In re Yellowstone Mountain Club, LLC*, 460 B.R. 254, 273 (Bankr. D. Mont. 2011)........ 14
*In re Zilog, Inc.*, 450 F.3d 996, 1010 n. 5 (9th Cir. 2006)........ 15
*Stern v. Marshall*, 564 U.S. 462, 487, 131 S. Ct. 2594, 2611, 180 L. Ed. 2d 475 (2011)........ 21
*Stratosphere Litig. L.L.C. v. Grand Casinos, Inc.*, 298 F.3d 1137, 1143 (9th Cir.2002)........ 16

Statutes

11 U.S.C. § 524(e)........ 16
11 U.S.C. §1141(d)(1)(A)........ 12, 15

Rules

NRCP 8(c)........ 19

Scott Lyle Graves Canarelli ("Scott", "Scott Canarelli", or "Petitioner"), by and through his undersigned counsel, hereby opposes the Reorganized Debtor's Motion (I) to Reopen Chapter 11 Case; and (II) for an Order to Show Cause why Scott Lyle Graves Canarelli and his Counsel Should not be Held in Contempt for Violating Plan Discharge, Exculpation, Release And Injunctive Provisions (the "Motion").

This Opposition is made and based upon the Points and Authorities below, the exhibits attached hereto, the Declaration of Dana Dwiggins, Esq. filed herewith (the "Dwiggins Declaration"), the pleadings, papers and records on file in this case, and any oral argument which this Court may entertain at the time of the hearing of the Motion.

Respectfully submitted this 7th day of March, 2018.

CLARK HILL PLLC

By: ______________________

CANDACE C. CARLYON, ESQ.
Nevada Bar No. 02666
3800 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Counsel for Scott Lyle Graves Canarelli

## POINTS AND AUTHORITIES

### I. INTRODUCTION

*"The vanity and presumption of governing beyond the grave is the most ridiculous and insolent of all tyrannies."*

Scott Canarelli's parents apparently regret gifting funds to him decades ago, and particularly regret that Scott found out that they engaged in a series of self-dealing transactions starting in May of 2013 in violation of their duties as trustees of Scott's trust. In 2013, the Probate Court assumed jurisdiction over the trust and ordered Scott's parents to provide a full

accounting. In 2017 the Probate Court turned the trust over to an independent trustee. And 2018 Scott's parents decided to try to reopen this long closed corporate bankruptcy on the pretense that the plan of American West Development, Inc. precluded their liability for their (post-effective date) breach of fiduciary duties as Scott's trustees.

The Motion seeks to avoid the jurisdiction of the Probate Court which, in September of 2013, assumed *in rem* jurisdiction over the Scott Lyle Graves Canarelli Irrevocable Trust (the "Irrevocable Trust"). Scott also requested that the Probate Court order an inventory and accounting of the assets in the Irrevocable Trust. Neither the Reorganized Debtor nor its principals raised any issues relative to the Debtor or its confirmed plan (likely because they knew that the bankruptcy has no relevance to the Probate Court Proceedings). The Probate Court granted the Petition, and issued an order on October 24, 2013, which included the Probate Court's determination to assume "*in rem* jurisdiction over the Scott Lyle Graves Canarelli Irrevocable Trust, dated February 24, 1998 ("Irrevocable Trust"), and any and all trusts created within such trust." In addition, the Probate Court ordered the trustees and former trustees of the Irrevocable Trust (the "Trustees") to provide an inventory and accounting of the Irrevocable Trust from its inception, and to provide all information and documentation necessary for that purpose.

On June 27, 2017, Scott Canarelli filed his *Petition To Surcharge Trustee And Former Trustees For Breach Of Fiduciary Duties* ("Surcharge Petition"). While the Trustees objected to the Surcharge Petition, they again did not raise any defenses based on the closed AWDI bankruptcy. However, seeking to obtain an advantage (or at least a delay) in pending discovery disputes between Petitioner and the Trustees, AWDI filed the instant Motion to reopen the long-closed AWDI bankruptcy case and requested that this Court enter an order to show cause why Scott and his attorneys should not be held in contempt.

As discussed below, the Plan does not discharge the claims raised in the Surcharge Petition because (1) they arose post-effective date; (2) they are against non-debtors; and (3) they are not within the scope of Claims which are subject to the Plan release provisions. In addition, the Trustees have waived any such defense, and no showing has been made which would confer post-confirmation jurisdiction in the Bankruptcy Court over the issues being litigated in the Probate Court.

## II.
## FACTS

### A. The Filing and Closing of the Bankruptcy Case

As set forth in the Motion, the AWDI bankruptcy was filed on March 1, 2012, the Frist Amended Plan of Reorganization (the "Plan")(Dkt. No. 714)[1] was confirmed on February 14, 2013 (Dkt. No. 853), and the Plan Effective Date occurred on March 15, 2013 (Dkt. No. 868).

On June 25, 2013, Debtor requested a final decree (Dkt. No. 963, attached as Exhibit 3), representing that "the assets of ADWI's estate have been fully administered." *Id.* at p. 8 ¶20. On September 5, 2013, this Court entered a final decree closing the AWDI bankruptcy case. (Dkt. No. 1039, attached as Exhibit 4.) The Order recited that the Court's continuing jurisdiction was no longer necessary and that the bankruptcy case has been fully administered. As discussed in Section III(F), below, AWDI also argued in 2015 that the case was not subject to being reopened where the assets were fully administered.

### B. The Petition and Order Granting the Petition for the Probate Court to Assume Jurisdiction over the Trust

The Probate Court Proceedings arise from a transaction (the "Purchase Agreement") which was conducted by the Trustees without the consent, or even knowledge, of Scott Canarelli. On May 31, 2013, all of the assets in the Irrevocable Trust were "sold" to SJA Acquisitions, LLC, an entity established and managed by Scott's father, Lawrence Canarelli, for the benefit of

[1] Attached as Exhibit 1.

trusts in favor of Scott's siblings (the "Siblings Trusts"). The bulk of the consideration was in the form of unsecured promissory notes from SJC and the Siblings Trust (the "Notes").

On September 30, 2013, Scott Canarelli filed his *Petition to Assume Jurisdiction Over the Scott Lyle Graves Canarelli Irrevocable Trust; to Confirm Edward C. Lubbers as Family and Independent Trustee; for an Inventory and Accounting; to Compel an Independent Valuation of the Trust Assets Subject to the Purchase Agreement, Dated May 31, 2013; and to Authorize and Direct the Trustee and Former Trustees to Provide Settlor/Beneficiary With Any and All Information and Documents concerning the Sale of the Trust's Assets Under Such Purchase Agreement* (the "Original Petition"). The Original Petition requested that the Probate Court assume *in rem* jurisdiction over the Irrevocable Trust, and, in part, sought an inventory and accounting with regard to the assets of the Irrevocable Trust from its inception in 1998. The Original Petition was opposed by attorney Edward Lubbers, who, in addition to being a Trustee of the Irrevocable Trust, served as counsel to the Reorganized Debtor. No issue was raised with respect to the AWDI Bankruptcy. On October 24, 2013, the Probate Court granted the Original Petition, ordering that "this Court assumes *in rem* jurisdiction over the Scott Lyle Graves Canarelli Irrevocable Trust, dated February 24, 1998 ('Irrevocable Trust'), and any and all trusts created within such trust...." Exhibit 2 at p.2.

The Probate Jurisdiction Order also ordered the current and former trustees of the Trust to provide information regarding the assets of the Irrevocable Trust from 1998 to the present:

> IT IS HERBY FURTHER ORDERED that Edward Lubbers, the Family and Independent Trustee of the Irrevocable Trust, shall prepare and produce to Scott Canarelli, Settlor and Beneficiary of the Irrevocable Trust, an inventory and an accounting of the Irrevocable Trust from February 24, 1998, the date of the Irrevocable Trust's creation, through the present date within sixty (60) days of entry of this order;
>
> IT IS HEREBY FURTHER ORDERED that Lawrence Canarelli and Heidi Canarelli, former Family Co-Trustees of the Irrevocable Trust, shall provide Edward Lubbers and Scott Canarelli with any and all information and documents

> in their possession or control as may be appropriate to provide Scott Canarelli with an inventory and an accounting of the Irrevocable Trust from February 24, 1998, the date of the Irrevocable Trust's creation, through the present date;
>
> ...
>
> IT IS HEREBY FURTHER ORDERED that Edward Lubbers, the current Family and Independent Trustee of the Irrevocable Trust, and Lawrence Canarelli and Heidi Canarelli, the former Family Co-Trustees of the Irrevocable Trust, shall provide to Scott Canarelli any and all information and documentation within his or her knowledge or control concerning the Purchase Agreement, dated May 31, 2013, including, without limitation, any and all information and documents in his or her control regarding the advisability, necessity, fairness and reasonableness of all aspects of the transaction [the "Purchase Agreement"] and whether it was in the best interest of the Irrevocable Trust.

The Probate Jurisdiction Order also ordered the appointment of a neutral valuator on behalf of Scott Canarelli to value the assets which were the subject of the Purchase Agreement, and ordered the Trustees to "fully cooperate with and facilitate such valuation…."

**C. The Petition to Surcharge the Trustees For Actions Relating to the (Post Effective Date) Purchase Agreement Entered Into by the Trustees**

On June 27, 2017, Scott Canarelli filed his *Petition To Surcharge Trustee And Former Trustees For Breach Of Fiduciary Duties, Conspiracy And Aiding And Abetting; Petition For Breach Of Fiduciary Duty For Failure To Properly Account; Petition To Compel Trustee To Enforce Rights Of Trust Under Purchase Agreement, Promissory Note And Guaranty; Petition To Accelerate Promissory Notes; Declaration Of Principal And Interests Payments Due And Owing Under Purchase Agreement; Petition For Constructive Trust; Petition To Remove Trustee And Appoint Independent Trustee; Petition Precluding The Trustee And Former Trustees From Paying Attorneys' Fees And Costs From The Trust; Petition Directing Trustee To Immediately Seek Full Reimbursement Of Retainer Paid To Dickinson Wright; And Petition For An Award Of Attorney Fees, Accountant Fees And Costs* (the "Surcharge Petition"). The Surcharge Petition makes the following legal claims:

A. The Former Trustees have fiduciary obligations

B. The Trustee and Former Trustees breached their fiduciary duties and violated Nevada Law by selling the assets of the Irrevocable Trust

C. The Former Trustees breached their fiduciary duty by not enforcing the requirement of the Purchase Contract that an independent appraisal of the assets be conducted, and the purchase price adjusted upward if the assets appraised at a higher value.

D. The Trustees breached their Fiduciary Duty by suspending the payments due to the Irrevocable Trust pursuant to the Notes.

E. The Court should accelerate the Notes, and include the higher purchase price (with associated interest) based on the appraised value.

F. The Court should impose a constructive trust from profits derived from non-payment of amounts due under the Notes.

G. The Court should surcharge the Trustees for the loss of investment opportunities derived from the failure to require payments under the Notes.

H. The Court should surcharge the Trustees for damages resulting from the failure to render a proper accounting.

I. The Former Trustees (Heidi and Larry Canarelli) are liable for civil conspiracy and aiding and abetting the Trustee (Lubbers).

J. The Trustees should be precluded from using the assets of the Irrevocable Trust to defend themselves.

K. The Trustee should be compelled to obtain reimbursement of retainers and fees paid to defend the Trustee after entering into a tolling agreement with Petitioner (on March 29, 2016).

L. Petitioner is entitled to an award of attorneys' fees and costs caused by the wrongful conduct of the Former Trustees.

At this point, the Court should be wondering what any of this has to do with the closed ADWI bankruptcy. The answer is—nothing. The prayer for relief contained in the Surcharge Petition seeks no relief whatsoever against the Debtor or Reorganized Debtor, and is limited to damages stemming from the post-Effective Date Purchase Agreement and the conduct of the Trustees after the execution of the Purchase Agreement, including the failure to render the complete accounting as ordered by the Probate Court:

> **WHEREFORE**, Petitioner requests that this Petition be set for hearing, with notice of the time and place of such hearing given in the matter required by law, and that upon hearing the Petition, this Court make and enter the following orders:
>
> 1. This Court should compel the Trustee to enforce the [Irrevocable Trust's] rights under the Purchase Agreement, LLC Note and Corporate Note by demanding the following:
>    a. Payment of an additional $4,711,525 by SJA Acquisitions to the Trust, representing the amount the Purchase Price relative to the LLC Sale Interests was undervalued;
>    b. Payment by SJA Acquisition to the [Irrevocable Trust] for unpaid interest on the amount the LLC Note was undervalued;
>    c. Payment of $3 million by SJA Acquisitions to the [Irrevocable Trust] for unpaid principal payments for 2014, 2015 and 2016;
>    d. Payment of $3 million by the Siblings Trust to the [Irrevocable Trust] for unpaid principal payments for 2014, 2015 and 2016;
>    e. Disclosure of the terms of the extended or new Credit Agreement so as to allow Petitioner [to] determine what, if any, impact such credit agreement has on the LLC Note, Corporate Note and Guaranty;
>    f. Execution of an amended note by SJA Acquisitions to represent the adjusted sale price of the LLC Sale interests;
>    g. Execution of a new guaranty by the Guarantors, representing the adjusted sale price of the LLC Sale Interests;
>    h. Provide written notice of default and ten (10) days to cure such default;
>    i. Accelerating the LLC Note and Corporate Note in the event the defaults are not cured within the applicable time period;
>    j. Demand payment on the Guarantors for the unpaid principal balance and accrued interest;
>    k. Commence Default Interest under the LLC Note and Corporate Note;
>    l. Alternatively, demand payment of any principal payments properly deferred;
>    m. Disclose all payments made to the Trust under the Purchase Agreement, LLC Note and Corporate Note; and
>    n. Disclose any and all adjustments made to the LLC Note based on the Valuation.

2. That this Court surcharge the Former Trustees and Trustee for breach of their fiduciary obligations relating to the sale of all of the Trust's interest in the LLCs and Corporations, as set forth herein;

3. That [t]his Court enter an order holding the Former Trustees and Trustee liable for damages resulting from breach of the Purchase Agreement by, in part, conspiracy and aiding and abetting the breach of contract, as set forth more fully herein;

4. That this court surcharge the Former Trustees and Trustee for breach of their fiduciary obligations relating to their failure to adequately account, as set forth herein;

5. That the Court impose a constructive trust and recoup the 'benefit' conferred upon the Canarelli Entities as a result of its ability to utilize payments due and owing to the [Irrevocable Trust] for the past 3 to 4 years in a[n] amount to be proven at the evidentiary hearing;

6. That this Court order the Former Trustees and Trustee to reimburse the Trust for all legal fees, accountant fees, and all costs paid from the Trust to date;

7. That this Court enter an order prohibiting the Trustee and Former Trustees from paying their attorneys' fees and costs from the Trust, and an order disgorging the amounts already paid to Dickenson Wright; and

8. For such other orders as the Court deems just and proper under the circumstances.

Each of these requests seeks relief based on activities of the Trustees with respect to the Irrevocable Trust, all of which activities occurred on or after May 31, 2013, the date of the Purchase Agreement. The Plan Effective Date was March 15, 2013. The "Respondents" to the Surcharge Petition are the Trustees-Edward Lubbers, Lawrence Canarelli, and Heidi Canarelli. Respondents filed a response to the Surcharge Petition, which did not raise any defense relative to the AWDI bankruptcy. (Dkt. 1086 pps. 113-114).

On September 28, 2017, the Probate Court issued an Order finding that the Trustee, Edward Lubbers, was in a conflict position, and suspended him as trustee of the Irrevocable Trust. The Probate Court ordered that $1,873,678 (relating to the undervaluation of the assets which were the subject of the Purchase Agreement) be set aside, and prohibited the further use of funds from the Irrevocable Trust to be utilized in defense of the Trustees.

In connection with preparation for trial on the Surcharge Petition, on October 9, 2017, Petitioner served a subpoena on AWDI. On November 30, 2017, AWDI responded by submitting written objections to the subpoena. In response to such objections, Petitioner sent a

letter on January 9, 2018, responding to the objections, but agreeing to narrow the scope of the subpoena. Counsel for the Petitioner and AWDI thereafter held a meet and confer on January 23, 2018, but were unable to reach an agreement. Petitioner has not yet filed a motion to compel with regard to the subpoena issued to AWDI. Dwiggins Declaration at ¶7.

Although the AWDI bankruptcy was not raised in response to the Original Petition (filed in 2013) or in the response to the Surcharge Petition (filed on August 9, 2017), on February 8, 2018, Reorganized Debtor filed the instant Motion, seeking both to "reopen" the (fully administered) ADWI bankruptcy and to "sanction" Petitioner and his counsel, despite the fact that no claims have been filed against ADWI, and the only involvement of ADWI in the Probate Court Proceedings is its duty to respond to a subpoena.

## III.
## ARGUMENT

### A. The Surcharge Petition Seeks Damages From the Former Trustees For Their Breach of Fiduciary Duty Stemming From The Purchase Agreement Entered Into After The Effective Date Of The Plan.

The claims asserted and relief sought in the Surcharge Petition are solely against the Trustees and relate to the Purchase Agreement, which was executed on May 31, 2013, after the March 15, 2013, effective Date of the Plan. Scott seeks damages relating to the (1) asset sale; (2) timing of the sale; (3) purchase price; and (4) deferral of principal payments under the Notes.

The Motion incorrectly contends that the Surcharge Petition seeks damages and other relief against "a broad range of entities that appears to include AWDI and its affiliates" and further "asserts claims focused primarily on AWDI and its affiliates, the Term Loan, and other related matters." Motion at p 5, ¶¶24-25. Such contentions are completely undermined by the plain reading of the Surcharge Petition and the claims and relief alleged therein. Indeed, not one single citation referenced in the Motion supports the position that Scott seeks a surcharge or

damages against any individual, trust or entity other than Lawrence and Heidi Canarelli and Lubbers, in their capacities as Trustees.

As the Trustees, the Canarellis and Lubbers are personally liable for all damages sustained as a result of their breaches of fiduciary duty. While Scott *may* be able to assert *additional* claims against other individuals, trusts or entities, he has not done so.

ADWI cites to ¶¶ 90-92 of the Surcharge Petition to contend that Scott has filed a claim against the Siblings Trust and a "broad range of entities", allegedly in violation of the Plan. Such paragraphs, however, unequivocally set forth allegations relating to the Former Trustees' decision to forego principal payments under the Promissory Notes to the detriment of Scott and the Irrevocable Trust. Specifically, Paragraph 90 concludes with the following statement: "Accordingly, the **Trustee should be forced** to seek a constructive trust and recoup the "benefit" conferred upon the Canarelli Entities as a result of its ability to utilize payments due and owing to the [Irrevocable Trust] for the past 3 to 4 years; said amount which will be proven at an evidentiary hearing." (Emphasis added). Simply put, Scott alleges that the Trustees are further personally liable to the Trust for their breach of duties as a result of their failure to enforce the terms of the Promissory Notes given in connection with the post-Effective Date Purchase Agreement between three non-debtor parties-the Irrevocable Trust, SJR, and the Siblings Trusts. To the extent there was a benefit conferred upon the purchasers, Scott is seeking to hold the Trustees liable for such amounts.

For the most part, the remaining paragraphs of the Surcharge Petition referenced in the Motion are simply background factual allegations, appearing in the section of the Surcharge Petition labeled "STATEMENT OF RELEVANT FACTS". Specifically, the citations referred to in the Motion are as follows: Surcharge Petition at ¶¶ 11-12 are mere background factual allegations concerning the Term Loan and that Scott was informed by one of the Trustees that

the "Term Loan" precluded Scott from receiving distributions from any of the LLCs and Corporations until the lenders under the Term Loan were paid in full; ¶¶ 19-28 are mere factual allegations setting forth the execution of the Purchase Agreement by the Trustees and the timing and terms thereof, including the appraisal process and the terms of the promissory Notes and guaranty for the Purchase Price (all of which was done without Scott's knowledge or consent); ¶42 n. 6 merely points out that the Trustee's stated basis for the Purchase Agreement (that the Irrevocable Trust was prohibited from making distributions to Scott under Term Loan) is illogical since it is believed that the Siblings Trusts were presumably subject to the same terms; ¶86 n. 23 alleges that, since the Notes under the Purchase Agreement are subordinate to the Term Loan, there is a potential that the Notes will never be paid in full); ¶90 alleges that, since Lawrence Canarelli is also trustee of the Siblings Trusts, it is likely the deferred $7.7 million in payments are being utilized to enrich the Siblings Trusts.

Contrary to AWDI's contention, the foregoing allegations do not support the position that the Surcharge Petition focuses "primarily on AWDI and its affiliates, the Term Loan, and other related matters." *See* Motion at p. 4, ¶ 21. Any reference to the "Term Loan" (also referred to as "Credit Agreement") in the Surcharge Petition directly relate to the Former Trustees' contention that there was no liquidity to make discretionary distributions from the Trust to Scott in the amount of $10,000 per month which, as expressly stated in the Purchase Agreement, purportedly served as the basis of the Former Trustees' decision to sell almost $30 million in assets of the Trust.

### B. The Plan, Appropriately And Repeatedly, Recognizes That Any Discharge Provisions Are Applicable Only To Claims Arising Before The Effective Date.

The Plan contains four possible sources of protection: Discharge, Exculpation, Release, and Injunction. None of them apply to Scott's claims, which arose post-Effective Date.

1. The Discharge Applies only to Pre-Effective Date Conduct

Section 12.1 of the Plan is the "Discharge" provision. Subpart (a) discharges "Claims" against the Debtor and estate assets in conjunction with §1141. Section 1141(d)(1)(A) limits the discharge to "any debt that arose before the date of such confirmation". Plan §12.1 subpart (b) provides that, except as provided in the Confirmation Order, confirmation discharges "DEBTOR AND REORGANIZED DEBTOR" from all claims or debts "THAT AROSE BEFORE THE EFFECTIVE DATE...(emphasis added)."

Subpart (c) provides that, upon the Effective Date, "ALL CLAIMS AGAINST DEBTOR WHICH AROSE BEFORE THE EFFECTIVE DATE" (emphasis added) shall be discharged in full, all rights of prior equity will be cancelled, and all persons shall be precluded from asserting any claims against the Debtor, Reorganized Debtor, its Successors, or its Assets, any claims based on any occurrence "BEFORE THE EFFECTIVE DATE...(emphasis added)"

Subpart (d) excepts certain IRS claims from the discharge.

Thus, nothing in Section 12.1 of the Plan discharges claims arising after the Effective Date.

2. The §12.2 Injunction Applies Only to Pre-Effective Date Claims

Section 12.2 of the Plan is entitled "Binding Effect of Plan/Injunction," and contains three subparts.

Subpart (a) provides that the Plan is binding "TO THE FULLEST EXTENT PERMITTED BY BANKRUPTCY CODE SECTION 1141(a)." That section provides that a plan will bind any creditor regardless of whether the creditor is impaired by or accepts the plan. Thus, subpart (a) does not define the scope of Claims which are subject to the Plan Injunction.

Subpart (b) of the Plan enjoins the commencement or continuation of any actions based on Claims or Causes of Action which are (1) against assets of the Debtor or the Reorganized

Debtor "BASED UPON ANY ACT, OMISSION, TRANSACTION OR OTHER ACTIVITY THAT OCCURRED BEFORE THE EFFECTIVE DATE" (emphasis added); (2) efforts to enforce liens against assets to be distributed under the Plan; or (3) asserting successor liability claims against the Reorganized Debtor. None of these provisions have application to the Surcharge Petition.

Subpart (c) provides that holders of "Claims" against the Debtor are enjoyed from interfering with the implementation of the Plan, the Confirmation Order, or any of their Operative Documents. The Surcharge Petition implicates none of these areas. Scott does not seek to enforce any pre-Effective Date Claim or to enforce any liens or successor liability claims against the Reorganized Debtor.

3. The Exculpation Applies Only to Conduct Related to the Plan, and Therefore Not to Post-Effective Date Actions by the Trustees

Section 12.3 is titled "Exculpation", and provides that, except for claims based on fraud, gross negligence or willful misconduct, the Debtor, the Estate, the Secured Lenders, the DIP Lenders, certain individuals appointed pursuant to the Plan, and their professionals (the "Exculpated Parties" have no liability for acts "in connection with, relating to, or arising out of the Chapter 11 Case, the pursuit of confirmation of this Plan, or the Consummation of this Plan…."

Some courts, including the District of Nevada, have recognized a limited exception to the Ninth Circuit's prohibition on non-Debtor releases (discussed extensively below) for such plan exculpation clauses. Generally, such clauses are looked upon as merely embodying the quasi-judicial immunity which may be enjoyed by plan actors in bringing the plan to confirmation. Thus, the limited plan exculpation does "not affect the liability of these parties, but rather states the standard of liability under the Code…." *In re S. Edge LLC*, 478 B.R. 403, 415 (D. Nev.

2012). "[E]xculpation clauses are intended to 'prevent parties—who are disappointed subsequent to the completion of a Chapter 11 case, from suing professionals and others that are directly involved in the process of reorganization. But they are limited, and they are intended solely to preclude litigation related to or acts and conduct related to the process of the reorganization itself. *In re Yellowstone Mountain Club, LLC*, 460 B.R. 254, 273 (Bankr. D. Mont. 2011).

Because Scott raises no claims which relate to the reorganization process, the exculpation provisions of the Plan are not applicable to the Probate Court Proceedings.

4. <u>The Release Provision Applies only to Pre-Effective Date Claims</u>

Section 12.4 is titled "<u>Releases</u>". Subpart (a) provides for certain releases "EFFECTIVE AS OF THE EFFECTIVE DATE" as to Claims and Causes of Action "BASED ON WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE OR <u>CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE</u> ARISING FROM OR RELATED IN ANY WAY ...TO DEBTOR, REORGANIZED DEBTOR OR THEIR RESPECTIVE ASSETS AND ESTATE, THE CHAPTER 11 CASE, THE DISCLOSURE STATEMENT, THIS PLAN OR THE SOLICITATION OF VOTES ON THIS PLAN..." (emphasis added). The Surcharge Petition does not include any claims against the Debtor, Reorganized Debtor, or their respective assets, nor attempt to establish liability for actions related to the AWDI reorganization, and thus the release provision is not applicable.

Subpart (b) relates to parties voting to accept the plan, which is not applicable as neither Scott Canarelli nor his trust voted to accept the Plan.

Subpart (c) relates to elections by Construct Defect Claim holders, which is not applicable.

Subpart (d) provides that the releases are binding on a future Chapter 7 trustee.

5. The §12.5 Injunction Applies Only to Pre-Effective Date Claims

Section 12.5 of the Plan is titled "Injunctions." Subpart (a) enjoins "Released Parties" from any proceedings or enforcement of liens, judgments, or setoff rights against "Released Parties" in respect of any "Released Liabilities". Released Liabilities is defined in Plan Exhibit A ¶119 to mean Claims and Causes of Action "that arose prior to the Effective Date and relate to Debtor, the Plan or the Chapter 11 Case…" (emphasis added). Again, the Purchase Agreement was entered into after the Effective Date, and thus is not subject to the Injunction provision.

6. Nor Could a Plan Discharge Post-Effective Date Claims

As discussed above, each of the relevant discharge, exculpation, release and injunction provisions of the Plan relate only to Claims which arose prior to the Effective Date - March 15, 2013. The Plan does not attempt to discharge any claims which are based on occurrences after March 15, 2013, which include the Purchase Agreement and subsequent activities related to the Notes executed in connection with the Purchase Agreement. Such an effort would, in any case, be prohibited under bankruptcy law. The scope of the bankruptcy plan discharge is provided by 11 U.S.C. §1141(d)(1)(A), which provides that "the confirmation of a plan—(A) discharges the debtor from any debt that arose before the date of such confirmation… (emphasis added)."

The Ninth Circuit has questioned whether claims arising post-petition (*i.e.* "administrative claims") are subject to discharge under Section 1141, but recognizes that "it would be manifestly unjust to discharge claims that could not have been filed as either pre-petition claims or administrative expenses…." *In re Zilog, Inc.*, 450 F.3d 996, 1010 n. 5 (9th Cir. 2006).

**C. The Plan Does Not and Could Not Discharge Claims Against Third Parties**

The Surcharge Petition does not seek any relief against the Debtor, AWDI. Rather, the Surcharge Petition seeks relief from the Trustees of the Irrevocable Trust. The Ninth Circuit prohibits a plan from discharging liabilities of non-debtors.

> [T]he United States Court of Appeals for the Ninth Circuit has prohibited such releases as a matter of law, concluding that bankruptcy courts lack the power under the Bankruptcy Code to discharge the liabilities of third parties who are not seeking bankruptcy protection. *See Stratosphere Litig. L.L.C. v. Grand Casinos, Inc.*, 298 F.3d 1137, 1143 (9th Cir.2002) ("[A] bankruptcy court cannot confirm a reorganization plan that discharges the liabilities of a third party."); *In re Lowenschuss,* 67 F.3d 1394, 1402 (9th Cir.1995) ("This court has repeatedly held, without exception, that [11 U.S.C.] § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors.").

*In re S. Edge LLC*, 478 B.R. 403, 414 (D. Nev. 2012). In this case, the Debtor has confirmed that the Plan does not attempt to discharge third parties, as would be prohibited by *Stratosphere* and *Lowenschuss.*

Debtor's post-Effective Date conduct is consistent with this fact. In 2015 Zurich American Insurance Companies, *et. al*., moved the Bankruptcy Court, *inter alia,* for an order to determine that the Plan did not discharge certain non-debtors. In ruling that such motion should be denied, this Court held: "Section 524(e) makes clear that a debtor's discharge does not affect the liability of any other entity for the same debt. As such non-debtor entities do not receive a discharge, the discharge injunction simply does not apply." Dkt. 1071 p. 5. This Court further noted that "[a]t the hearing on the Motion, counsel for the Debtor correctly acknowledged that the non-Debtor parties did not obtain a bankruptcy discharge of the claims asserted by Zurich." *Id*. at n. 5.

The actual terms of the Plan reflect adherence to the law of the Ninth Circuit. Section 12.1 (the Discharge provision) (a) is limited to claims "AGAINST DEBTOR, AND OF THE ASSETS OF THE ESTATE"; (b) is applicable to "DEBTOR AND REORGANIZED DEBTOR"; and (c) is limited to "DEBTOR, REORGANIZED DEBTOR, ITS SUCCESSORS, OR ANY OF ITS ASSETS".

Section 12.2 (the Injunction Provision) (a) relates to "DEBTOR'S ASSETS"; (b) to actions "AGAINST ANY ASSETS DISTRIBUTED OR TO BE DISTRIBUTED UNDER THE PLAN,

OR VESTED IN REORGANIZED DEBTOR" or "CLAIMS AGAINST REORGANIZED DEBTOR" based on successor-type liability; (c) to actions "THAT WOULD INTERFERE OR OTHERWISE HINDER DEBTOR OR REORGANIZED DEBTOR FROM IMPLEMENTING THIS PLAN, THE CONFIRMATION ORDER" or the Plan documents.

Section 12.3 (the Exculpation provision) relates only to "Exculpated Parties", which are defined in Plan Exhibit A ¶69 and 111 to be Debtor and its Estate, the Secured Lenders, Reorganized Debtor, the DIP Lender, the Distribution Agent, the Construction Defect Trustee, and Professionals who are employed under the Code, awarded compensation by the Bankruptcy Court, or employed by the Futures Representative pursuant to an order of the Bankruptcy Court.

Section 12.4 is a point of emphasis by AWDI. AWDI asserts that §12.4(a) provides for a release by Releasing Parties of Released Parties, that the definitions of "Releasing Parties" includes Scott, and that the definition of "Released Parties" includes the Trustees. AWDI argues that Releasing Parties is defined in §12.4(a) as "DEBTOR, ... DEBTOR'S ESTATE, AND EACH OF ITS RELATED PERSONS". "Related Persons" is defined in Plan Appendix A ¶118 as any Person's "predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and Subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives and other professionals, and any Person claiming by or through any of them." Debtor claims that, because Scott was a $30,000 per year employee of AWDI, he is a "Releasing Party." Debtor then asserts that "Released Party" is defined in Plan Appendix A ¶120 to mean Debtor, its Estate, Reorganized Debtor, the DIP Lender, the Distribution Agent, the Futures Representative; Professionals (who are employed under the Code, awarded compensation by the Bankruptcy Court, or employed by the

Futures Representative pursuant to an order of the Bankruptcy Court); the Secured Lenders; and the respective Related Persons of each of them. Paragraph 47 of the Motion attempts to place the Trustees within the auspices of "Released Parties." Lawrence Canarelli, it is argued, is an officer of AWDI. While this is a fact, it is by no means clear that the Plan (or this Court) intended the scope of the Plan release to extend to Lawrence Canarelli other than in his capacity as an officer of the Debtor. Of course, Lawrence Canarelli is not a Respondent in the Probate Court Proceedings in his capacity of an officer of AWDI, rather he is a Respondent in his capacity as a Former Trustee of the Irrevocable Trust. The same is true of Heidi Canarelli, as to whom no analysis is performed by the Debtor as to why she is asserted to be a "Released Party" And Edward Lubbers is stated to be "counsel for the DIP Lender" and an attorney for AWDI and other borrowers, but there is no allegation that he meets the Plan definition of Professional- requiring that the professional be employed or compensated by order of the Bankruptcy Court or employed by the Futures Representative pursuant to an order of the Bankruptcy Court. But, regardless, each of the Trustees are respondents in the Probate Court Proceedings in their capacities as Trustees of the Irrevocable Trust - and it is beyond reason to assert that the Plan did or could release the Trustees for claims brought against them in such capacities.

**D. The Surcharge Petition Does Not Raise Claims Which Are Subject to the Plan**

The claims raised in the Surcharge Petition are against the Trustees based on their post-Effective Date breach of fiduciary duties to the Irrevocable Trust. The provisions of Article XII of the Plan are not applicable to such claims.

The Discharge provisions of Section 12.1(a) are limited to claims against Debtor and the assets of the Estate. 12(b) discharges only Debtor and Reorganized Debtor. Subpart (c) relates to Claims against Debtor.

The Injunction provisions of Section 12.2 of the Plan relate to assets of the Debtor and the Reorganized Debtor and Claims against the Reorganized Debtor; and actions which would interfere with the implementation of the Plan or the Confirmation Order.

The Exculpation provisions of Section 12.3 of the Plan relate only to claims for acts "in connection with, relating to, or arising out of the Chapter 11 Case, the pursuit of confirmation of this Plan, or the Consummation of this Plan…."

The Release provisions of Section 12.4 relate to Claims related to Debtor, Reorganized Debtor, their assets and estate, the Chapter 11 Case, the Plan, and the solicitation of votes under the Plan.

The "Injunction" provisions of Plan Section 12.5 are limited to "Released Liabilities," which are limited to liabilities which "relate to Debtor, the Plan or the Chapter 11 Case".

None of these provisions involve claims against the Trustees of Irrevocable Trust for actions taken by them in that capacity.

**E. Any Defense Based Upon the Bankruptcy Has Been Waived**

It is of great significance that, in responding to the both the Original Petition and the Surcharge Petition, no issue was raised with regard to the AWDI bankruptcy. In 2015, another party moved for relief in the ADWI bankruptcy. Debtor opposed that motion, and the Court issued a comprehensive decision on the issue. This Court held that "a bankruptcy discharge" arguably is an affirmative defense that must be raised in an answer or it is waived. For example, Rule 8(c) of the Nevada Rules of Civil Procedure ("NRCP") lists the affirmative defenses that must be asserted by a defendant in answering a civil complaint. 'Discharge in bankruptcy' is one of the defenses that NRCP 8(c) requires to be pled affirmatively." With regard to the Original Petition, the objection did not interpose the (recently fabricated) issue of the effect of the ADWI discharge, and that Original Petition was granted by the Probate Court's Order of October 24,

2013. The Surcharge Petition, which seeks damages only with respect to the post-Effective Date Purchase Agreement and subsequent activities, is also the subject of an Objection filed on August 2, 2017, which does not raise any defense with regard to the AWDI plan. Thus, not only are the arguments asserting that the Plan somehow discharged the claims against the Trustees entirely meritless, but they have also been waived.

**F. AWDI is Subject to Discovery in the Probate Court Proceedings**

Even pre-confirmation, there is no prohibition on serving discovery upon a debtor in connection with litigation against non-debtor entities. *See, e.g., In re Miller*, 262 B.R. 499, 505 (9th Cir. BAP 2001)(court found that the automatic stay did not prohibit discovery of the debtor, nor the imposition of sanctions against the debtor for non-compliance, stating: "Information is information, and we believe the discovery of it as part of the development of a case against non-debtor parties is permissible"). For the same reason, discovery is appropriate where the debtor has been discharged, so long as the underlying litigation does not seek recovery against the debtor. *Id.* at 506, quoting *In re Traylor,* 94 B.R. 292, 293 (Bankr.E.D.N.Y.1989)("the debtor, whether discharged or not, is under the same obligations as would be any witness, regardless of the inconvenience to him, to attend any trial that may take place if the relief is granted").

**G. The Case Should Not be Reopened As It Has Been Fully Administered**

In successfully opposing the Zurich Motion, Debtor stated: "A party seeking to reopen a case must present prima facie proof that the estate has not been fully administered." Exhibit 5 at p. 9, *citing In re Elias*, 215 B.R. 600, 604 (9th Cir. BAP 1997), *aff'd*, 188 F. 3d 1160 (9th Cir. 1999). Debtor has already conceded that the estate is fully administered. Exhibit 3 at p. 8 ¶20 ("the assets of ADWI's estate have been fully administered"). Thus, the Motion to reopen should be denied.

**H. The Court Lacks Jurisdiction Over the Claims Raised in the Surcharge Petition**

The post-confirmation jurisdiction of a bankruptcy court is limited. *See, e.g., In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005)("post-confirmation bankruptcy court jurisdiction is necessarily more limited than pre-confirmation jurisdiction"). Assumption of post-confirmation jurisdiction requires "a close nexus to the bankruptcy plan or proceeding…." *Id.* This requires that the controversy must "affect the implementation and execution of the Plan itself…." *Id.* Debtor's interpretation of *Pegasus* is illuminating:

> [B]ankurptcy courts possess limited jurisdiction following the confirmation of a plan. The Ninth Circuit has held that a bankruptcy court's post-confirmation jurisdiction is limited to "matters affecting the interpretation, implementation, consummation, execution, or administration of the confirmed plan [which] will typically have the requisite close nexus to the bankruptcy plan or proceeding.

Debtor's Opposition to Zurich Motion, Exhibit 5 hereto, at p. 13.

Thus, a bankruptcy court had no jurisdiction to interpret a settlement agreement between two non-debtors, even though the settlement agreement was approved by the bankruptcy court and provided for the bankruptcy court to retain jurisdiction over its enforcement, when the outcome would not have an impact on the handling or administration of the estate. *In re Valdez Fisheries Dev. Ass'n, Inc.*, 439 F.3d 545, 548 (9th Cir. 2006). The court will find the "close nexus" required in *Pegasus* "to exist where the post-confirmation claims asserted that the defendant breached the Reorganization Plan and where the outcome of those claims could affect the implementation and execution of the Plan." *Id.* (Even pre-confirmation, a bankruptcy court's jurisdiction is limited to matters which relate to the bankruptcy case. *See, e.g., Stern v. Marshall*, 564 U.S. 462, 487, 131 S. Ct. 2594, 2611, 180 L. Ed. 2d 475 (2011)(bankruptcy court has no authority to enter final order in a controversy involving state law claims which exist independently from the bankruptcy).)

In a case following both *Stern* and *Pegasus*, the Ninth Circuit held that the bankruptcy court had no jurisdiction over a claim brought against the debtor, and others, claiming that a bankruptcy-court approved sale violated the claimant's asserted first right of refusal. In so holding, the Ninth Circuit held that the claim was state law based, and not "arising under" the Bankruptcy Code nor "arising in" the bankruptcy case. The matter was not within the bankruptcy court's post-confirmation "related to" jurisdiction because it was a matter "that could have existed entirely apart from the bankruptcy proceeding and did not necessarily depend upon resolution of a substantial question of bankruptcy law." *In re Ray*, 624 F.3d 1124, 1135 (9th Cir. 2010). Clearly the same is true as to Scott's claims raised in the Surcharge Petition.

The fact that this Court does not retain jurisdiction over the Probate Court Proceedings between Scott and the Trustees is aptly illustrated by the ADWI's own argument to this Court. In opposing the Zurich Motion, Debtor stated: "Article XI of the First Amended Plan, specifically subsection 11.1 and its 21 subparts, describe the types of disputes and issues for which the Court retained jurisdiction. None of those subcategories relate to the adjudication of the liabilities of non-debtors to other third parties." Exhibit 5 at p. 13.

Here, it is clear that the claims raised in the Surcharge Petition do not come within the post-confirmation jurisdiction of the bankruptcy court. The claims are between non-debtors, and can have no impact on the administration of the estate. They arise under state law, and do not depend on bankruptcy law for determination. Under the authorities above, there is no jurisdiction in the bankruptcy court.

. . .

. . .

. . .

. . .

## III. CONCLUSION

For the reasons stated above, it is respectfully requested that the Court deny the Motion, and grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 7th day of March, 2018.

CLARK HILL PLLC

By: ______________________________
CANDACE C. CARLYON, ESQ.
Nevada Bar No. 02666
3800 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Counsel for Scott Lyle Graves Canarelli

# EXHIBIT 1

EXHIBIT 1

BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
MICAELA RUSTIA MOORE, ESQ.
Nevada Bar No. 9676
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
mmoore@foxrothschild.com
*Counsel for Debtor*

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re

AMERICAN WEST DEVELOPMENT, INC., a Nevada corporation,

fdba Castlebay 1, Inc.
fdba Development Management, Inc.
fdba Fairmont 1, Inc.
fdba Glen Eagles 3, Inc.
fdba Heritage 1, Inc.
fdba Inverness 5, Inc.
fdba Kensington 1, Inc.
fdba Kingsbridge 1, Inc.
fdba Promontory Estates, LLC
fdba Promontory Point 4, Inc.
fdba Silverado Springs 1, Inc.
fdba Silverado Springs 2, Inc.
fdba Tradition, Inc.
fdba Windsor 1, Inc.

Debtor.

Case No. BK-S-12-12349-MKN

Chapter 11

**DEBTOR'S FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

Hearing Date:
Hearing Time:

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND RULES OF INTERPRETATION ........ 1

1.1 Definitions ........ 1

1.2 Rules of Interpretation ........ 1

1.3 Appendices and Operative Documents ........ 2

ARTICLE II CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........ 2

2.1 Introduction. ........ 2

2.2 Unclassified Claims ........ 3

(a) Administrative Claims ........ 3

(b) Priority Tax Claims ........ 4

2.3 Classified Claims and Interests ........ 5

(a) Class 1: Other Priority Claims ........ 5

(b) Class 2: Secured Claims ........ 5

(c) Class 3: General Unsecured Claims ........ 7

(d) Class 4: Construction Defect Claims ........ 7

(e) Class 5: Bond Claims ........ 9

(f) Class 6: Old Equity Interests ........ 9

2.4 Retention of Defenses Regarding Claims ........ 10

2.5 Disputed, Contingent and Unliquidated Claims and Interests ........ 10

ARTICLE III ACCEPTANCE OR REJECTION OF THIS PLAN ........ 10

3.1 Acceptance by an Impaired Class ........ 10

3.2 Summary of Classes Voting on this Plan ........ 10

3.3 Elimination of Vacant Classes ........ 11

3.4 Tabulation of Votes ........ 11

3.5 Nonconsensual Confirmation ........ 11

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ARTICLE IV EXECUTORY CONTRACTS .......... 11

4.1 Executory Contracts .......... 11

4.2 Cure of Defaults for Assumed Executory Contracts .......... 11

4.3 Rejection of Executory Contracts .......... 13

4.4 Filing of Rejection Claims .......... 13

4.5 Modifications, Amendments, Supplements, Restatements or Other Agreements .......... 13

4.6 Reservation of Rights .......... 14

4.7 Warranty Program .......... 14

4.8 Price Promises and Price Guaranties .......... 14

ARTICLE V PLAN IMPLEMENTATION .......... 14

5.1 Plan Implementation .......... 14

5.2 Issuance of Equity Interests .......... 15

5.3 Disposition of Assets and Equity Interests .......... 15

5.4 Satisfaction of Allowed Claims .......... 15

5.5 Corporate Actions .......... 16

(a) Adoption of Reorganized Debtor's Bylaws .......... 16

(b) Renaming Reorganized Debtor and Authority to Execute Operative Documents .......... 16

5.6 Exemption from Certain Transfer Taxes and Further Transactions .......... 16

5.7 Final Decree .......... 16

5.8 Effectuating Documents, Further Transactions .......... 17

5.9 Post Effective Date Fees and Expenses .......... 17

ARTICLE VI THE CONSTRUCTION DEFECT TRUST .......... 18

6.1 Creation of the Construction Defect Trust and Appointment of the Construction Defect Trustee .......... 18

6.2 Property of the Construction Defect Trust .......... 18

6.3 Purpose of the Construction Defect Trust .......... 19

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 4 of 76

6.4 Powers of the Construction Defect Trustee ........ 20

6.5 Construction Defect Trust Advisory Board ........ 21

6.6 Cooperation Between Construction Defect Trustee and Disbursing Agent ........ 21

6.7 Assumption of Liabilities by the Construction Defect Trust ........ 22

6.8 Termination of the Construction Defect Trust ........ 23

ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS ........ 23

7.1 Allowance of Claims ........ 23

7.2 Claims Administration Responsibilities ........ 24

7.3 Claim Objection Deadline ........ 24

7.4 Contingent Claims ........ 24

7.5 Estimation of Claims ........ 24

7.6 Payments ........ 25

ARTICLE VIII PROVISIONS CONCERNING PLAN DISTRIBUTIONS ........ 25

8.1 Distributions on Account of Claims Allowed as of the Effective Date ........ 25

8.2 Distributions on Account of Claims Allowed After the Effective Date ........ 25

(a) Payments and Distributions on Disputed Administrative and Priority Claims ........ 25

(b) Special Rules for Distributions to Holders of General Unsecured Claims ........ 25

(c) Special Rules for Distributions to Holders of Disputed Claims ........ 26

(d) Special Rules for Distributions to Holders of Allowed Construction Defect Claims ........ 26

8.3 Manner of Payment Under this Plan ........ 26

8.4 Whole Dollars ........ 26

8.5 [reserved] ........ 26

8.6 Stop Payment ........ 26

8.7 Delivery of Distributions ........ 27

(a) Record Date for Distributions ........ 27

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 5 of 76

(b) Distribution Agent ..... 27

(c) Delivery of Distributions in General ..... 27

8.8 Returned Distributions ..... 28

8.9 Disputed Distributions ..... 28

8.10 Setoffs ..... 28

8.11 Withholding Taxes ..... 29

8.12 Allocation of Distributions ..... 29

ARTICLE IX RESERVATION OF RIGHTS PENDING CONFIRMATION AND EFFECTIVE DATE ..... 29

9.1 Withdrawal of Plan; Rights if Plan Not Confirmed or Effective Date Does Not Occur ..... 29

9.2 No Admissions or Waiver ..... 29

9.3 Term of Bankruptcy Injunction or Stays ..... 30

ARTICLE X CONDITIONS TO EFFECTIVE DATE ..... 30

10.1 Conditions to Occurrence of Effective Date ..... 30

10.2 Notice of Effectiveness ..... 31

ARTICLE XI RETENTION OF JURISDICTION ..... 31

11.1 Retention of Jurisdiction ..... 31

11.2 Jurisdiction Unaffected ..... 34

11.3 Failure or Inability of Bankruptcy Court to Exercise Jurisdiction ..... 34

11.4 New Secured Loan Documents ..... 34

11.5 Term Loan ..... 34

ARTICLE XII EFFECT OF CONFIRMATION OF PLAN ..... 34

12.1 Discharge ..... 34

12.2 Binding Effect of Plan/Injunction ..... 35

12.3 Exculpation ..... 37

12.4 Releases ..... 37

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

(a) RELEASES BY DEBTOR AND ESTATE ..... 37
(b) Releases by Holders of Claims and Interests ..... 39
(c) Cash Out Release ..... 40
12.5 Injunctions ..... 40
(a) Injunction Against Releasors ..... 40
(b) Injunction Protecting Exculpation of Released Parties ..... 41
(c) Injunction Against Interference with Plan ..... 41
(d) Injunction Channeling Construction Defect Claims ..... 41
12.6 Adequate Protection Liens; Cash Collateral Orders ..... 42
12.7 DIP Loan and Liens ..... 42
12.8 Termination of Debt Instruments ..... 42
12.9 Judgments Void ..... 42
12.10 Revesting of Assets in Reorganized Debtor ..... 42
12.11 Discharge of Statutory Committee/Futures Representative ..... 43
12.12 Preservation of Causes of Action ..... 43
12.13 Maintenance of Administrative Claim Status Post Discharge ..... 44
12.14 No Limitation on Effect of Confirmation ..... 44
ARTICLE XIII MISCELLANEOUS PROVISIONS ..... 44
13.1 Modification of this Plan ..... 44
13.2 Notices ..... 45
13.3 Limitation of Notice ..... 47
(a) Notice of Entry of Confirmation Order ..... 47
(b) Post-Confirmation Date Service List—Additional Persons Entitled to Notice ..... 47
(c) Subordination ..... 47
13.4 Requisite Secured Lenders' Approval ..... 47
13.5 Headings ..... 48

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 7 of 76

13.6 Exhibits ..... 48

13.7 Nonseverability of Plan Provisions ..... 48

13.8 Waiver or Estoppel ..... 48

13.9 Conflicts ..... 48

13.10 Computation of Time ..... 49

13.11 Governing Law ..... 49

13.12 Successors and Assigns ..... 49

13.13 Good Faith ..... 49

13.14 Post Confirmation Conversion or Dismissal ..... 49

13.15 Post Confirmation Quarterly Fees ..... 50

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

American West Development, Inc. ("Debtor"), debtor and debtor-in-possession in the above-captioned case (the "Chapter 11 Case"), hereby proposes this first amended chapter 11 plan of reorganization (the "Plan"), dated as of October 15, 2012, pursuant to section 1121(b) of title 11 of the United States Code (the "Bankruptcy Code").

## DISCLAIMER

Reference is made to the Disclosure Statement accompanying this Plan, including the exhibits appended thereto, for a discussion of Debtor's history, business, results of operations and assets, and a brief summary and detailed analysis of this Plan. All creditors are encouraged to consult the Disclosure Statement and to read this Plan carefully and completely before voting to accept or reject this Plan.

## ARTICLE I

## DEFINITIONS AND RULES OF INTERPRETATION

1.1 Definitions. The capitalized terms used herein and in the accompanying Disclosure Statement shall have the respective meanings set forth in the Glossary of Defined Terms attached as **Exhibit "A"** hereto, such meanings to be equally applicable to the singular and the plural forms of the terms defined, unless the context otherwise requires. If capitalized terms used in this Plan are not defined in the Glossary of Defined Terms, then they are as defined in any other section of this Plan. Unless otherwise provided in this Plan, all terms used herein shall have the meaning assigned to them under the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The rules of construction applicable to the Bankruptcy Code and the Bankruptcy Rules shall be applicable to this Plan.

1.2 Rules of Interpretation. Any term used in this Plan that is not defined in this Plan, either in this Article I or elsewhere, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules. For purposes of this Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) to the extent a reference or description in this Plan to an Operative Document is inconsistent with the terms or conditions of that Operative Document, the terms and conditions of the Operative Document shall govern over the reference or description contained in this Plan; (c) any reference in this Plan to an existing document, schedule,

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 9 of 76

Operative Document or exhibit Filed or to be Filed means such document, schedule, Operative Document, or exhibit, as it may have been or may be amended, modified or supplemented as of the Confirmation Date in accordance with the terms hereof; (d) unless otherwise specified in a particular reference, all references in this Plan to Sections, Articles and exhibits are references to Sections, Articles and exhibits of or to this Plan; (e) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan in its entirety rather than to only a particular portion of this Plan; (f) the word "all" shall mean "any and all;" (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretations of this Plan; (h) the rules of construction set forth in Bankruptcy Code section 102 shall apply, including that the terms "includes," "shall include," and "including" are not limiting; (i) all exhibits and schedules to this Plan are incorporated into this Plan, and shall be deemed to be included in this Plan, regardless of when they are Filed; (j) any service or notice provided for in this Plan shall be provided at the addresses specified in Article XIII hereof; (k) except to the extent that the Bankruptcy Code or other state or federal law is applicable, or to the extent the exhibits, New Secured Loan Documents or Operative Documents provide otherwise, the rights, duties and obligations under this Plan shall be governed, construed and enforced in accordance with the laws of the State of Nevada; and (l) to the extent a reference or description in the Disclosure Statement to this Plan, a New Secured Loan Document or an Operative Document is inconsistent with the terms or conditions of this Plan, the New Secured Loan Document or Operative Document, the terms and conditions of this Plan, the New Secured Loan Document or Operative Documents, as applicable, shall govern over the reference contained in the Disclosure Statement.

1.3 Appendices and Operative Documents. All appendices to the Plan and the Operative Documents are incorporated into and are a part of this Plan as if set forth in full herein.

## ARTICLE II

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

2.1 Introduction.

(a) All Claims and Interests, except Administrative Claims (including Professional Fee Claims) and Priority Tax Claims, are placed in the Classes set forth below. In accordance with

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims are not required to be, and have not been, placed in any Class under the Plan.

(b) A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

2.2 Unclassified Claims.

(a) Administrative Claims.

(1) Deadline to File Administrative Claims. The Holder of an Administrative Claim, other than (i) a Professional Fee Claim, or (ii) a liability incurred and paid in the ordinary course of business by Debtor, must File with the Bankruptcy Court and serve on Debtor and Debtor's counsel, notice of such Administrative Claim on or before the Administrative Claim Bar Date. Such notice must include, at a minimum, (i) the name of the Holder of such Administrative Claim, (ii) the basis of the Administrative Claim, including why it is entitled to administrative priority under the Bankruptcy Code, and (iii) the amount of the Administrative Claim. Failure to File and serve such notice timely and properly shall result in the Administrative Claim being forever barred and discharged. The Administrative Claim Bar Date does not require the Internal Revenue Service to file a request for payment by that date.

(2) Payment Provisions. Subject to the provisions of Bankruptcy Code sections 330(a), 331 and 503(b), each Holder of an Administrative Claim shall, either:

(A) be paid from the Confirmation Funds in the Allowed amount of such Administrative Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the date upon which such Administrative Claim becomes Allowed, or (iii) such date as is otherwise agreed to by Debtor or Reorganized Debtor, as the case may be, and the Holder of such Administrative Claim; or

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

(B) have such Administrative Claim assumed by Reorganized Debtor, to be paid by Reorganized Debtor in Cash in the Allowed amount of such Administrative Claim on, or as soon as reasonably practicable after, the later of (i) the date upon which such Administrative Claim becomes Allowed, (ii) the date on which such Administrative Claim becomes due in the ordinary course of business, or (iii) such date as is otherwise agreed by Debtor, Reorganized Debtor and the Holder of such Administrative Claim.

(3) Professional Fee Claims and US Trustee Fees. Notwithstanding the foregoing or anything to the contrary in this Plan:

(A) all final applications for the allowance and payment of Professional Fee Claims constituting amounts due for services rendered on or before the Effective Date shall be Filed no later than ninety (90) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.

(B) Debtor shall pay, or cause to be paid, all accrued US Trustee Fees on or before the Effective Date; and following the Effective Date, Reorganized Debtor shall be responsible for timely payment of all US Trustee Fees until such time as the Final Decree closing the Chapter 11 Case is entered and all US Trustee Fees due are paid in full. US Trustee Fees are not subject to an allowance process.

(C) Debtor or Reorganized Debtor (as applicable) shall File with the Bankruptcy Court and serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) that the Chapter 11 Case remains open in such format as reasonably may be required by the United States Trustee.

(b) Priority Tax Claims. The legal and equitable rights of the Holders of Allowed Priority Tax Claims are unaltered by this Plan. Each Holder of an Allowed Priority Tax Claim shall be entitled to receive, on account of such Allowed Priority Tax Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, equal quarterly, consecutive Cash payments beginning on the Effective Date, and continuing until completed no later than five (5) years after the Petition Date totaling the principal amount of such Claim plus interest on

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 12 of 76

any outstanding balance from the Petition Date. The rate of interest on such payments shall be determined under applicable nonbankruptcy law, pursuant to Bankruptcy Code section 511.

2.3 Classified Claims and Interests.

(a) Class 1: Other Priority Claims.

*Claims in Class*: Class 1 consists of Other Priority Claims against Debtor.

*Treatment*: The legal and equitable rights of the Holders of Allowed Other Priority Claims are unaltered by this Plan. Each Holder of an Allowed Other Priority Claim shall, either: (i) be paid the Allowed amount of such Claim in Cash on the Effective Date; or (ii) receive such other treatment as is agreed to by the Holder of such Allowed Other Priority Claim, and Debtor or Reorganized Debtor, as the case may be.

*Impairment and Voting*: Class 1 Claims are not Impaired and the Holders of Allowed Other Priority Claims are conclusively deemed to have accepted this Plan, pursuant to Bankruptcy Code section 1126(f). Therefore, the Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject this Plan.

(b) Class 2: Secured Claims.

*Claims in Class*: Class 2 consists of the Secured Claims of the Secured Lenders against Debtor.

*Treatment*. On the Effective Date, each Secured Lender, as a Holder of an Allowed Secured Claim, shall receive, in full satisfaction, settlement, release and exchange for its Allowed Secured Claim, payments from and performance by Reorganized Debtor under the New Secured Loan according to the terms and conditions of the New Secured Loan Documents. The New Secured Loan will be evidenced by the New Secured Notes, which will be executed by Reorganized Debtor and be payable to the order of each Secured Lender according to such Secured Lender's pro rata interest in the New Secured Loan. The New Secured Notes will be in the aggregate principal amount of $49,635,000, maturing on December 31, 2015 (the "Maturity Date"). The New Secured Loan shall be secured by Liens on the Secured Lenders' collateral pursuant to the New Secured Loan Documents. Pursuant to the terms of the Lock-Up and Settlement Letter Agreement, the Secured Lenders shall waive any respective entitlement to receive or recover from Debtor or Reorganized Debtor any interest accruing at

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 13 of 76

the default rate under the Term Loan Documents prior to the Effective Date to the extent (and only to the extent) that such default rate interest would be triggered under the Term Loan Documents by the commencement of the Chapter 11 Case.

The New Secured Notes provide that the Secured Lenders will receive interest on the principal amounts of the New Secured Notes at either (a) a fixed rate of interest based on reserve-adjusted LIBOR rate plus the Applicable Margin for interest periods of one (1), two (2), three (3) or six (6) months or (b) a variable rate of interest based on the "prime rate" as announced from time to time by California Bank & Trust plus the Applicable Margin. If a fixed rate is selected, then upon expiration of the applicable interest period the variable rate will become applicable unless a new fixed rate interest period is selected in accordance with the New Secured Loan Documents. The variable rate will change with each change in the applicable "prime rate." The New Secured Notes further provide that: (i) accrued interest shall be due and payable on the first Business Day of each month, beginning with the first day of the first month after the month in which the Effective Date occurs, with interest being calculated based on the actual number of days that principal is outstanding over a year of 360 days; and (ii) the entire outstanding principal balance of the New Secured Notes plus any accrued and unpaid interest shall be immediately due and payable in one balloon payment on the Maturity Date. The New Secured Notes shall be secured, pursuant to the New Secured Loan Documents, by the Secured Lenders' collateral and shall be in a form acceptable to and approved by the Secured Lenders, which form is annexed as an exhibit to the Disclosure Statement. In the event of a default by Reorganized Debtor under the New Secured Loan Documents, the full amount of the obligation owed by Debtor's co-borrowers under the Term Loan shall, at the option of a designated percentage of the Secured Lenders, become immediately due and payable in full. In the event of any conflict between the New Secured Loan Documents and this Plan, the terms and conditions of the New Secured Loan Documents shall control.

Upon the Effective Date: (i) Debtor's obligations as co-borrower under the Term Loan shall be deemed replaced by its obligations as borrower under the New Secured Loan; (ii) Reorganized Debtor shall be deemed to be the sole owner of all of Debtor's re-vested assets, including the Receivable and contract rights under each of the Design-Build Agreements and the Marketing and

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Administrative Services Agreements, free and clear of all Liens and interests except the Secured Lenders' Liens and interests under the New Secured Loan Documents; and (iii) all Liens and security interests in the Receivable shall automatically be deemed to secure only Reorganized Debtor's obligations to the Secured Lenders under the New Secured Loan Documents. In addition, the Term Loan provides that Reorganized Debtor may become a co-borrower thereunder under certain conditions as set forth therein.

*Impairment and Voting*: Class 2 Claims are Impaired under the Plan. Therefore, the Holders of Allowed Class 2 Secured Claims are entitled to vote to accept or reject this Plan.

(c) Class 3: General Unsecured Claims.

*Claims in Class*: Class 3 consists of General Unsecured Claims against Debtor.

*Treatment*: Unless otherwise agreed to by the Holder, each Holder of an Allowed Class 3 General Unsecured Claim shall receive on the Effective Date, in full satisfaction, settlement, release and exchange of such Allowed General Unsecured Claim, its Pro Rata share of one million five hundred thousand dollars ($1,500,000), provided, however, that such Holder may not receive more than one hundred percent (100%) of the principal amount of its Allowed Class 3 General Unsecured Claim. Holders of Allowed Class 3 General Unsecured Claims are not entitled to interest on account of their claims. Distribution to Holders of Allowed Class 3 General Unsecured Claims will be made pursuant to Section 8.2(b) of this Plan.

On the Effective Date, assuming that Class 3 votes to accept the Plan, the Secured Lenders shall waive any Distribution on account of their Allowed Class 3 General Unsecured Claims, which are Deficiency Claims, as established or determined by the 9019 Order or otherwise.

*Impairment and Voting*: Class 3 Claims are Impaired under the Plan. Therefore, Holders of Allowed Class 3 General Unsecured Claims are entitled to vote to accept or reject this Plan.

(d) Class 4: Construction Defect Claims.

*Claims in Class*: Class 4 consists of all Construction Defect Claims against Debtor.

*Treatment*: On the Effective Date, liability of Debtor for all Construction Defect Claims shall be assumed by, and channeled pursuant to an injunction of the Bankruptcy Court to, the Construction Defect Trust. Except as provided below in this Section 2.3(d) regarding Construction

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Defect Claims for which the Cash Out Election is made and remains available since at least eighty percent (80%) in number of the Holders of Class 4 Construction Defect Claims who timely and properly voted to accept or reject the Plan actually voted to accept the Plan, all Construction Defect Claims shall be processed, liquidated and paid pursuant to the terms and provisions of the TDP, and the Construction Defect Trustee will determine, subject to the terms of the Construction Defect Trust Declaration and the TDP, whether a Construction Defect Claim is an Allowed Claim for purposes of receiving a Distribution on account thereof from the Construction Defect Trust. The sole recourse of a Holder of a Construction Defect Claim shall be against the corpus of the Construction Defect Trust, and such Holder shall have no rights whatsoever at any time to assert such Construction Defect Claim against Debtor, the Estate, Reorganized Debtor or the Assets vested in Reorganized Debtor upon Confirmation of this Plan. Without limiting the foregoing, on the Effective Date, all Holders of Construction Defect Claims shall be permanently and forever stayed, restrained and enjoined from taking any actions against Reorganized Debtor, Debtor, the Estate, the Assets, the Distribution Agent and the Professionals or their respective assets and property for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Construction Defect Claim. On the Effective Date, the Construction Defect Trust will be funded with the Construction Defect Trust Contribution. In addition, there will be transferred to the Construction Defect Trust various rights and causes of action that could augment the corpus of the Construction Defect Trust and the amount ultimately distributed to Holders of Allowed Construction Defect Claims.

The Class 4 Ballot provided to Holders of Construction Defect Claims includes the option for such Holders to make the Cash Out Election. So long as at least eighty percent (80%) in number of the Holders of Class 4 Construction Defect Claims actually vote to accept the Plan, each Holder of aConstruction Defect Claim who makes the Cash Out Election shall: (i) receive a Cash Out Payment, which shall consist of a check in the amount of its Allowed Construction Defect Claim mailed by the Construction Defect Trustee (funded from the Construction Defect Trust Contribution) within sixty (60) days of the Effective Date to the address to which the Class 4 Ballot was mailed unless a different address is provided on such Holder's completed Class 4 Ballot; (ii) not have any further right to any Distribution on account of any Construction Defect Claim from the Construction Defect Trustee,

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

the Distribution Agent, Debtor, Reorganized Debtor or otherwise; and (iii) grant the Cash Out Release effective immediately upon receipt of the Cash Out Payment without any further action or approval. If the Plan is not accepted by at least eighty percent (80%) in number of the Holders of Class 4 Claims who timely and property vote to accept or reject the Plan, there shall be no Cash Out Election available and the Claims of all Holders of Class 4 Claims shall be processed, liquidated and paid pursuant to the terms and provisions of the TDP.

*Impairment and Voting*: Class 4 Claims are Impaired under the Plan. Therefore, Holders of Class 4 Construction Defect Claims who make the Cash Out Election will be deemed to have Allowed Claims in the respective Allowed amounts of their Class 4 Claims for purposes of voting on the Plan and are entitled to vote to accept or reject this Plan. Holders of Class 4 Construction Defect Claims that do not make the Cash Out Election will be tabulated for purposes of voting on the Plan in the amount of $1.00 unless the Bankruptcy Court enters an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing any such Claim in a different amount. HOLDERS OF CLASS 4 CLAIMS WHO HAVE NOT FILED A PROOF OF CLAIM AND WHO DO NOT VOTE WILL EFFECTIVELY BE DELEGATING TO THE FUTURES REPRESENTATIVE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN. THE FUTURES REPRESENTATIVE INTENDS TO VOTE TO ACCEPT THE PLAN ON BEHALF OF THE HOLDERS OF CLASS 4 CLAIMS FOR WHO HAVE NOT VOTED THEMSELVES, THEREBY GRANTING THE NON-DEBTOR RELEASE SET FORTH IN SECTION 12.4(b) ON BEHALF OF SUCH HOLDERS.

(e) Class 5: Bond Claims.

*Claims in Class*: Class 5 consists of all Bond Claims against Debtor.

*Treatment*: Bond Claims will be paid in the ordinary course of Reorganized Debtor's business.

*Impairment and Voting*: Class 5 is not Impaired and the Holders of Allowed Bond Claims are conclusively deemed to have accepted this Plan, pursuant to Bankruptcy Code section 1126(f). Therefore, the Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject this Plan.

(f) Class 6: Old Equity Interests.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

*Claims in Class*: Class 6 consists of all Old Equity Interests.

*Treatment*: Holders of Old Equity Interests shall not receive or retain any property on account of such Old Equity Interests under this Plan. Upon the Effective Date, all Old Equity Interests shall be extinguished and canceled without further action by Debtor or notice to Holders of Old Equity Interests being necessary.

*Impairment and Voting*: Class 6 Interests are Impaired under the Plan. Because the Holders of Old Equity Interests are deemed not to have accepted this Plan pursuant to Bankruptcy Code section 1126(g), such Holder are therefore not required to vote to accept or reject the Plan.

2.4 Retention of Defenses Regarding Claims. Except as otherwise provided in (a) this Plan, and (b) the DIP Financing Order, nothing shall affect Debtor's rights and defenses, both legal and equitable, with respect to any Claims.

2.5 Disputed, Contingent and Unliquidated Claims and Interests. Any Claim or Interest that has been or is hereafter listed in the Schedules as disputed, contingent or unliquidated, and for which no Proof of Claim or Proof of Interest has been timely Filed by the Bar Date, is not considered Allowed and shall be expunged without further action by Debtor and without any further notice to or action, order or approval of the Bankruptcy Court.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

**ARTICLE III**

**ACCEPTANCE OR REJECTION OF THIS PLAN**

3.1 Acceptance by an Impaired Class. In accordance with Bankruptcy Code section 1126(c) and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall be deemed to have accepted this Plan if this Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

3.2 Summary of Classes Voting on this Plan.

(a) Only the votes of Holders of Allowed Claims in Classes 2, 3 and 4 will be solicited with respect to this Plan.

(b) Classes 1 and 5 shall be conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f) and Class 6 will be deemed not to have accepted the Plan pursuant

to Bankruptcy Code section 1126(f). Accordingly, acceptances of the Plan will not be solicited from the Holders of Class 1 or 5 Claims, or from the Holders of Class 6 Interests.

3.3 Elimination of Vacant Classes. Any Class of Claims that does not contain any Allowed Claims as of the Voting Record Date or any Claims temporarily Allowed under Bankruptcy Rule 3018(a) or otherwise shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Bankruptcy Code section 1129(a)(8).

3.4 Tabulation of Votes. The Voting and Claims Agent will tabulate all votes on this Plan for the purpose of determining whether this Plan has been accepted by each Impaired Class entitled to vote.

3.5 Nonconsensual Confirmation. If any Impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Bankruptcy Code section 1126(c), Debtor reserves the right, subject to the Lock-Up and Settlement Letter Agreement, to amend the Plan in accordance with Section 12.1 hereof or undertake to have the Bankruptcy Court confirm the Plan under Bankruptcy Code section 1129(b) or both. With respect to any Impaired Classes of Claims that are deemed to reject the Plan, Debtor shall request that the Bankruptcy Court confirm the Plan under Bankruptcy Code section 1129(b).

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

## ARTICLE IV

## EXECUTORY CONTRACTS

4.1 Executory Contracts. Debtor/Reorganized Debtor shall be deemed to have assumed each Assumed Contract as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court under Bankruptcy Code sections 365 and 1123(b)(2) approving the Assumed Contract assumptions by Debtor/Reorganized Debtor, as of the Effective Date.

4.2 Cure of Defaults for Assumed Executory Contracts.

(a) Any of the Assumed Contracts that are, or may be, alleged to be in default, shall be Cured by the Effective Date. Except with respect to Assumed Contracts with respect to which Debtor and the applicable counterparties have stipulated in writing as to the appropriate Cure, all requests for Cure that differ from the amounts and treatment proposed by Debtor must be Filed with the

Bankruptcy Court on or before the Cure Request Bar Date. Any request for payment or other Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against Debtor or Reorganized Debtor, without the need for any objection by Debtor or further notice to or action, order or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released and discharged upon payment by Reorganized Debtor of the amounts listed on the proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary. Debtor or Reorganized Debtor also may settle any Cure dispute without further notice to or action, order or approval of the Bankruptcy Court.

(b) If a counterparty objects to any Cure or any other matter related to assumption, absent an agreement being reached by Debtor and the objecting counterparty, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of Debtor or Reorganized Debtor to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of an order resolving such dispute, approving such assumption, or as may be agreed upon by Debtor or Reorganized Debtor and the counterparty to the Assumed Contract. Any counterparty to an Assumed Contract that fails to object timely to the proposed assumption of such Executory Contract will be deemed to have consented to such assumption. Debtor and Reorganized Debtor reserve the right either to reject or nullify the assumption of any Executory Contract no later than thirty (30) days after there is a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract.

(c) Assumption of any Assumed Contract pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults with respect to provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contract at any time prior to the effective date of assumption. Any Proofs of Claim Filed with respect to an Assumed Contract that has been assumed shall be deemed disallowed and expunged, without further notice to or action,

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

order or approval of the Bankruptcy Court, upon payment by Reorganized Debtor of the required Cure amount.

4.3 Rejection of Executory Contracts.

(a) Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2), of the rejection of all Executory Contracts of Debtor other than the Assumed Contracts.

(b) Any Holder of an Allowed Claim whose Claim arises from the rejection of a Rejected Contract with Debtor shall have the rights of a Holder of an Allowed General Unsecured Claim and shall receive the treatment provided to Holders of Allowed Class 3 General Unsecured Claims as set forth in this Plan.

4.4 Filing of Rejection Claims. Any Person or Entity who believes they are entitled to assert a Claim against Debtor by virtue of the rejection of a Rejected Contract pursuant to this Article IV or a Final Order entered after the Confirmation Date, may File a Claim not later than twenty (20) days after the date the rejection order was entered or such later time as may be set forth for the Filing of such Claim in said Final Order. If such Claim is not so Filed, it shall be forever barred from assertion against Debtor and Reorganized Debtor. Nothing in this Section 4.4 shall affect the right of any party-in-interest to object to any Claim which has been improperly Filed or not Filed on a timely basis.

4.5 Modifications, Amendments, Supplements, Restatements or Other Agreements.

(a) Each Assumed Contract shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Assumed Contract, and all Executory Contracts related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

(b) Modifications, amendments, supplements and restatements to pre-petition Executory Contracts that have been executed by Debtor during the Chapter 11 Case shall not be deemed to alter the pre-petition nature of the Executory Contract, or the validity, priority or amount of any Claims that may arise in connection therewith.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

4.6 Reservation of Rights. Nothing contained in this Plan shall constitute an admission by Debtor or Reorganized Debtor that any contract or lease is an Executory Contract or that Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was an Executory Contract at the time of assumption or rejection, Debtor and/or Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

4.7 Warranty Program. From and after the Effective Date, Reorganized Debtor shall assume the Warranty Program.

4.8 Price Promises and Price Guarantees. To the extent the Price Promises and Price Guarantees are Executory Contracts, the Bankruptcy Court ruled that they be treated as Rejected Contracts, thereby giving any Holder of an Allowed Claim whose Claim arises from the rejection of a Price Promise or Price Guarantee the rights set forth in Section 4.3(b) of this Plan, subject to such Holder's submission of a Proof of Claim prior to the bar date of June 29, 2012 at 5:00 p.m. prevailing Pacific Time.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ARTICLE V

**PLAN IMPLEMENTATION**

5.1 Plan Implementation.

This Plan shall be implemented in all respects in a manner that is consistent with the terms and conditions of the Operative Documents, the Lock-Up and Settlement Letter Agreement, DIP Financing Order, and the requirements of section 1123(a) and other applicable provisions of the Bankruptcy Code. Without limiting the generality of the foregoing, the New Capital Contribution shall be used to fund this Plan and shall be distributed or applied in the manner necessary to: (i) provide all required Confirmation Funds for Distribution pursuant to this Plan; (ii) fund the Construction Defect Trust Contribution; (iii) satisfy the costs, expenses, required payments and entitlements outlined herein on the Effective Date, or pursuant to the TDP; and (iv) provide Reorganized Debtor and the Construction Defect Trust with working capital and funding for operations and Plan needs. On the Effective Date, that portion of the New Capital Contribution to be used for the Confirmation Funds shall be turned over to the

Distribution Agent for distribution pursuant to this Plan and the Construction Defect Trust Contribution shall be turned over to the Construction Defect Trustee.

On the Effective Date the DIP Lender shall make the New Capital Contribution by funding the maximum amount of the DIP Loan by payment of Cash to Reorganized Debtor and the Construction Defect Trust in an aggregate amount equal to the difference between (x) the maximum amount of the DIP Loan of ten million dollars ($10,000,000), and (y) the outstanding amount of the DIP Loan advanced and paid to Debtor prior to the Effective Date. Notwithstanding the foregoing, the maximum amount of the New Capital Contribution shall not exceed the aggregate amount Reorganized Debtor and the Construction Defect Trust require to fund the Distributions required under this Plan. The DIP Lender shall, thereupon, forgive, release and discharge the DIP Loan and Liens securing same in consideration of its receipt of the New Equity Interests in Reorganized Debtor pursuant to this Plan.

5.2 Issuance of Equity Interests. On the Effective Date, Old Equity Interests shall be extinguished, canceled, terminated and be of no force and effect thereafter. In consideration of the New Capital Contribution, one hundred percent (100%) of the New Equity Interests in Reorganized Debtor shall be issued to the DIP Lender (subject to a pledge thereof in favor of the Secured Lenders to secure any obligations of Reorganized Debtor under the New Secured Loan).

5.3 Disposition of Assets and Equity Interests. On the Effective Date (as more fully set forth in Article XII of this Plan), without any further action, Reorganized Debtor will be vested with all of Debtor's Assets, free and clear of all Claims, Liens and Old Equity Interests (except for Liens provided or authorized pursuant to this Plan).

5.4 Satisfaction of Allowed Claims. On and after the Effective Date, unless such Claims shall be paid on or prior to such date, (i) to the extent not satisfied with Confirmation Funds, Reorganized Debtor shall be responsible for satisfying Allowed Administrative Claims and Allowed Class 1 Other Priority Claims pursuant and subject to the treatment thereof as set forth in this Plan and the Confirmation Order; (ii) Reorganized Debtor shall satisfy Allowed Class 2 Secured Claims and Allowed Class 5 Bond Claims pursuant and subject to the treatment thereof as set forth in this Plan and the Confirmation Order; (iii) the Distribution Agent shall satisfy Allowed Class 3 General Unsecured Claims from the Confirmation Funds; and (iv) the Construction Defect Trust shall be deemed to have

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

assumed Debtor's obligations on account of Class 4 Construction Defect Claims, in each case including obligations (if any) on account of such Claims that are Disputed Claims or with respect to which any applicable period for asserting a Claim has not expired.

5.5 Corporate Actions.

(a) Adoption of Reorganized Debtor's Bylaws. On the Effective Date and without further order of the Bankruptcy Court or need for corporate approval, Reorganized Debtor's Bylaws shall supersede and replace all other corporate agreements and bylaws previously governing Debtor.

(b) Renaming Reorganized Debtor and Authority to Execute Operative Documents. The Confirmation Order shall, among other things, constitute an order authorizing the managers, officers and agents of Debtor and Reorganized Debtor to execute and deliver the Operative Documents, as applicable (to the extent they have not already been executed and delivered), including without limitation all documents necessary to, on or prior to the Effective Date, rename Reorganized Debtor, at the option and in the sole discretion of Reorganized Debtor, without requiring any further corporate authorizations and notwithstanding the requirements under any applicable non-bankruptcy law.

5.6 Exemption from Certain Transfer Taxes and Further Transactions. Pursuant to Bankruptcy Code section 1146(a), the issuance or exchange of any security, or the making or delivery of any instrument of transfer under, in furtherance, or in connection with this Plan, including, but not limited to, any deeds, bills of sale, assignments or other instruments of transfer, shall not be subject to any stamp tax, real estate transfer tax or similar tax.

5.7 Final Decree. Notwithstanding otherwise applicable law, Debtor shall not request entry of the Final Decree with respect to the Chapter 11 Case, unless and until:

(a) The New Capital Contribution has been disbursed to Reorganized Debtor and the Construction Defect Trustee to be distributed in accordance with this Plan and the TDP, as applicable, and the New Equity Interests have been issued in accordance with this Plan.

(b) All adversary proceedings and contested matters pending in the Chapter 11 Case have been resolved by entry of a Final Order.

(c) All Claims have either: (i) become Allowed Claims and been paid in accordance with the treatment to be given such Allowed Claims pursuant to this Plan; (ii) been disallowed by a

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Final Order or deemed to be a Disallowed Claim, in accordance with the terms of this Plan or the Bankruptcy Code; or (iii) been assumed by Reorganized Debtor.

(d) All Distributions to be made under this Plan shall have been made (i) to Holders of Allowed Claims in accordance with the requirements of this Plan by the Distribution Agent; and (ii) to Holders of Allowed Construction Defect Claims in accordance with the TDP by the Construction Defect Trust.

5.8 Effectuating Documents, Further Transactions. On and after the Effective Date, Debtor and its agents, officers and members, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan in the name of and on behalf of Debtor, as applicable, without the need for any approvals, authorizations or consents except for those expressly required pursuant to this Plan.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

5.9 Post Effective Date Fees and Expenses.

(a) From and after the Effective Date, the Distribution Agent shall pay all Post Effective Date Fees from the Post Effective Date Fee Fund without the necessity of any approval by the Bankruptcy Court.

(b) In the event, and to the extent, that there are not sufficient funds in the Post Effective Date Fee Fund from which to pay any of the Post Effective Date Fees, Reorganized Debtor shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay any Post Effective Date Fees which are not paid by the Distribution Agent from the Post Effective Date Fee Fund.

(c) In order to seek payment of Post Effective Date Fees, each respective Professional will send its invoice to Reorganized Debtor, the Distribution Agent, and the Administrative Agent for the Secured Lenders. Reorganized Debtor and the Secured Lenders shall have ten (10) Business Days thereafter within which to notify the other, the Professional, and the Distribution Agent in writing that it objects to payment of the invoice. If no objection is made within that time frame, Distribution Agent or Reorganized Debtor (as applicable) shall pay the invoice within thirty (30) days thereafter. In the event Reorganized Debtor or the Secured Lenders object(s) and the parties are unable

to resolve the objection, the Professional may bring the matter before the Bankruptcy Court for determination by motion after giving twenty-eight (28) days' notice to the objecting party(ies).

**ARTICLE VI**

**THE CONSTRUCTION DEFECT TRUST**

6.1 Creation of the Construction Defect Trust and Appointment of the Construction Defect Trustee.

(a) On the Effective Date, the Construction Defect Trust will be created pursuant to the Construction Defect Trust Declaration.

(b) The Construction Defect Trust shall be administered by the Construction Defect Trustee, who shall be James L. Moore, whose annual compensation shall be $100,000. Entry of the Confirmation Order shall constitute approval of the foregoing.

(c) The Construction Defect Trustee shall have all of the rights and powers, and shall perform all of the duties, conveyed upono him as set forth in this Plan and the Construction Defect Trust Declaration.

(d) On the Effective Date, the DIP Lender shall transfer to the Construction Defect Trust the Construction Defect Trust Contribution. If, but only if, the Holders of at least eighty percent (80%) in number of Class 4 Construction Defect Claims actually vote to accept the Plan, then within sixty (60) days of the Effective Date, the Cash Out Payment will be made to such Holders who made the Cash Out Election. The Remaining Construction Defect Trust Fund, a portion equal to sixty percent (60%) of which is earmarked to pay the reasonable costs and expenses associated with the administration of the Construction Defect Trust, including, but not limited to, reasonable costs and expenses to be incurred by the Construction Defect Trust in connection with the prosecution of Insurance Coverage Actions and Construction Defect Actions, will be used to pay Allowed Class 4 Construction Defect Claims allowed by the Construction Defect Trustee for those who did not make the Cash Out Election. DIP Lender shall not be reimbursed for such transfer and neither DIP Lender nor Reorganized Debtor shall have any further obligation to fund the Construction Defect Trust.

6.2 Property of the Construction Defect Trust. In addition to DIP Lender funding the Construction Defect Trust with the Construction Defect Trust Contribution pursuant to Section 6.1 of

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

this Plan, and notwithstanding any prohibition against assignability under applicable non-bankruptcy law, on the Effective Date, Reorganized Debtor shall be deemed to have automatically transferred to the Construction Defect Trust all of its right, title and interest in and to all of the Insurance Coverage Actions and Construction Defect Actions and the proceeds thereof, and any right, title or interest in pursuing and receiving any and all Insurance Recoveries. In accordance with Bankruptcy Code section 1141(c), on the Effective Date, the transfer of the Insurance Coverage Actions, Insurance Recoveries and Construction Defect Actions shall automatically vest in the Construction Defect Trust free and clear of, among other things, all Claims and Interests for the benefit of the Holders of Allowed Construction Defect Claims. Notwithstanding the foregoing, Reorganized Debtor reserves the right, in its sole discretion, to retain the Insurance Recoveries and pay the net proceeds of such recoveries (after the deduction of the reasonable and necessary unreimbursed costs and expenses associated with obtaining such proceeds) to the Construction Defect Trust if, after consultation with the Construction Defect Trustee, it is determined that such retention better preserves such assets.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

6.3 Purpose of the Construction Defect Trust. The Construction Defect Trust shall be established for the primary purpose of (a) liquidating its assets in accordance with Treas. Reg. § 301.7701-4(d) with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Construction Defect Trust, and (b) liquidating, resolving, paying and satisfying all Construction Defect Claims pursuant to claims liquidation procedures established by the Construction Defect Trustee, after consultation with and approval by the Construction Defect Trust Advisory Board. Accordingly, the Construction Defect Trustee shall, in an expeditious but orderly manner, disburse the Cash Out Payments to Holders of Construction Defect Claims who make the Cash Out Election, liquidate and convert to Cash the Insurance Coverage Actions, Insurance Recoveries and Construction Defect Actions, make timely distributions to the other Holders of Allowed Construction Defect Claims of Cash and property, and not unduly prolong the duration of the Construction Defect Trust. The Construction Defect Trustee shall not be deemed a successor-in-interest of Debtor or Reorganized Debtor for any purpose other than as specifically set forth herein or in the Construction Defect Trust Declaration. The Construction Defect Trust is intended to qualify and shall be treated as a "qualified

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 27 of 76

settlement fund" within the meaning of Treas. Reg. § 1.468B-1, and the Construction Defect Trustee shall be the "administrator" of the Construction Defect Trust pursuant to Treas. Reg. § 1.468B-2(k)(3). No election shall be made to treat the Construction Defect Trust as a grantor trust for U.S. federal income tax purposes. Accordingly, the Construction Defect Trust shall be treated as a taxable entity for federal income tax purposes.

6.4 Powers of the Construction Defect Trustee. The Construction Defect Trustee shall have the power to administer the assets of the Construction Defect Trust in a manner consistent with the Construction Defect Trust Declaration, and the Construction Defect Trustee, in consultation with the Construction Defect Trust Advisory Board, shall be the Estate representative and the representative of the Construction Defect Trust's beneficiaries designated to prosecute any and all Insurance Coverage Actions and Construction Defect Actions transferred to the Construction Defect Trust, and to object to and resolve objections to Construction Defect Claims pursuant to the claims liquidation procedures established by the Construction Defect Trustee, after consultation with and approval by the Construction Defect Trust Advisory Board. Without limiting the generality of the foregoing, the Construction Defect Trustee shall (a) hold, administer and prosecute the assets of the Construction Defect Trust and any proceeds thereof; (b) have the power and authority to retain, as an expense of the Construction Defect Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Construction Defect Trustee hereunder or in the Construction Defect Trust Declaration and the TDP; (c) object to Construction Defect Claims and prosecute and resolve such objections; (d) otherwise resolve all Construction Defect Claims; (e) make Distributions as provided in the Construction Defect Trust Declaration; and (f) provide periodic reports and updates regarding the status of the administration of the Construction Defect Trust. The Construction Defect Trustee shall be deemed a Distribution Agent under the Plan when making distributions to Holders of Construction Defect Trust Interests pursuant to and as defined in the Construction Defect Trust Declaration. Further, the Construction Defect Trustee shall be deemed the Distribution Agent in Article VIII with respect to the filing, prosecution and resolution of objections to Construction Defect Claims.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

6.5 Construction Defect Trust Advisory Board. On the Effective Date, the Construction Defect Trust Advisory Board shall be created pursuant to the Construction Defect Trust Declaration. The initial members of the Construction Defect Trust Advisory Board shall be David N. Keys for a five year term, Lance W. Johns for a four-year term and Jerry McGuire for a three-year term. The Construction Defect Trust Advisory Board shall consult with and advise the Construction Defect Trustee regarding the administration of the Construction Defect Trust and the liquidation and resolution of Construction Defect Claims in accordance with the provisions of this Plan and the Construction Defect Trust Declaration.

6.6 Cooperation Between Construction Defect Trustee and Disbursing Agent

(a) The right to control the Insurance Coverage Actions, Insurance Recoveries and the Construction Defect Actions, including negotiations relating thereto and settlements thereof, shall be vested in the Construction Defect Trust on and after the Effective Date. Notwithstanding the foregoing, to enable the Construction Defect Trustee to perform his duties under the Construction Defect Trust Declaration and the Plan, Reorganized Debtor shall cooperate with the Construction Defect Trustee in pursuing the Insurance Coverage Actions, Insurance Recoveries and the Construction Defect Actions, and shall provide the representatives of the Construction Defect Trust with reasonable access to personnel and books and records of Debtor and/or Reorganized Debtor relating to the Insurance Coverage Actions, Insurance Recoveries and the Construction Defect Actions. Reorganized Debtor shall provide the Construction Defect Trust with advance notice of any proposed disposition of any books and records relating to the Insurance Coverage Actions, Insurance Recoveries and the Construction Defect Actions and a reasonable opportunity for the Construction Defect Trust to segregate and remove such books and records as the Construction Defect Trust may select. The Construction Defect Trustee and the Disbursing Agent shall consult and cooperate reasonably in the performance of their duties under the Plan.

(b) If the Construction Defect Trust obtains from Reorganized Debtor or its representatives any documents or communications (whether electronic, written or oral) to which any privilege attaches, the Construction Defect Trust shall be deemed the privilege holder for purposes of fulfilling the Construction Defect Trust obligations and preserving the privilege, shall be required to

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 29 of 76

take all reasonable steps to maintain any such privilege and may not waive any such privilege without the consent of Reorganized Debtor, which consent shall not be unreasonably withheld. Any disputes between the Construction Defect Trust and Reorganized Debtor regarding the production of any documents or communications or the waiver of any privileges shall be decided by the Bankruptcy Court. In the event that any third party challenges any such privilege, Reorganized Debtor or the Construction Defect Trustee may seek protection from a court of competent jurisdiction.

(c) Reorganized Debtor shall cooperate with the Construction Defect Trust and use commercially reasonable efforts to take or cause to be taken all appropriate actions and to do or cause to be done all things necessary or appropriate to effectuate all transfers and assignments identified herein to the Construction Defect Trust. Reorganized Debtor shall, without limitation, (i) provide the Construction Defect Trust with copies of insurance policies and settlement agreements, if any, included within or relating to any Construction Defect Claims; (ii) provide the Construction Defect Trust with information necessary or helpful to the Construction Defect Trust in connection with its efforts to obtain insurance coverage for the Construction Defect Claims as well as the Insurance Recoveries; (iii) execute assignments or allow the Construction Defect Trust to pursue claims in its own name with respect to Construction Defect Claims (subject to appropriate disclosure of the fact that the Construction Defect Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings or litigation, to the extent necessary or helpful to the efforts of the Construction Defect Trust to obtain insurance coverage for the Construction Defect Claims as well as the Insurance Recoveries; and (iv) at the sole cost and expense of the Construction Defect Trust, pursue and recover insurance coverage for the Construction Defect Claims, including the Insurance Recoveries, in its own name or right to the extent that any or all of the transfers, assumptions and assignments of the Insurance Coverage Actions, Insurance Recoveries and Construction Defect Actions provided for herein are not able to be fully effectuated, with any and all recoveries therefrom to be transferred to the Construction Defect Trust.

6.7 Assumption of Liabilities by the Construction Defect Trust. Upon the occurrence of the Effective Date, in exchange for the consideration provided for herein, the Construction Defect Trust shall be deemed, without need for further action, to have assumed responsibility and liability for all

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Construction Defect Claims. The Construction Defect Trust shall have no recourse, claims, causes of action or right to recovery against Reorganized Debtor on account of the Construction Defect Claims.

6.8 Termination of the Construction Defect Trust. The Construction Defect Trust shall exist for an initial term of five (5) years following the Effective Date (subject to extension under certain circumstances). On or prior to the date of termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Construction Defect Trust for a finite period, if such an extension is necessary to liquidate the assets of the Construction Defect Trust or for other good cause. Multiple extensions of the termination of the Construction Defect Trust may be obtained so long as Bankruptcy Court approval is obtained prior to the expiration of each extended term and the Construction Defect Trustee receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Construction Defect Trust as a qualified settlement fund for federal income tax purposes. Notwithstanding the foregoing or any other provision of the Plan or the Construction Defect Trust Declaration, the Construction Defect Trustee may make distributions of Cash and property held by the Construction Defect Trust to the Holders of Allowed Construction Defect Claims at such times as the Construction Defect Trustee, after consultation with the Construction Defect Trust Advisory Board, shall determine, in its discretion, and in accordance with the TDP.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

## ARTICLE VII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

7.1 Allowance of Claims. After the Effective Date, Reorganized Debtor shall have and retain any and all rights and defenses Debtor had with respect to any Claim or Interest immediately prior to the Effective Date, except with respect to any Claims deemed Allowed under the Plan, any Construction Defect Claims, and any applications for allowance of compensation and reimbursement of expenses under Bankruptcy Code sections 330, 331 and/or 503. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Case allowing such Claim. No Construction

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Defect Claim shall become an Allowed Construction Defect Claim (i) unless the Holder makes the Cash Out Election, or (ii) until Allowed by the Construction Defect Trustee after consultation with the Construction Defect Trust Advisory Board. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

7.2 Claims Administration Responsibilities. Except as otherwise specifically provided in the Plan, after the Effective Date, Reorganized Debtor shall have the sole authority: (1) to File, withdraw or litigate to judgment any objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to, or action, order or approval by, the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order or approval by, the Bankruptcy Court.

7.3 Claim Objection Deadline. As soon as practicable, but in no event later than thirty (30) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of Reorganized Debtor without notice or a hearing), objections to Claims shall be Filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made. Notwithstanding anything to the contrary in this Plan, Construction Defect Claims shall be liquidated, resolved, paid and satisfied by the Construction Defect Trust, rather than by objection in the Bankruptcy Court, unless the Construction Defect Trustee Files an objection to any Construction Defect Claim in the Bankruptcy Court within thirty (30) days after the Effective Date.

7.4 Contingent Claims. Until such time as a Contingent Claim or a contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to Distributions under the Plan. The Holder of a Contingent Claim will only be entitled to a Distribution under the Plan when and if such Contingent Claim becomes an Allowed Claim.

7.5 Estimation of Claims. Debtor or Reorganized Debtor shall be permitted, at any time, to request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code section 502(c), regardless of whether Debtor previously had objected to such Claim or whether the Bankruptcy Court had ruled on such objection, and the Bankruptcy Court shall retain

jurisdiction to estimate any Claim at any time during any litigation concerning any objection to such Claim, including during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on the amount of such Claim, Debtor may elect to pursue any supplemental proceedings to object to the allowance of such Claim.

7.6 Payments. Payments and Distributions to each Holder of a Disputed Claim that ultimately becomes an Allowed Claim shall be made in accordance with the provision of this Plan with respect to the Class of Claims to which the Allowed Claim of such Holder belongs.

ARTICLE VIII

**PROVISIONS CONCERNING PLAN DISTRIBUTIONS**

8.1 Distributions on Account of Claims Allowed as of the Effective Date. Distributions under this Plan on account of Claims, other than General Unsecured Claims and Construction Defect Claims for which no Cash Out Election is made, Allowed on or before the Effective Date, shall be made on the Effective Date, or on the first date thereafter as is reasonably practicable.

8.2 Distributions on Account of Claims Allowed After the Effective Date.

(a) Payments and Distributions on Disputed Administrative and Other Priority Claims. Except as otherwise provided in this Plan, or any Final Order in the Chapter 11 Case, any Disputed Administrative Claim or Disputed Priority Claim that becomes Allowed after the Effective Date shall be satisfied from the Confirmation Funds or, to the extent there are no available Confirmation Funds from which to pay such Claim, the obligation to satisfy such Claims will be assumed by Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice.

(b) Special Rules for Distributions to Holders of General Unsecured Claims. After adequately reserving for each Disputed Claim in Class 3, an initial Distribution on account of Allowed General Unsecured Claims shall be made on the Effective Date. Additional Distributions on account of General Unsecured Claims, even if Allowed, shall not be made until all objections to Disputed General

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Unsecured Claims have been resolved by settlement or Final Order and the Claims have been Allowed or Disallowed, as the case may be, which shall, in no event, be later than one hundred twenty (120) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of Reorganized Debtor without notice or a hearing).

(c) Special Rules for Distributions to Holders of Disputed Claims. Except as otherwise provided in this Plan and except as otherwise agreed by the relevant parties: (i) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order, and (ii) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on account of the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and such Disputed Claim has been Allowed or Disallowed, as the case may be.

(d) Special Rules for Distributions to Holders of Allowed Construction Defect Claims. Distributions to Holders of Allowed Construction Defect Claims for which no Cash Out Election was made shall be made pursuant to the TDP by the Construction Defect Trustee.

8.3 Manner of Payment Under this Plan. Distributions of Cash to be made by the Distribution Agent pursuant to this Plan shall be made, at the discretion of the Distribution Agent, by check drawn on the Distribution Agent's bank account or by wire transfer from a domestic bank.

8.4 Whole Dollars. Any other provision of this Plan to the contrary notwithstanding, no payments of cents will be made in connection with a Distribution. Whenever any payment of cents would otherwise be called for, the actual payment may reflect a rounding of such fraction to the nearest whole dollar (up or down).

8.5 [reserved]

8.6 Stop Payment. Holders of Allowed Claims, except for Allowed Construction Defect Claims, shall have ninety (90) days from the check date to negotiate Distribution checks issued by the Distribution Agent under the terms of this Plan, otherwise payment on such checks may at the Distribution Agent's sole discretion be stopped and the funds shall be returned to the Distribution Agent

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

and shall be promptly distributed to Reorganized Debtor. The Construction Defect Trust and TDP govern these issues as they pertain to Construction Defect Claims.

8.7 Delivery of Distributions.

(a) Record Date for Distributions. On the Distribution Record Date, the Claims Register shall be closed and any Person responsible for making Distributions shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make Distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b) Distribution Agent. The Distribution Agent shall make all Distributions required under this Plan, whereas the Construction Defect Trustee shall make all distributions under the Construction Defect Trust Declaration pursuant to the TDP or the Cash Out Election, as the case may be.

(c) Delivery of Distributions in General. Except as otherwise provided in this Plan, and notwithstanding any authority to the contrary, Distributions to all Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if Debtor has been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to Debtor after the date of any related Proof of Claim; (d) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Case on the Holder's behalf. Except as otherwise provided in this Plan, Distributions under this Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the Distributions in the manner set forth in this Plan. Absent willful misconduct or gross negligence,

Debtor, Reorganized Debtor and Distribution Agent, as applicable, shall not incur any liability on account of any Distributions made under this Plan.

8.8 Returned Distributions. In the case of Distributions to the Holders of Allowed Claims that are returned to the Distribution Agent due to an incorrect or incomplete address, the Distribution Agent shall retain any such returned Distribution in a segregated account established by the Distribution Agent to keep track of any returned Distributions. Unless the Holder of the Allowed Claim relating to any such returned Distribution contacts the Distribution Agent (or its designee) within three (3) months from the date on which such Distribution was returned and provides the Distribution Agent (or its designee) with acceptable proof of identity and an accurate address, such Holder shall forfeit all rights thereto, and to any and all future Distributions or rights under this Plan. In such event, the Claim for which such Distributions were issued shall be treated as a Disallowed Claim and the Distribution on account of such Disallowed Claim shall promptly be distributed to Reorganized Debtor.

8.9 Disputed Distributions. In the event of any dispute between or among Holders of Claims as to the right of any Holder of a Claim to receive or retain any Distribution to be made to such Holder under this Plan, the Distribution Agent, in lieu of making such Distribution to such Holder, may make it instead into an escrow account for payment as ordered by the Bankruptcy Court or as the interested parties to such dispute may otherwise agree among themselves. Any such Holder who fails to raise such dispute by filing an appropriate request for relief with the Bankruptcy Court prior to the issuance of such disputed Distribution by the Distribution Agent shall be deemed to have forever waived any right to dispute such Distribution or to enjoin, impair or otherwise restrict the use of any such Distribution.

8.10 Setoffs. The Distribution Agent may, but shall not be required to, set-off against any Distributions to be made pursuant to this Plan to a Holder of an Allowed Claim, Claims of any nature whatsoever that Debtor may have, or may have had, against such Holder that have not been previously released, but neither the failure to do so, nor the allowance of any Claim held by such Holder, shall constitute a waiver or release by the Distribution Agent of any such Claim Debtor may have, or may have had, against such Holder. Nothing in this Plan shall affect the right of the Internal Revenue Service to assert setoff and recoupment rights, or impair the ability of the Internal Revenue Service to

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 36 of 76

collect interest on its Administrative Claims in accordance with applicable non-bankruptcy law, and such rights are expressly reserved.

8.11 Withholding Taxes. The Distribution Agent shall be entitled to deduct any applicable federal or state withholding taxes from any payments made with respect to Allowed Claims, as appropriate, and shall otherwise comply with Bankruptcy Code section 346.

8.12 Allocation of Distributions. Distributions on account of Allowed Claims shall, for tax purposes, be treated as allocated first to principal, and thereafter to interest only to the extent that the entire principal amount has been recovered, if applicable.

## ARTICLE IX

## RESERVATION OF RIGHTS PENDING CONFIRMATION AND EFFECTIVE DATE

9.1 Withdrawal of Plan; Rights if Plan Not Confirmed or Effective Date Does Not Occur. Subject to the Lock-Up and Settlement Letter Agreement, Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If Debtor revokes or withdraws this Plan, or if the Effective Date does not occur on or before June 1, 2013, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts affected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims or Interests by or against Debtor or any Person or Entity; (b) prejudice in any manner the rights of Debtor or any other Person or Entity in any further proceedings involving Debtor; or (c) constitute an admission, acknowledgment, offer or undertaking of any sort by Debtor or any other Person or Entity.

9.2 No Admissions or Waiver. Without limiting the generality of any similar provision in this Plan, notwithstanding anything in the Plan to the contrary, nothing contained in the Plan or in the Disclosure Statement shall be deemed an admission by Debtor or any Person or Entity with respect to any matter set forth herein. If the Effective Date does not occur on or before June 1, 2013, no statement contained in the Plan or in the Disclosure Statement may be used or relied on in any manner in any suit, action, proceeding or controversy within or outside of the Chapter 11 Case against Debtor. Without in

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 37 of 76

any way limiting the provisions set forth in Section 9.1, Debtor reserves any and all of its rights as against all Persons and Entities in the event the Effective Date does not occur on or before June 1, 2013.

9.3 Term of Bankruptcy Injunction or Stays. All injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date unless the Bankruptcy Court shall order otherwise, provided however that the injunction under Bankruptcy Code section 105 that channels all liability for Construction Defect Claims to the Construction Defect Trust shall remain in full force and effect in perpetuity.

## ARTICLE X

## CONDITIONS TO EFFECTIVE DATE

10.1 Conditions to Occurrence of Effective Date. Each of the following is a condition precedent to the occurrence of the Effective Date, unless waived in writing by Debtor:

(a) [reserved];

(b) The Confirmation Order, which shall be in form and substance reasonably acceptable to Debtor, shall have been entered by the Bankruptcy Court and shall have become a Final Order, and provide, among other things, that: (i) Debtor, Reorganized Debtor, the Secured Lenders and the DIP Lender have acted in good faith; (ii) the Distributions and/or consideration received by the DIP Lender and Reorganized Debtor shall not be subject to avoidance, turnover or disgorgement in any subsequent insolvency proceeding by any Person or Entity; and (iii) the Liens securing the New Secured Loan constitute valid first priority Liens, subject only to any Permitted Encumbrances, and shall not be subject to avoidance, turnover or disgorgement in any subsequent insolvency proceeding by any Person or Entity;

(c) Debtor shall have timely sent the Notice of Confirmation;

(d) The Disclosure Statement Order shall have been entered by the Bankruptcy Court and shall have become a Final Order;

(e) The Bar Date shall have passed;

(f) The Construction Defect Trust Declaration shall have been executed and delivered;

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

(g) The Construction Defect Trust Contribution and the Construction Defect Actions shall have been transferred to the Construction Defect Trust;

(h) The New Capital Contribution shall have been fully funded and paid to Reorganized Debtor and the Construction Defect Trust, respectively, in an amount which sufficiently provides for the required amount of Confirmation Funds, working capital and other Cash needs, including the amounts to fund the Construction Defect Trust Contribution;

(i) The required amount of Confirmation Funds shall have been paid and turned over to the Distribution Agent for Distribution in accordance with this Plan;

(j) The Confirmation Order shall have authorized the assumption of all Assumed Contracts;

(k) To the extent Confirmation Funds are insufficient to satisfy the Allowed Administrative Claims and Allowed Other Priority Claims in full, Reorganized Debtor shall have assumed or paid the remaining amounts unless otherwise agreed by the Holder of such Allowed Administrative Claim and Allowed Other Priority Claim;

(l) All conditions precedent to the closing of the New Secured Loan Documents shall have been satisfied or waived in accordance with the terms thereof;

(m) Any outstanding US Trustee Fees shall have been paid in full; and

(n) Issuance of the channeling injunction contained in Section 12.5(d).

10.2 Notice of Effectiveness. When all the conditions contained in Section 10.1 have been completed, Debtor shall File with the Bankruptcy Court and serve upon all Creditors and all potential Holders of Administrative Claims known to Debtor (whether or not disputed), a notice of the occurrence of the Effective Date of the Plan. Such notice shall include notice of the Administrative Claim Bar Date.

## ARTICLE XI

## RETENTION OF JURISDICTION

11.1 Retention of Jurisdiction. Except to the extent otherwise expressly set forth herein, the Bankruptcy Court shall retain jurisdiction of the Chapter 11 Case following the Confirmation Date for the following purposes, it being expressly intended that such retention of jurisdiction shall in all cases

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

hereafter set forth, extend to any actions or proceedings commenced prior or subsequent to the Confirmation Date and/or the Effective Date whether by Debtor, Reorganized Debtor or the parties specified herein:

(a) To hear and determine any objections to the allowance of Claims or Construction Defect Claims, including any objections by Reorganized Debtor with respect to any Claims which have been reinstated or assumed in accordance with the terms of this Plan;

(b) To determine any and all applications for compensation for any Professionals and similar fees to the extent made specifically subject to a hearing under this Plan and applicable provisions of the Bankruptcy Code;

(c) To determine any and all applications for the rejection or assumption and assignment of Executory Contracts to which Debtor is a party or with respect to which it may be liable, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom;

(d) To modify this Plan pursuant to Bankruptcy Code section 1127 or to remedy any defect or omission or reconcile any inconsistency in the Confirmation Order to the extent authorized by the Bankruptcy Code;

(e) To hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of this Plan;

(f) To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of the Bankruptcy Court entered in the Chapter 11 Case;

(g) To adjudicate all controversies concerning the classification of any Claim or Interest;

(h) To liquidate or estimate damages in connection with any disputed, contingent or unliquidated Claim;

(i) To adjudicate all Claims to a security or ownership interest in any of the Assets, or in any proceeds thereof,

(j) To adjudicate all Claims or controversies arising out of any purchases, sales or contracts made or undertaken by Debtor;

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

(k) To determine all questions and disputes regarding recovery of, and entitlement to, any property of Debtor, or in any proceeds thereof;

(l) To adjudicate all Causes of Action with respect to which Debtor or Reorganized Debtor is a party, whether or not such Claim or controversy is raised or filed before or after the Effective Date;

(m) To determine issues and disputes concerning entitlement to Distributions to be made under and pursuant to this Plan;

(n) To enter any order, including injunctions, necessary to enforce the title, rights and powers of Debtor or Reorganized Debtor or the rights of any Person or Entity hereunder and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary or appropriate;

(o) To determine such other matters as may be provided for in the Confirmation Order and this Plan, or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(p) To enter a Final Decree closing the Chapter 11 Case;

(q) To enforce the provisions of any Administrative Claim Bar Date order entered by the Bankruptcy Court;

(r) To make such orders as are necessary or appropriate to carry out the provisions of this Plan, including but not limited to orders interpreting, clarifying or enforcing the provisions hereof;

(s) Without limiting the generality of any of the foregoing, to hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 345, 505 and 1146;

(t) To hear and determine all issues, if any, as may arise in connection or related to the channeling injunction in Section 12.5(d); and

(u) To hear and determine all issues referred to the Bankruptcy Court by the Construction Defect Trust and/or the TDP.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

11.2 Jurisdiction Unaffected. The occurrence of the Effective Date and/or the entry of a Final Decree shall not divest the Bankruptcy Court of any jurisdiction otherwise retained under this Article XI or the Confirmation Order.

11.3 Failure or Inability of Bankruptcy Court to Exercise Jurisdiction. If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter arising under, arising in or related to the Chapter 11 Case, including any of the matters set forth in the Plan, the Plan shall not prohibit or limit the exercise of jurisdiction by any other court of competent jurisdiction with respect to such matter.

11.4 New Secured Loan Documents. Any issues or disputes with respect to the New Secured Loan Documents arising after the Effective Date may be resolved pursuant to the applicable provisions thereof.

11.5 Term Loan. Notwithstanding anything contained in this Plan, nothing herein shall confer on the Bankruptcy Court jurisdiction to hear or determine any claims, causes of action or disputes arising under or in connection with the Term Loan or the Term Loan Documents, as they may be amended from time to time.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

## ARTICLE XII

## EFFECT OF CONFIRMATION OF PLAN

12.1 Discharge.

(a) IN CONJUNCTION WITH BANKRUPTCY CODE SECTION 1141, EXCEPT AS OTHERWISE PROVIDED FOR HEREIN, THE RIGHTS AFFORDED HEREIN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION, DISCHARGE AND RELEASE OF CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER AGAINST DEBTOR, AND OF THE ASSETS OF THE ESTATE, INCLUDING ANY INTEREST ACCRUED ON SUCH CLAIMS FROM AND AFTER THE PETITION DATE.

(b) WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS PROVIDED IN THE CONFIRMATION ORDER, CONFIRMATION DISCHARGES DEBTOR AND REORGANIZED DEBTOR FROM ALL CLAIMS OR OTHER DEBTS THAT AROSE

BEFORE THE EFFECTIVE DATE, AND ALL DEBTS OF THE KIND SPECIFIED IN BANKRUPTCY CODE SECTIONS 502(g), 502(h) OR 502(i), WHETHER OR NOT: (X) A PROOF OF CLAIM BASED ON SUCH A DEBT HAS BEEN FILED, OR DEEMED TO HAVE BEEN FILED, UNDER BANKRUPTCY CODE SECTIONS 501 OR 1111(a); (Y) A CLAIM BASED ON SUCH DEBT IS ALLOWED UNDER BANKRUPTCY CODE SECTION 502; OR (Z) THE HOLDER OF A CLAIM BASED ON SUCH DEBT HAS ACCEPTED THE PLAN.

(c) EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, (I) ON THE EFFECTIVE DATE, ALL CLAIMS AGAINST DEBTOR WHICH AROSE BEFORE THE EFFECTIVE DATE SHALL BE SATISFIED, DISCHARGED AND RELEASED IN FULL, (II) ON THE EFFECTIVE DATE, THE RIGHTS AND INTERESTS OF ALL HOLDERS OF OLD EQUITY INTERESTS SHALL BE TERMINATED, CANCELED AND BE OF NO FORCE AND EFFECT, AND (III) ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST DEBTOR, REORGANIZED DEBTOR, ITS SUCCESSORS, OR ANY OF ITS ASSETS, ANY OTHER OR FURTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE, AS WELL AS ANY DEBT OF A KIND SPECIFIED IN BANKRUPTCY CODE SECTIONS 502(g), 502(h) OR 502(i), IRRESPECTIVE OF WHETHER (X) A PROOF OF CLAIM BASED ON SUCH A DEBT HAS BEEN FILED, OR DEEMED TO HAVE BEEN FILED, UNDER BANKRUPTCY CODE SECTIONS 501 OR 1111(a), (Y) SUCH CLAIM IS ALLOWED UNDER BANKRUPTCY CODE SECTION 502, OR (Z) THE HOLDER OF THE CLAIM HAS ACCEPTED THE PLAN.

(d) Nothing contained in (a)-(c) above shall discharge any claim of the Internal Revenue Service of the type described in section 1141(d)(6) of the Bankruptcy Code.

12.2 Binding Effect of Plan/Injunction.

(a) UPON THE EFFECTIVE DATE, BANKRUPTCY CODE SECTION 1141 SHALL BECOME APPLICABLE WITH RESPECT TO THE PLAN AND THE PLAN SHALL BE BINDING ON ALL PARTIES TO THE FULLEST EXTENT PERMITTED BY BANKRUPTCY CODE SECTION 1141(a). IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1141, ALL

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

OF DEBTOR'S ASSETS, EXCEPT SUCH ASSETS BEING TRANSFERRED TO THE CONSTRUCTION DEFECT TRUST ON THE EFFECTIVE DATE PURSUANT TO THE TERMS OF THIS PLAN, SHALL BE VESTED IN REORGANIZED DEBTOR FREE AND CLEAR OF ALL CLAIMS, LIENS AND INTERESTS OF CREDITORS AND EQUITY INTEREST HOLDERS, EXCEPT FOR THE LIENS GRANTED TO THE SECURED LENDERS HEREUNDER AND PURSUANT TO THE TERMS OF THE NEW SECURED LOAN DOCUMENTS.

(b) UPON THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES SHALL BE PERMANENTLY ENJOINED BY THE PLAN FROM (I) COMMENCING OR CONTINUING ANY ACTION, EMPLOYING ANY PROCESS, ASSERTING OR UNDERTAKING AN ACT TO COLLECT, RECOVER, OR OFFSET, DIRECTLY OR INDIRECTLY, ANY CLAIM, RIGHTS, CAUSES OF ACTION, LIABILITIES OR INTERESTS IN OR AGAINST ANY ASSETS DISTRIBUTED OR TO BE DISTRIBUTED UNDER THE PLAN, OR VESTED IN REORGANIZED DEBTOR, BASED UPON ANY ACT, OMISSION, TRANSACTION OR OTHER ACTIVITY THAT OCCURRED BEFORE THE EFFECTIVE DATE, (II) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST ANY ASSETS DISTRIBUTED OR TO BE DISTRIBUTED UNDER THE PLAN OTHER THAN AS PERMITTED UNDER THE PLAN AND UNDER THE NEW SECURED LOAN DOCUMENTS, AND (III) WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ASSERTING ANY CLAIMS AGAINST REORGANIZED DEBTOR BASED ON SUCCESSOR LIABILITY OR SIMILAR OR RELATED THEORY, EXCEPT TO THE EXTENT A PERSON OR ENTITY HOLDS AN ALLOWED CLAIM UNDER THE PLAN AND IS ENTITLED TO A DISTRIBUTION AND/OR LIEN UNDER THE PLAN IN ACCORDANCE WITH ITS TERMS, AND TO ENFORCE ITS RIGHTS TO SUCH DISTRIBUTION AND/OR LIEN UNDER THE PLAN.

(c) ON AND AFTER THE EFFECTIVE DATE, EACH HOLDER OF ANY CLAIM AGAINST OR INTEREST IN DEBTOR IS PERMANENTLY ENJOINED FROM TAKING OR PARTICIPATING IN *ANY* ACTION THAT WOULD INTERFERE OR OTHERWISE HINDER DEBTOR OR REORGANIZED DEBTOR FROM IMPLEMENTING THIS PLAN, THE

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

CONFIRMATION ORDER OR ANY OPERATIVE DOCUMENTS IN ACCORDANCE WITH THE TERMS THEREOF.

12.3 Exculpation. None of the Exculpated Parties shall have or incur any liability to any Holder of a Claim against or Interest in Debtor, or any other party-in-interest, or any of their successors or assigns, for any act, omission, transaction or other occurrence in connection with, relating to, or arising out of the Chapter 11 Case, the pursuit of confirmation of this Plan, or the Consummation of this Plan, except and solely to the extent such liability is based on fraud, gross negligence or willful misconduct. The Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to any of their duties and responsibilities under this Plan or in the context of the Chapter 11 Case. No Holder of a Claim against or Interest in Debtor, or any other party-in-interest, shall have any right of action against the Exculpated Parties, for any act, omission, transaction or other occurrence in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of this Plan, the Consummation of this Plan or the administration of this Plan, except to the extent arising from fraud. The Reorganized Debtor shall indemnify the Futures Representative for any liability that the Futures Representative incurs as a result of the performance of his duties in such capacity, except and solely to the extent such liability is based on fraud, gross negligence or willful misconduct.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

12.4 Releases.

(a) RELEASES BY DEBTOR AND ESTATE. EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, DEBTOR, IN ITS INDIVIDUAL CAPACITY AND AS DEBTOR-IN-POSSESSION, AS THE CASE MAY BE, DEBTOR'S ESTATE, AND EACH OF ITS RELATED PERSONS (COLLECTIVELY, THE "RELEASING PARTIES") SHALL, AND SHALL BE DEEMED TO, COMPLETELY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASE, WAIVE, VOID, EXTINGUISH AND DISCHARGE EACH AND ALL OF THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE RELEASING PARTIES) AND EACH RELEASED

PARTY'S RESPECTIVE ASSETS AND RELATED PERSONS, OF AND FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LITIGATION CLAIMS, AVOIDANCE ACTIONS AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, JUDGMENTS AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO DEBTOR, REORGANIZED DEBTOR OR THEIR RESPECTIVE ASSETS AND ESTATE, THE CHAPTER 11 CASE, THE DISCLOSURE STATEMENT, THIS PLAN OR THE SOLICITATION OF VOTES ON THIS PLAN THAT SUCH RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF DEBTOR OR ITS ESTATE (WHETHER DIRECTLY OR DERIVATIVELY) AGAINST ANY OF THE RELEASED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THIS PLAN; (II) ANY CAUSES OF ACTION ARISING FROM ACTUAL OR INTENTIONAL FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY FINAL ORDER OF THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION; AND/OR (III) THE RIGHTS OF SUCH RELEASING PARTY TO ENFORCE THIS PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THIS PLAN OR ASSUMED PURSUANT TO THIS PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT. THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON.

(b) Releases by Holders of Claims and Interests. Effective as of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Holder of a Claim or Equity Interest that has indicated, via voting to accept the Plan, its agreement to grant the release contained in this Section 12.4, including all Holders of Construction Defect Claims for whom the Futures Representative casts a Ballot, shall, and shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, void, extinguish and discharge the Released Parties, other than the Futures Representative with respect to any Ballot cast by the Futures Representative, from any and all Claims, Causes of Action, Avoidance Actions and any other obligations, rights, suits, damages, judgments, debts, remedies and liabilities whatsoever, including any Claims or Causes of Action that could be asserted on behalf of or against Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such Holder of a Claim or Equity Interest would have been legally entitled to assert in its own right (whether individually, derivatively or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, in any way relating or pertaining to (w) the purchase or sale, or the rescission of a purchase or sale, of any security of Debtor, (x) Debtor, Reorganized Debtor or their respective assets, property and Estate, (y) the Chapter 11 Case, and (z) the negotiation, formulation and preparation of the Plan, the Disclosure Statement, or any related agreements, instruments or other documents; provided, however, that these releases will have no effect on the liability of any Released Party arising from any act, omission, transaction, agreement, event or other occurrence constituting willful misconduct, gross negligence, fraud or criminal conduct as determined by a Final Order or a final order of a court of competent jurisdiction other than the Bankruptcy Court; provided further, however, the foregoing shall not constitute a waiver or release of any right of the Holder of an Allowed Claim or Equity Interest, or party to an Assumed Contract to payment under this Plan or otherwise on account of such Allowed Claim or any of the rights of any parties in respect of Assumed Contracts under or in connection with this Plan or prior order of the

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Bankruptcy Court; provided further, however, that nothing in the Plan or any order confirming the Plan shall release, waive, void, extinguish, discharge, modify, alter or limit in any way (i) any and all obligations, debts and liabilities of any non-Debtor Person or Entity to the Secured Lenders, or (ii) any and all rights and remedies held by the Secured Lenders against any non-Debtor Person or Entity or their respective assets; provided further, however, that nothing in the Plan shall enjoin, alter, diminish or impair the rights of the Construction Defect Trust with respect to any Insurance Recovery, any Insurance Coverage Action, or any Construction Defect Action, with the Construction Defect Trust being, and deemed to be, for all purposes of insurance and indemnity, the successor Debtor in respect of all Construction Defect Claims and all Insurance Recoveries.

(c) Cash Out Release. The Cash Out Release shall take effect and become binding as to any Holder of a Construction Defect Claim who makes the Cash Out Election immediately upon receipt of the Cash Out Payment without any further action or approval.

(d) Binding Effect of Releases. The Releases set forth in this Article XII shall be binding upon and shall inure to the benefit of any chapter 7 trustee in the event the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code.

12.5 Injunctions.

(a) Injunction Against Releasors. All of the Releasors, along with any of their successors or assigns, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Released Parties in respect of any Released Liabilities, (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Released Parties in respect of any Released Liabilities, (iii) creating, perfecting or enforcing any encumbrance of any kind against the Released Parties or their respective assets in respect of any Released Liabilities, or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Released Parties or against the property or interests in property of the Released Parties, in respect of any Released Liabilities; provided, however, that nothing contained herein shall preclude such Releasors from exercising their rights pursuant to and consistent with the terms hereof and the contracts, instruments, releases and other agreements and documents delivered under or in connection with this Plan; provided,

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

further, that nothing contained herein shall be deemed to enjoin any Releasor from taking any action against any Released Party based on the release exceptions contained in Section 12.4 of this Plan.

(b) [reserve].

(c) Injunction Against Interference with Plan. Upon the Effective Date, all Holders of Claims against or Interests in Debtor and its Related Persons and any of its successors or assigns shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.

(d) Injunction Channeling Construction Defect Claims. Upon the Effective Date, pursuant to Bankruptcy Code section 105, all Persons and Entities shall be permanently and forever stayed, restrained and enjoined from taking any of the following actions against or affecting Reorganized Debtor, Debtor , the Estate, the Assets, the Distribution Agent, the Professionals and their respective assets and property for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Construction Defect Claims, regardless of when such Claims are deemed to arise, all of which will be channeled to the Construction Defect Trust, including, but not limited to:

(1) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including a judicial, arbitral, administrative or other proceeding);

(2) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;

(3) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance;

(4) asserting any setoff, right of subrogation or recoupment of any kind; and

(5) proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Construction Defect Trust, except in conformity and compliance therewith.

Notwithstanding anything to the contrary, nothing in this Plan shall enjoin, alter, diminish, or impair the rights of the Construction Defect Trust with regard to any insurance company and/or with respect

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

to any Insurance Coverage Action, Insurance Recoveries or Construction Defect Action, with the Construction Defect Trust being, and deemed to be, for all purposes of insurance and indemnity, the successor to Debtor in respect of all Construction Defect Claims and other recoveries from any insurance company, including Insurance Recoveries.

12.6 Adequate Protection Liens; Cash Collateral Orders.

(a) As of the Effective Date, any replacement Liens granted as adequate protection pursuant to the terms of any Cash Collateral Orders shall be deemed to be terminated, discharged, eliminated and of no further force and effect;

(b) As of the Effective Date, Debtor's obligations under all Cash Collateral Orders shall be deemed to be fully satisfied, released, discharged and terminated, and such Cash Collateral Orders shall be of no further force and effect.

12.7 DIP Loan and Liens. As of the Effective Date, the DIP Loan shall be fully paid or otherwise satisfied through issuance of the New Equity Interests, the DIP Lending Order shall terminate and all Liens granted under the DIP Lending Order, as well as Debtor's obligations under the DIP Loan and DIP Lending Order, shall be deemed to be terminated, discharged, eliminated and of no further force and effect.

12.8 Termination of Debt Instruments. On the Effective Date, all instruments evidencing indebtedness of Debtor held by Holders of Claims that are Impaired by this Plan or have been paid in full pursuant hereto shall be deemed canceled as against Debtor (or in the case of the New Secured Loan, replaced by the New Secured Notes and related New Secured Loan Documents), but not against any non-Debtor Person or Entity.

12.9 Judgments Void. Any judgment obtained before or after the Effective Date in any court other than the Bankruptcy Court shall be null and void as a determination of liability of Debtor and/or Reorganized Debtor with respect to any debt treated by the Plan.

12.10 Revesting of Assets in Reorganized Debtor. Except as otherwise expressly provided herein or in the Confirmation Order, on the Effective Date, but retroactive to the Confirmation Date, without any further action, Reorganized Debtor will be vested with all of Debtor's Assets, wherever situated, free and clear of all Claims, Liens and Old Equity Interests (except for Liens provided or

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

authorized pursuant to this Plan and Permitted Encumbrances). Without limiting the generality of the foregoing, on and after the Effective Date, Reorganized Debtor shall be vested with all of Debtor's Assets, wherever situated, free and clear of any Claims based on any form of successor liability or similar or related theory of liability. On and after the Effective Date, Reorganized Debtor shall be free of any restrictions imposed by the Bankruptcy Code or Bankruptcy Court, may operate its business and may use, acquire or dispose of its assets free of any restrictions imposed by the Bankruptcy Code and the Bankruptcy Rules and without supervision or approval by the Bankruptcy Court, other than the obligations set forth in this Plan or the Confirmation Order. Without limiting the generality of the foregoing and except as otherwise expressly provided herein or in the Confirmation Order, any Causes of Action will be preserved and retained solely for Reorganized Debtor's commencement, prosecution, use and benefit.

12.11 Discharge of Statutory Committee/Futures Representative. Upon the Effective Date, the Futures Representative and the members of any Statutory Committee shall be discharged from their duties as such. Notwithstanding the foregoing, the Futures Representative and any Statutory Committee shall be entitled to appear and be heard regarding final applications for allowance of Professional Fee Claims.

12.12 Preservation of Causes of Action. Pursuant to Bankruptcy Code section 1123(b), Debtor as Reorganized Debtor shall retain and reserve the right to enforce all rights to commence and pursue Causes of Action whether arising prior to or after the Petition Date, and whether pending as of or Filed after the Effective Date, in any court or other tribunal. Unless a Cause of Action is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, Debtor on behalf of itself and as Reorganized Debtor expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to any Causes of Action upon Confirmation or the Effective Date. No Person or Entity may rely on the absence of a specific reference in the Plan, or the Disclosure Statement to any Cause of Action against them as an indication that Debtor or Reorganized Debtor will not pursue any and all available Causes of Action against such Person or Entity. Debtor and Reorganized Debtor expressly reserve all rights to

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan.

12.13 Maintenance of Administrative Claim Status Post Discharge. Notwithstanding any discharge granted to Debtor, Allowed Administrative Claims shall maintain their administrative priority status under Bankruptcy Code section 507(a)(2) until paid in full.

12.14 No Limitation on Effect of Confirmation. Nothing contained in the Plan or the Disclosure Statement will limit, waive or restrict in any way the effect of Confirmation as set forth in Bankruptcy Code section 1141; provided, however, nothing shall affect the ability of the Internal Revenue Service to pursue any non-debtor to the extent allowable under non-bankruptcy law for any liabilities that may be related to any federal tax liabilities of the Debtor or the Reorganized Debtor; provided further, however, that except with respect to the provisions of Section 12.5(d) hereof applicable to Construction Defect Claims, nothing in the Plan or any order confirming the Plan shall release, waive, void, extinguish, discharge, modify, alter or limit in any way (i) any and all obligations, debts and liabilities of any non-Debtor Person or Entity to the Secured Lenders, or (ii) any and all rights and remedies held by the Secured Lenders against any non-Debtor Person or Entity or their respective assets. Confirmation will bind Debtor, Reorganized Debtor, all Creditors, Equity Interest Holders and other parties in interest to the provisions of the Plan, whether or not the Claim or Equity Interest of such Creditor or Equity Interest Holder is Impaired under the Plan and whether or not such Creditor or Equity Interest Holder has accepted the Plan and whether or not a Proof of Claim or Equity Interest has been Filed or deemed to have been Filed under Bankruptcy Code sections 501 or 1111(a), or such Claim or Equity Interest is Allowed under Bankruptcy Code section 502.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1 Modification of this Plan.

(a) Subject to the Lock-Up and Settlement Letter Agreement, Debtor may alter, amend or modify the Plan at any time before the entry of the Confirmation Order, provided that the Plan, as altered, amended or modified, satisfies the conditions of Bankruptcy Code sections 1122 and 1123, and Debtor shall have complied with Bankruptcy Code section 1125. However, the Bankruptcy

Court may require a new Disclosure Statement and/or re-voting on the Plan if Debtor modifies the Plan before Confirmation.

(b) Subject to the Lock-Up and Settlement Letter Agreement, Debtor may also seek to alter, amend or modify the Plan at any time after Confirmation so long as (1) the Plan has not been substantially consummated, (2) the Plan, as altered, amended or modified, satisfies the conditions of Bankruptcy Code sections 1122 and 1123, and (3) the Bankruptcy Court authorizes the proposed alteration, amendment or modification after notice and a hearing under Bankruptcy Code section 1129.

(c) Subject to the Lock-Up and Settlement Letter Agreement, a Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder. Subject to the Lock-Up and Settlement Letter Agreement, prior to the Effective Date, Debtor may make appropriate technical, non-material modifications to the Plan or the Disclosure Statement without further order or approval of the Bankruptcy Court, provided that such technical modifications do not adversely affect the treatment of Holders of Claims or Equity Interests.

(d) Subject to the Lock-Up and Settlement Letter Agreement, Debtor further reserves the right to modify the treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

(e) Subject to the Lock-Up and Settlement Letter Agreement, Debtor reserves the right, in accordance with the Bankruptcy Code, to amend, alter or modify this Plan before or after the Confirmation Date, including to make any amendments, alterations or modifications necessary to satisfy the requirements of Bankruptcy Code section 1129(b).

(f) Any modification of the Plan that directly or indirectly affects any Secured Lender cannot be made without the unanimous consent of the Secured Lenders.

13.2 Notices. Except as otherwise set forth in Section 13.3 below, all notices, requests, elections or demands in connection with this Plan, including any change of address of any Holder of a Claim for the purposes of receiving any Distributions under this Plan, shall be in writing and shall be delivered personally or by facsimile, electronic mail or overnight courier (confirmed by first class mail

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

or express mail) or mailed by first class mail. Such notice shall be deemed to have been given when received or, if mailed by first class mail, seven (7) days after the date of mailing, or if express mailed, the next Business Day following the date of mailing and addressed to the following:

(a) If to Debtor, to:

American West Development, Inc.
250 Pilot Road, Suite 140
Las Vegas, Nevada 89119
Attention: Robert M. Evans
Email: BobEvans@AmericanWestHomes.com
Facsimile: (702) 736-7970

with copies to:

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Attention: Brett A. Axelrod, Esq.
Email: baxelrod@foxrothschild.com
Facsimile: (702) 597-5503

(b) If to Secured Lenders, to:

California Bank & Trust
c/o CB&T Real Estate Finance
2929 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
Attention: Bruce Weyers
Email: Bruce.Weyers@nbarizona.com
Facsimile: (602) 230-1345

with copies to:

Snell & Wilmer L.L.P.
One Arizona Center
400 East Van Buren
Phoenix, Arizona 85004-2202
Attention: Dave Sprentall, Esq.
Email: dsprentall@swlaw.com
Facsimile: (602) 382-6070

All notices and requests to Holders of Claims of any Class shall be sent to them at their known address. Any Holder of a Claim of any Class may designate in writing any other address for purposes of this Section 13.2, which designation shall be effective upon receipt.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

13.3 Limitation of Notice. Debtor shall give the following notice with regard to the following matters, which notice shall be deemed to be good and sufficient notice of such matters, with no requirement for any additional or further notice:

(a) Notice of Entry of Confirmation Order. The notice of entry of the Confirmation Order shall be sufficient if mailed to all known Holders of Claims (which have not become Disallowed Claims) and Interests within five (5) Business Days of the Confirmation Date.

(b) Post-Confirmation Date Service List—Additional Persons Entitled to Notice. Except as set forth in Section 13.2 hereof, from and after the date the Confirmation Order becomes a Final Order, notices of appearances and demands for service of process Filed with the Bankruptcy Court prior to such date shall no longer be effective, and no further notices, other than the Notice of Confirmation Order, shall be required to be sent to such parties, unless such parties File a new notice of appearance and demand for service of process dated subsequent to the Effective Date, which subsequent notice and demand must be Filed with the Bankruptcy Court and served upon the Persons and Entities listed in Section 13.2 above.

(c) Subordination. Nothing in this Plan shall in any way be deemed to have impaired, altered or otherwise affected the rights of Debtor or Reorganized Debtor to enforce any right of subordination that may exist by agreement or otherwise, including under Bankruptcy Code section 510; provided, however, that neither Debtor nor Reorganized Debtor have any subordination right or remedy against the Secured Lenders as of the Effective Date.

13.4 Requisite Secured Lenders' Approval. Wherever the approval of the Secured Lenders with respect to the Term Loan or New Secured Loan is referred to anywhere in this Plan, the Entity seeking such approval shall be entitled to direct the request for approval solely to the Secured Lenders pursuant to the requirements of Section 13.2 hereof, and the Secured Lenders shall then be responsible for determining and communicating whether or not such approval has or has not been obtained. Any written statement by the Secured Lenders specifically referring to such approval to any other Person or Entity concerning any consent or approval of the Secured Lenders required hereunder which is signed by the Person to whom notices directed to the Secured Lenders must be addressed pursuant to Section 13.2 hereof may be relied upon by such Person or Entity.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

13.5 Headings. The headings used in this Plan are inserted for convenience only and neither constitutes a portion of this Plan nor in any manner affect the provisions of this Plan.

13.6 Exhibits. [reserve].

13.7 Nonseverability of Plan Provisions. If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power, at the request of Debtor and subject to the consent of any Person or Entity adversely affected thereby, to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to this Plan and may not be deleted or modified without the consent of Debtor and any other Person or Entity affected by such provision; and (c) nonseverable and mutually dependent.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

13.8 Waiver or Estoppel. Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with Debtor or its counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

13.9 Conflicts.

(a) To the extent that any provision of the Disclosure Statement, any amendments to the Plan, the Operative Documents or any New Secured Loan Documents, or any order (other than the Confirmation Order) referenced in this Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or is in any way inconsistent with any provision of this Plan, this Plan shall govern and control, unless expressly set forth herein.

(b) From and after the Effective Date, to the extent that any provision of this Plan, the Disclosure Statement, or any order (other than the Confirmation Order) referenced in this Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of any New Secured Loan Document, then the New Secured Loan Document shall govern and control, unless otherwise expressly set forth therein.

13.10 Computation of Time. In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

13.11 Governing Law. Except to the extent that the Bankruptcy Code or any other federal law is applicable, and except as otherwise provided by the New Secured Loan Documents, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Nevada.

13.12 Successors and Assigns. The rights and obligations of any Person or Entity named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person or Entity.

13.13 Good Faith. Confirmation of the Plan will constitute a finding that the Plan has been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code.

13.14 Post Confirmation Conversion or Dismissal. A Creditor or party in interest may bring a motion to convert or dismiss the Chapter 11 Case under Bankruptcy Code section 1112(b), after the Plan is confirmed, if there is a default in performance of the Plan or if cause exists under Bankruptcy Code section 1112(b). If the Bankruptcy Court orders the Chapter 11 Case converted to a case under chapter 7 of the Bankruptcy Code after the Plan is confirmed, then all property that had been Assets, and that has not been disbursed or distributed pursuant to the Plan, will revest in the chapter 7 estate, and the automatic stay pursuant to Bankruptcy Code section 362(a) will be reimposed upon the revested property only to the extent that relief from stay was not previously granted by the Bankruptcy Court during the Chapter 11 Case. In addition, any Allowed Administrative Claims which are not paid on the Effective Date shall continue to be entitled to administrative priority under Bankruptcy Code section 507(a)(1) in any such subsequent chapter 7 case to which the Chapter 11 Case is converted.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 57 of 76

13.15 Post Confirmation Quarterly Fees. US Trustee Fees continue to be payable to the Office of the United States Trustee after Confirmation until such time as the Chapter 11 Case is converted, dismissed or closed pursuant to Final Decree.

DATED this 15th day of October, 2012.

AMERICAN WEST DEVELOPMENT, INC.
a Nevada corporation

By /s/Robert M. Evans
Robert M. Evans, President

Respectfully submitted by:

FOX ROTHSCHILD LLP

By: /s/ Brett A Axelrod
BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
MICAELA RUSTIA MOORE, ESQ.
Nevada Bar No. 9676
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
*Counsel for Debtor*

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

EXHIBIT A

**GLOSSARY OF DEFINED TERMS**

1. "9019 Motion" means the motion seeking Bankruptcy Court approval of the Lock-Up and Settlement Letter Agreement.

2. "9019 Order" means the order entered by the Bankruptcy Court approving the 9019 Motion.

3. "Administrative Claim" means a Claim for costs and expenses of administration, pursuant to Bankruptcy Code sections 503(b), 507(a)(2), 507(b) or 546(c)(2), including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of Debtor (such as wages, salaries or commissions for services, and payments for goods and services); (b) the value of any goods received by Debtor within twenty (20) days before the Petition Date, which goods have been sold to Debtor in the ordinary course of its business; (c) compensation and reimbursement of expenses for legal, financial advisory, accounting and other services, including but not limited to, Allowed Professional Fees, pursuant to Bankruptcy Code sections 328, 330(a) or 331 or otherwise for the period commencing on the Petition Date and ending on the Effective Date; (d) all fees and charges assessed against the Estate pursuant to chapter 123 of the Judicial Code and 28 U.S.C. § 1930; and (e) all Bankruptcy Court approved requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case, pursuant to Bankruptcy Code sections 503(b)(3), (4) and (5).

4. "Administrative Claim Bar Date" means the deadline for Filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date, except with respect to Professional Fees, which shall be subject to the provisions of Section 2.2 hereof.

5. "Affiliate" has the meaning set forth in Bankruptcy Code section 101(2).

6. "Allowed" means, with reference to any Claim or Interest, except for a Claim that is a Construction Defect Claim, and with respect to Debtor: (a) any Claim against or Interest in Debtor that has been listed by Debtor in its Schedules, as such Schedules may be amended by Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim or Proof of Interest has been Filed; (b) any Claim or Interest

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

allowed (i) under this Plan, (ii) by Final Order, or (iii) as to which the liability of Debtor and the amount thereof are determined by a final order of a court of competent jurisdiction other than the Bankruptcy Court; or (c) any Claim or Interest as to which a Proof of Claim or a Proof of Interest has been timely Filed in a liquidated amount with the Bankruptcy Court, pursuant to the Bankruptcy Code or any order of the Bankruptcy Court, or has been Filed with leave of the Bankruptcy Court after notice and a hearing, provided that no objection to the allowance of such Claim or Interest or motion to expunge such Claim or Interest has been interposed by any party in interest before any final date for the Filing of such objections or motions set forth in this Plan, the Confirmation Order or other order of the Bankruptcy Court. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any valid and enforceable Claim that Debtor may hold against the Holder thereof, to the extent such Claim may be validly offset, recouped or otherwise reduced under applicable law.

7. "Allowed Construction Defect Claim" means a Construction Defect Claim that is deemed allowed by the Construction Defect Trustee, after consultation with the Construction Defect Advisory Board; provided that (i) the amount of the Class 4 Construction Defect Claim of each Holder thereof who makes the Cash Out Election, if the Cash Out Election remains available, shall be deemed to be reduced (as necessary) and allowed in the amount of the Cash Out Payment made to such Holder pursuant to this Plan without further approval of the Bankruptcy Court or action on the part of Debtor, Reorganized Debtor, the Construction Defect Trust, the Construction Defect Trustee, the Construction Defect Advisory Board or the Holder, (ii) such allowed amount shall be binding on such Holder for all purposes under the Plan, and (iii) such Allowed Class 4 Construction Defect Claim for each Holder thereof who makes the Cash Out Election shall be satisfied in full and discharged upon such Holder's receipt of such Cash Out Payment.

8. "Applicable Margin" means, with respect to borrowings under the New Secured Loan, (i) 3.25% per annum in the case of fixed rate borrowings and 0.50% per annum in the case of variable rate borrowings; provided that during any Remargin Period (as defined in the Term Loan Documents) under the Term Loan, "Applicable Margin" means 5.25% per annum in the case of fixed rate borrowings and 2.50% per annum in the case of variable rate borrowings.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

9. "Assets" means all of Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in Bankruptcy Code section 541. For the avoidance of doubt, all of Debtor's rights and benefits under any license, permit, development order, zoning approval or other governmental or quasi-governmental undertaking or action shall constitute an interest in property.

10. "Assumed Contracts" means any of Debtor's Executory Contracts existing on the Petition Date and any Executory Contracts entered into by Debtor after the Petition Date which, prior to the Confirmation Date, have been assumed by Debtor pursuant to Bankruptcy Code section 365, or are to be assumed by Debtor or Reorganized Debtor pursuant to the Plan.

11. "Avoidance Actions" means all Causes of Action of the Estate under the Bankruptcy Code, including but not limited to those set forth in sections 506(c), 506(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553, regardless of whether or not such actions have been commenced prior to the Effective Date.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

12. "Ballot" means a ballot in the form or forms approved by the Bankruptcy Court pursuant to the Disclosure Statement Order on which the Holder of an Allowed Claim who is entitled to vote to accept or reject the Plan (including the Holder of any Construction Defect Claim who makes the Cash Out Election) actually votes to accept or reject the Plan.

13. "Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

14. "Bankruptcy Court" means the United States Bankruptcy Court for the District of Nevada, or such other court as may from time to time have jurisdiction over the Chapter 11 Case.

15. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as heretofore or hereafter amended, and the general, local and chambers rules and orders of the Bankruptcy Court.

16. "Bar Date" means the date or dates established by order of the Bankruptcy Court, or the Bankruptcy Code or the Bankruptcy Rules by which all Persons (except Holders of Claims that appear in the Schedules not scheduled as disputed, contingent or unliquidated, but only with respect to such Claims) asserting a Claim against Debtor (except the Administrative Claims, which are governed by the Administrative Claim Bar Date, and the Construction Defect Claims, which are governed by the

Construction Defect Claim Bar Date) must File a Proof of Claim or forever be barred from asserting a Claim against Debtor or its property, voting on the Plan, and sharing in Distributions under the Plan.

17. "Bond Claims" means any Claim against Debtor, relating to or arising under any municipal bond assessments, infrastructure improvement bonds, special improvement districts or associated maintenance charges.

18. "Business Day" means any day, other than a Saturday, Sunday, or "legal holiday", as defined in Bankruptcy Rule 9006(a).

19. "Cash" means legal tender of the United States of America, which may be conveyed by check or wire transfer.

20. "Cash Collateral" has the meaning set forth in Bankruptcy Code section 363(a).

21. "Cash Collateral Orders" means any and all interim and Final Orders entered by the Bankruptcy Court, permitting Debtor to use the Cash Collateral of the Secured Lenders.

22. "Cash Collateral Stipulation" means that Stipulated Agreement Between Debtor and its Pre-Petition Secured Lenders Regarding (I) Use of Cash Collateral; and (II) Adequate Protection filed in the Chapter 11 Case on March 1, 2012 as Docket No. 12.

23. "Cash Out Election" means the election made by a Holder of a Class 4 Construction Defect Claim to receive a Cash Out Payment in lieu of any other or further Distribution from the Construction Defect Trust. The Cash Out Election shall be void if less than eighty percent (80%) in number of the Holders of Class 4 Construction Defect Claims actually vote to accept the Plan, *provided that*, except with respect to any Ballot submitted by the Futures Representative, any Holder of more than one (1) Class 4 Construction Defect Claim will be treated as a single Holder for purposes of calculating such eighty percent (80%) amount.

24. "Cash Out Election Ratio" means a ratio calculated wherein (x) the numerator is the total aggregate number of Holders of Class 4 Construction Defect Claims who timely and properly make the Cash Out Election, and (y) the denominator is the total aggregate number of Holders of Class 4 Construction Defect Claims.

25. "Cash Out Payment" means a one-time Cash payment to each Holder of a Construction Defect Claim who makes the Cash Out Election, which Cash Out Payment shall be equal to (x) the

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Total Cash Out Fund, divided by (y) the total aggregate number of Holders of Construction Defect Claims who make the Cash Out Election.

26. "Cash Out Release" means the form of release to be granted by each Holder of a Construction Defect Claim who makes the Cash Out Election, which Cash Out Release shall, in return for the Cash Out Payment, comprehensively release Debtor, Reorganized Debtor, the Construction Defect Trust and any Affiliate of the foregoing from any and all liability for any and all Construction Defect Claims.

27. "Causes of Action" means any Claim, Avoidance Action, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, including through the Effective Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

28. "Chapter 11 Case" shall have the meaning given to it in the Preamble of the Plan.

29. "Claim" has the meaning set forth in Bankruptcy Code section 101(5).

30. "Claims Objection Deadline" means the deadline for filing objections to Claims as set forth in Section 7.3 of the Plan.

31. "Claims Register" means the official register of Claims and Interests maintained in the Chapter 11 Case.

32. "Class" means a class of Claims or Interests pursuant to Bankruptcy Code section 1122(a) and as described in Article II of the Plan.

33. "Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order in the Chapter 11 Case.

34. "Confirmation Date" means the date upon which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case.

35. "Confirmation Funds" means all funds required to be disbursed, or deposited and held for later disbursement upon allowance or other Bankruptcy Court authorization, on or as of the

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Effective Date (i) to Holders of Allowed Professional Fee Claims, other Allowed Administrative Claims, Allowed Other Priority Claims to be paid in Cash on the Effective Date, any Allowed Priority Tax Claims other than Priority Tax Claims to be paid in deferred payments pursuant to the Plan, (ii) to the DIP Lender to fully pay and satisfy the DIP Loan, (iii) to the United States Trustee for US Trustee Fees due as of the Effective Date, and (iv) for any other Distributions and payment of costs and expenses in connection with consummating the Plan.

36. "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to Bankruptcy Code section 1129, as such hearing may be adjourned or continued from time to time.

37. "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan in accordance with the Bankruptcy Code.

38. "Construction Defect Actions" means the Causes of Action that Debtor may have against any subcontractor or other Person or Entity who installed defective materials in a home built and sold by Debtor, directly or indirectly, any insurer of any such subcontractor or any other Person or Entity, any retailer, wholesaler, distributor, manufacturer or provider of defective materials that was installed in a home built or sold by Debtor, directly or indirectly, and/or any insurer of any such retailer, wholesaler, distributor, manufacturer or provider.

39. "Construction Defect Advisory Board" means the advisory board to be established pursuant to the Construction Defect Trust Declaration and with which the Construction Defect Trustee shall consult regarding matters that will have a material impact on the value of the Construction Defect Trust, which matters shall be set forth in detail in the Construction Defect Trust Declaration.

40. "Construction Defect Claim" means (i) any threatened or pending civil action or statutory pre-litigation Claim against Debtor relating to construction defects, warranty claims, or third party indemnity claims relating to, or arising from, ownership on the Confirmation Date of a home constructed by Debtor, including without limitation, those civil actions with case numbers A-11-638731-D, A-11-633888-D, 08-A-558243, and A-11-642932-D, pending in the Eighth Judicial District Court for Clark County, Nevada on the Petition Date; (ii) a related or similar Claim for which a Proof of Claim is Filed or which Debtor listed in the Schedules Filed in the Chapter 11 Case.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

41. "Construction Defect Claim Bar Date" means the deadline for filing Proofs of Claim for Construction Defect Claims, which shall be governed by the Construction Defect Trust and its related TDP.

42. "Construction Defect Trust" means the trust established pursuant to the Construction Defect Trust Declaration.

43. "Construction Defect Trust Contribution" means a portion of the New Capital Contribution in the amount of either (i) one million five hundred thousand dollars ($1,500,000) or (ii) two hundred thousand dollars ($200,000), which will be (a) contributed to the Construction Defect Trust, and (b) allocated between the Total Cash Out Fund and the Remaining Construction Defect Trust Fund according to the Cash Out Election Ratio if at least eighty percent (80%) in number of the Holders of Class 4 Construction Defect Claims actually vote to accept the Plan.

44. "Construction Defect Trust Declaration" means the declaration of trust to be entered into by Debtor, the Construction Defect Trustee and the Construction Defect Advisory Board. The Construction Defect Trust Declaration shall be in substantially the form Filed with the Bankruptcy Court as part of the Disclosure Statement.

45. "Construction Defect Trustee" means the Person selected to serve as the initial trustee of the Construction Defect Trust, and any successor trustee thereof.

46. "Consummation" means the occurrence of the Effective Date.

47. "Contingent Claim" means a Claim which is contingent, unmatured or unliquidated on or immediately before the Confirmation Date.

48. "Creditor" means a Holder of a Claim.

49. "Cure" means the payment of Cash by Debtor, or the distribution of other property and the performance of any other obligations as the parties may agree or the Bankruptcy Court may order necessary to cure defaults under Executory Contracts Debtor is authorized to assume under Bankruptcy Code section 365(a) or under the Plan.

50. "Cure Request Bar Date" means the deadline for Filing requests for payment of Cure, which shall be fifteen (15) days prior to the date of the Confirmation Hearing.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

51. "Debtor in Possession" means Debtor, as debtor in possession in the Chapter 11 Case, exercising Debtor's rights and operating Debtor's business pursuant to Bankruptcy Code sections 1107 and 1108, respectively.

52. "Debtor" means American West Development, Inc.

53. "Deficiency Claim" means the difference between the amount of a Secured Lender's Allowed Claim and the value of the collateral which secures such Secured Lender's Allowed Claim.

54. "Design-Build Agreements" means various Design-Build Agreements between Debtor, certain affiliated land-owning entities and certain affiliated home-selling entities.

55. "DIP Financing Order" means the order of the Bankruptcy Court approving and authorizing the DIP Loan on an interim basis and any Final Order entered with respect thereto.

56. "DIP Lender" means the Entity that made the DIP Loan.

57. "DIP Loan" means the postpetition loan in the amount of up to ten million dollars ($10,000,000) made by DIP Lender to Debtor pursuant to the DIP Financing Order.

58. "Disallowed Claim" or "Disallowed," when used in connection with the term "Claim," means any Claim or portion thereof that has been disallowed by a Final Order of the Bankruptcy Court or scheduled as disputed, contingent or unliquidated that is not superseded by a timely filed Proof of Claim.

59. "Disclosure Statement" means the solicitation materials and disclosure statements, including all exhibits and schedules thereto, as amended, supplemented or modified from time to time, that are found by the Bankruptcy Court under the circumstances of the Chapter 11 Case to contain adequate information to solicit acceptances and rejections of the Plan.

60. "Disclosure Statement Order" means that certain Order: (I) Approving (A) Adequacy of Master Disclosure Statement, (B) Adequacy and Use of Home Owner Disclosure Statement as Summary of First Amended Plan, (C) Procedures and Schedule for the Solicitation, Submission and Tabulation of Votes, (D) Form and Scope of Notices, and (E) Form of Ballots and Related Documents; (II) Scheduling Confirmation Hearing and Related Deadlines; and (III) Granting Related Relief, entered by the Bankruptcy Court, as the order may be amended from time to time.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

61. "Disputed Claim" means: (a) any Claim or portion of a Claim (including any Administrative Claim, Priority Tax Claim or Other Priority Claim) listed in the Schedules as disputed, contingent or unliquidated; or (b) any Claim, as to which an objection to the allowance thereof has been Filed with the Bankruptcy Court within any time limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or an order of the Bankruptcy Court, which objection has not been settled, withdrawn or determined, in whole or in part, by a Final Order.

62. "Distribution" means any distribution made by the Distribution Agent on account of Allowed Claims under the Plan pursuant to the terms of the Plan or by the Construction Defect Trustee of the Construction Defect Trust pursuant to the TDP in respect of Construction Defect Claims.

63. "Distribution Agent" means Debtor, or the Person or Entity chosen by Debtor to make or to facilitate Distributions pursuant to the Plan or, with respect to Construction Defect Claims, the Construction Defect Trustee.

64. "Distribution Record Date" means August 10, 2012 unless the Bankruptcy Court establishes a different date for the Distribution Record Date in the Confirmation Order.

65. "Effective Date" means the first Business Day after the date on which the conditions specified in Article X of the Plan have been satisfied in full or waived.

66. "Entity" has the meaning as set forth in Bankruptcy Code section 101(15).

67. "Equity Interest" means the same as "Interest."

68. "Estate" means the estate of Debtor that was created by the commencement of the Chapter 11 Case pursuant to Bankruptcy Code section 541, and shall be deemed to include any and all Assets of Debtor, whether real, personal or mixed, rights, Causes of Action, avoidance powers or extensions of time that Debtor or the estate shall have had effective as of the Petition Date or thereafter, whether by virtue of Bankruptcy Code sections 544, 545, 546, 547, 548, 549 or 550 or otherwise.

69. "Exculpated Party" means each of: (a) Debtor and its Estate; (b) the Secured Lenders; (c) Reorganized Debtor; (d) the DIP Lender; (e) the Distribution Agent; (f) the Construction Defect Trustee; (g) the Futures Representative; and (h) Professionals.

70. "Executory Contract" means an executory contract or unexpired lease to which Debtor is a party that is subject to assumption or rejection under Bankruptcy Code section 365 or under the Plan.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

71. "File" means to duly and properly file with the Bankruptcy Court as reflected on the Bankruptcy Court's docket or the Claims Register in the Chapter 11 Case or, in the case of Class 4 Claims, duly and properly filed with the Trustee of the Construction Defect Trust.

72. "Final Decree" means an order of the Bankruptcy Court closing the Chapter 11 Case pursuant to Bankruptcy Code section 350.

73. "Final Order" means an order or judgment entered by the Bankruptcy Court: (a) that has not been reversed, stayed, modified, amended, revoked, varied or set aside, and as to which (i) any right to appeal or seek certiorari, review, reargument, stay or rehearing has been waived, or (ii) the time to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending; or (b) as to which an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed, and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought, and (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has been waived or expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending, provided, however, that no order or judgment shall fail to be a "Final Order" hereunder solely because of the possibility that a motion pursuant to Bankruptcy Code sections 502(j) or 1144, Rules 59 or 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be Filed with respect to such order or judgment.

74. "Futures Representative" means James L. Moore, the representative of potential Holders of Construction Defect Claims for which damage or loss has not yet become manifest, duly appointed by the Bankruptcy Court.

75. "General Unsecured Claims" means any Claim against Debtor that is not an (a) Administrative Claim, (b) Priority Tax Claim, (c) Other Priority Claim, (d) Secured Claim, (e) Construction Defect Claim, or (f) Bond Claim.

76. "Holder" means any Person or Entity that is the record or beneficial owner of a Claim or Interest in the Chapter 11 Case; provided that the Holder of a Construction Defect Claim arising in connection with a particular home constructed by Debtor shall be the owner of legal record of such

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

residence (a) as of the Voting Record Date for purposes of voting to accept or reject the Plan and making (and receiving) the Cash Out Election, and (b) as of the Distribution Record Date for purposes of further participation in the Construction Defect Trust by any Holder of a Construction Defect Claim that does not make the Cash Out Election.

77. "Impaired" means with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of Bankruptcy Code section 1124.

78. "Insurance Coverage Actions" means any rights to indemnification, reimbursement, contribution or other payment under any of Debtor's existing insurance policies, including Debtor's director and officer liability insurance policies, as of the Effective Date, that may provide coverage with respect to Construction Defect Claims.

79. "Insurance Recovery" means (a) the right to pursue and receive the benefits and proceeds of any insurance policy issued to, owned by, or otherwise providing coverage to Debtor, including any insurance policy owned by any third party on which Debtor is named as an additional insured, with respect to Construction Defect Claims; (b) the right to pursue and receive recovery from or as a result of any Insurance Coverage Action; (c) the right to pursue and receive recovery from or as a result of any Claim, Cause of Action or right of Debtor or Reorganized Debtor against any insurance company concerning insurance coverage for or relating to Construction Defect Claims, or enforcement of any extracontractual or statutory remedies and relief relating to any insurance providing coverage for Construction Defect Claims, including, without limitation, any Insurance Coverage Actions or any other litigation, arbitration, mediation and informal negotiations, whether past, pending or not yet initiated, including, without limitation, consequential, contractual, extracontractual and statutory damages, or other proceeds, distributions, awards or benefits; (d) the right to pursue and receive recovery from or as a result of any Claim, Cause of Action or right of Debtor or Reorganized Debtor to pursue insurance recovery related to Construction Defect Claims through available administrative or other means from any insurance company that is insolvent or has been liquidated, or is otherwise subject to statutory or legal protections against litigation; and (e) the right to pursue and receive any other recovery from an insurance company, in its capacity as such, with respect to Construction Defect Claims.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

80. "Interest" means any: (i) equity or other ownership interest in any Person or Entity, including, but not limited to, all issued and outstanding or reserved for issuance, common stock, preferred stock, membership interests, warrants, options or other ownership rights or rights to purchase or receive additional shares of stock or membership interests in any Person or Entity, and/or any other instrument or document to the extent that it directly or indirectly evidences, creates or reserves any equity or ownership interest in any Person or Entity giving rise to any Claim or Interest, (ii) equity security, including all membership interests together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto and (iii) partnership, limited liability company or similar interest.

81. "Interest Holder" means the Holder of an Interest or Equity Interest.

82. "Key Transaction Documents" means the Plan, the Disclosure Statement, the Ballots, the New Secured Loan Documents, and Reorganized Debtor's Bylaws or amended certificates of incorporation.

83. "LIBOR Rate" means the London Inter-Bank Market Offered Rate, as more specifically defined in the New Secured Loan Documents.

84. "Lien" has the meaning set forth in Bankruptcy Code section 101(37).

85. "Lock-Up and Settlement Letter Agreement" means that certain Restructuring, Lock-Up and Settlement Letter Agreement entered into by Debtor and the Secured Lenders, approved by the 9019 Order, to be implemented through the Plan, and establishing, among other things, the Allowed amounts of each Secured Lender's Secured Claim at the values of each Secured Lender's collateral, which collateral Debtor believes is worth an aggregate amount of $49,635,000, on a net present value basis, and providing that the Secured Lenders will waive their rights to receive any Distribution on account of their Class 3 General Unsecured Claims under the Plan, provided that the Holders of Class 3 Claims vote as a Class to accept the Plan.

86. "Marketing and Administrative Services Agreement" means various Marketing and Administrative Services Agreements between Debtor and certain affiliated home-selling entities.

87. "Maturity Date" means December 31, 2015, as defined in Section 2.3(b) of the Plan.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

88. "New Capital Contribution" means the aggregate sum in a maximum amount of ten million dollars ($10,000,000) from the DIP Lender for, among other things, providing Reorganized Debtor with the amount of Cash required for all Confirmation Funds, working capital for Reorganized Debtor to fund operations, and any Plan needs, including the Construction Defect Trust Contribution. The aggregate sum of the New Capital Contribution may be increased, with the mutual written agreement of Debtor, the DIP Lender and the Secured Lenders. The New Capital Contribution shall be paid to Reorganized Debtor on the Effective Date by way of the DIP Lender funding the maximum amount of the DIP Loan by payment of Cash to Reorganized Debtor and the Construction Defect Trust in an amount equal to the difference between (x) the maximum amount of the DIP Loan of ten million dollars ($10,000,000), and (y) the outstanding balance of the DIP Loan on the Effective Date and, contemporaneously therewith, forgiving, releasing and discharging the DIP Loan and Liens securing same in consideration of its receipt of the New Equity Interests in Reorganized Debtor.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

89. "New Equity Interests" means those Interests of Reorganized Debtor to be authorized and issued to the DIP Lender pursuant to the Plan on the Effective Date in exchange for the New Capital Contribution.

90. "New Secured Loan" means the refinanced (restructured) secured loan pursuant to the terms of the Plan to be evidenced by the New Secured Loan Documents.

91. "New Secured Loan Documents" means the New Secured Notes and related documents in form and substance acceptable to and approved by the Secured Lenders, evidencing, securing and providing for the terms and conditions of the New Secured Loan, to be executed by and between the Secured Lenders and Reorganized Debtor on or as of the Effective Date, which are attached as exhibits to the Disclosure Statement, with any modifications or additional documents in form and substance acceptable to and approved by the Secured Lenders.

92. "New Secured Loan Payment Terms" means the payment terms of the New Secured Notes, as summarized in Section 2.3 of the Plan.

93. "New Secured Notes" means the promissory notes in form and substance acceptable to and approved by the Secured Lenders to be issued by Reorganized Debtor to the Secured Lenders evidencing the New Secured Loan, as summarized in Section 2.3 of the Plan.

94. "Notice of Confirmation" means that certain notice, pursuant to Bankruptcy Rule 3020(c)(2), notifying Holders of Claims and Interests that the Bankruptcy Court has confirmed the Plan.

95. "Old Equity Interests" means Equity Interests in Debtor.

96. "Operative Document" means any contract, instrument, release, settlement agreement or other agreement or document, if any, that is reasonably necessary to effectuate and implement the transactions provided for in the Plan, including the Key Transaction Documents.

97. "Other Priority Claims" means any Claim entitled to priority under Bankruptcy Code sections 507(a) other than under subsections (a)(2) and (a)(8) thereof.

98. "Other Secured Claims" means any Secured Claim other than a Claim with respect to the Term Loan.

99. "Permitted Encumbrances" means (i) Liens for *ad valorem* taxes not yet due and payable, (ii) easements, restrictions, conditions and limitations of record that affected the title to any of Debtor's real properties as of the Petition Date, (iii) any Liens securing Other Secured Claims that are reinstated or assumed by Reorganized Debtor, and (iv) as such term is defined in the New Secured Loan Documents.

100. "Person" means any individual, corporation, partnership, limited liability company, joint venture, association, trust or organization, or other "person" as defined in Bankruptcy Code section 101(41), as well as any governmental agency, governmental unit or political subdivision.

101. "Petition Date" means March 1, 2012.

102. "Plan" means this Debtor's First Amended Chapter 11 Plan of Reorganization to which this Exhibit A is attached, either in its present form or as the same may be altered, amended or modified from time to time pursuant to the Bankruptcy Code or Final Order.

103. [reserve]

104. [reserve]

105. "Post Effective Date Fee Fund" means a sum of two million eighty thousand dollars ($2,080,000) to be paid to the Distribution Agent on the Effective Date from the New Capital Contribution, which shall be part of the Confirmation Funds and used by the Distribution Agent to pay any Post Effective Date Fees.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

106. "Post Effective Date Fees" means the reasonable fees and expenses of Debtor's Professionals incurred by Debtor and/or Reorganized Debtor after the Effective Date, including those fees and expenses incurred for legal, financial advisory, accounting and other services rendered in connection with the implementation, Consummation and performance of the Plan and which are necessary to complete the administration of, conclude and close the Chapter 11 Case.

107. "Price Guarantee" means, in summary, that pricing incentive offered by Debtor from 2006 through 2008 to certain home purchasers to receive a credit against their purchase of a replacement home from Debtor equal to the difference between the price paid for their original home and the value of the replacement home (if less) on the fifth (5th) anniversary of the date of the original home purchase, under certain express conditions.

108. "Price Promise" means, in summary, that three-year pricing incentive offered by Debtor from 2006 through 2008 to certain home purchasers who paid the current asking base price, at the time of the original home purchase, to receive a purchase price refund, under certain express conditions.

109. "Priority Tax Claims" means any Claim that is entitled to priority under Bankruptcy Code sections 502(i) or 507(a)(8). Priority Tax Claims do not include *ad valorem* tax Claims if such Claims under applicable state law are Secured by a Lien on Debtor's Assets.

110. "Pro Rata" means, with respect to an amount of Cash or other consideration to be paid or distributed on a particular date to a Holder of an Allowed Claim, that such Distribution shall be made in accordance with the ratio, as of such date, of the amount such Allowed Claim is to the aggregate of the amounts of Claims in the Class to which such Allowed Claim belongs.

111. "Professional" means a Person or Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with Bankruptcy Code sections 327 or 1103 and to be compensated for services rendered prior to or on the Effective Date, pursuant to Bankruptcy Code sections 327, 328, 329, 330 or 331; (b) awarded compensation and reimbursement by the Bankruptcy Court, pursuant to Bankruptcy Code section 503(b)(4); or (c) employed by the Futures Representative pursuant to an order of the Bankruptcy Court.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

112. "Professional Fee Claim" means any Claim for compensation or reimbursement of fees and expenses as may be requested by (i) the Futures Representative, or (ii) a Professional to the extent such Professional is required to apply to the Bankruptcy Court for payment of such Claim pursuant to Bankruptcy Code sections 326, 328, 330 or 331 and the terms of the Plan.

113. "Professional Fees" means all reasonable fees and expenses incurred by Professionals or the Futures Representative and allowed by the Bankruptcy Court.

114. "Proof of Claim" means a proof of claim for a Claim which has been Filed.

115. "Proof of Interest" means a proof of interest for an Interest which has been Filed.

116. "Receivable" means the right of Debtor to receive deferred payments due from certain affiliates, representing amounts due for lot development, unit construction and other services for which Debtor has acted as general contractor pursuant to agreements memorialized as (i) various Marketing and Administrative Services Agreements, and (ii) various Design-Build Agreements.

117. "Rejected Contract" means any Executory Contract that has been rejected prior to Confirmation, or is the subject of a pending motion for rejection or has been designated in the Disclosure Statement as a contract or lease that is not to be an Assumed Contract, or is otherwise rejected pursuant to the Plan.

118. "Related Persons" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and Subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives and other professionals, and any Person claiming by or through any of them.

119. "Released Liabilities" means, with respect to a given Releasor, all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities based on any act, omission, transaction, event or other occurrence (other than rights to enforce the terms of the Plan or any related document or agreement), whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that arose prior to the Effective Date and relate to

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Debtor, the Plan or the Chapter 11 Case, which could have been asserted by such Releasor (or on behalf of Debtor or its Estate) against any Released Party.

120. "Released Party" means each of: (a) Debtor and its Estate; (b) Reorganized Debtor; (c) the DIP Lender; (d) the Distribution Agent; (e) the Futures Representative; (f) Professionals; (g) the Secured Lenders; and (h) the respective Related Persons of each of the foregoing.

121. "[reserve]".

122. "Releasing Parties" shall have the meaning given to it in Section 12.4(a) of the Plan.

123. "Releasors" means each of: (a) Debtor and its Estate; (b) Reorganized Debtor; (c) the DIP Lender; (d) the Distribution Agent; (e) the Futures Representative; (f) Professionals; and (g) the respective Related Persons of each of the foregoing.

124. "Remaining Construction Defect Trust Fund" shall mean a portion of the Construction Defect Trust Contribution calculated in accordance with the Cash Out Election Ratio as the remainder of (x) the Construction Defect Trust Contribution, less (y) the Total Cash Out Fund, sixty percent (60%) of which Remaining Construction Defect Trust Fund shall be earmarked first to be used to administer the Construction Defect Trust. If less than eighty percent (80%) in number of the Holders of Class 4 Construction Defect Claims actually vote to accept the Plan, there shall be no Total Cash Out Fund and the Cash Out Election Ratio shall be inapplicable.

125. "Reorganized Debtor" means, on or after the Effective Date, Debtor as reorganized debtor.

126. "Reorganized Debtor's Bylaws" means the amended and restated agreements that will govern Reorganized Debtor as of the Effective Date, the form of which is attached as an exhibit to the Disclosure Statement.

127. "Schedule of Assumed Contracts" means the schedule of Assumed Contracts and Debtor's proposed respective Cure amounts, if any, which is attached as an exhibit to the Disclosure Statement.

128. "Schedule of Disputed Claims" means the non-exhaustive list of Claims whose amounts are disputed, which is attached as an exhibit to the Disclosure Statement.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Case 12-12349-mkn Doc 714 Entered 10/26/12 18:38:59 Page 75 of 76

129. "Schedules" means the schedules of Assets and liabilities, the list of Holders of Interests and the statements of financial affairs Filed by Debtor under Bankruptcy Code section 521 and Bankruptcy Rule 1007, and all amendments and modifications thereto through the Confirmation Date.

130. "Secured" means, when referring to a Claim: (a) secured by a Lien on any Assets, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to Bankruptcy Code section 553, to the extent of the value of the Creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a); or (b) a Claim deemed or treated under the Plan as a Secured Claim.

131. "Secured Lenders" means, collectively, the "Lenders," as defined in the Term Loan Documents and the New Secured Loan Documents.

132. "Statutory Committee" means, collectively, any committee appointed in the Chapter 11 Case pursuant to Bankruptcy Code section 1102.

133. "TDP" means the Construction Defect Trust Distribution Procedures attached as Exhibit 1 to the Construction Defect Trust Declaration.

134. "Term Loan" means the secured loan the Secured Lenders provided to Debtor before the Petition Date pursuant to the Term Loan Documents, which Term Loan, notwithstanding the commencement of the Chapter 11 Case, remains outstanding as to other co-borrowers of Debtor thereunder.

135. "Term Loan Documents" means the agreement, instruments and documents governing the Term Loan, including, without limitation, that certain Term Loan Credit Agreement among California Bank & Trust (individually and as Administrative Agent and as Lead Arranger), Wells Fargo Bank, National Association (individually and as Syndication Agent), the Secured Lenders, certain borrowers (including Debtor) and certain guarantors dated as of December 31, 2009, as amended from time to time, and including exhibits thereto.

136. "Total Cash Out Fund" means a portion of the Construction Defect Trust Contribution calculated according to the Cash Out Election Ratio.

137. "US Trustee Fees" means fees payable pursuant to 28 U.S.C. § 1930.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

138. "Voting and Claims Agent" means The Garden City Group, in its capacity as solicitation, notice, claims and balloting agent for Debtor.

139. "Voting Record Date" means the date for determining which Holders of Claims, including Construction Defect Claims and Equity Interests are entitled to receive the Disclosure Statement and vote to accept or reject the Plan, as established by the Disclosure Statement Order.

140. "Warranty Program" means all warranty obligations or customer programs established by Debtor for the benefit of its customers, as modified from time to time, whether or not such obligations or programs were or have been terminated according to their terms before the Petition Date or during the Chapter 11 Case.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

# EXHIBIT 2

EXHIBIT 2

ORIGINAL

Electronically Filed
10/24/2013 09:54:27 AM

CLERK OF THE COURT

ORDG

MARK A. SOLOMON, ESQ.
Nevada Bar No. 00418
Email: msolomon@sdfnvlaw.com
BRIAN P. EAGAN, ESQ.
Nevada Bar No. 09395
Email: beagan@sdfnvlaw.com
SOLOMON DWIGGINS & FREER, LTD.
Cheyenne West Professional Centré
9060 West Cheyenne Avenue
Las Vegas, Nevada 89129
Telephone: (702) 853-5483
Facsimile: (702) 853-5485

Attorneys for Petitioner, Scott Canarelli

SOLOMON DWIGGINS & FREER, LTD.
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TEL: (702) 853-5483 | FAX: (702) 853-5485

DISTRICT COURT

COUNTY OF CLARK, NEVADA

| In the Matter of the<br><br>THE SCOTT LYLE GRAVES CANARELLI IRREVOCABLE TRUST, dated February 24, 1998. | Case No.: P-13- 078912-T<br>Dept. No.: XXVI/PROBATE<br><br>Hearing Date: 10/18/2013<br>Hearing Time: 9:30 a.m. |
|---|---|

**ORDER GRANTING PETITION TO ASSUME JURISDICTION OVER THE SCOTT LYLE GRAVES CANARELLI IRREVOCABLE TRUST; TO CONFIRM EDWARD C. LUBBERS AS FAMILY AND INDEPENDENT TRUSTEE; FOR AN INVENTORY AND ACCOUNTING; TO COMPEL AN INDEPENDENT VALUATION OF THE TRUST ASSETS SUBJECT TO THE PURCHASE AGREEMENT, DATED MAY 31, 2013; AND TO AUTHORIZE AND DIRECT THE TRUSTEE AND FORMER TRUSTEES TO PROVIDE SETTLOR/BENEFICIARY WITH ANY AND ALL INFORMATION AND DOCUMENTS CONCERNING THE SALE OF THE TRUST'S ASSETS UNDER SUCH PURCHASE AGREEMENT**

THIS MATTER came on for hearing on October 18, 2013, at 9:30 a.m. on the Petition to Assume Jurisdiction Over the Scott Lyle Graves Canarelli Irrevocable Trust; to Confirm Edward C. Lubbers as Family and Independent Trustee; for an Inventory and accounting; to Compel an Independent Valuation of the Trust Assets Subject to the Purchase Agreement, Dated May 31, 2013; and to Authorize and Direct the Trustee and Former Trustees to Provide Settlor/Beneficiary with any and all Information and Documents Concerning the Sale of the Trust's Assets Under Such Purchase

Agreement ("Petition") filed by SCOTT LYLE GRAVES CANARELLI ("Petitioner"), Settlor and Beneficiary of the SCOTT LYLE GRAVES CANARELLI IRREVOCABLE TRUST, dated February 24, 1998 (the "Irrevocable Trust"), with Petitioner appearing by and through his counsel of record, the law firm of SOLOMON DWIGGINS & FREER, LTD.; EDWARD LUBBERS, Successor Family and Independent Trustee of the Irrevocable Trust, appearing by and through his counsel of record, the law firm of LEE HERNANDEZ LANDRUM GAROFALO BLAKE; and LAWRENCE CANARELLI and HEIDI CANARELLI, former Family Trustees of the Irrevocable Trust, making no appearance. The Court, having reviewed the Petition, there being no objections filed thereto; having found that proper notice of the hearing on the Petition have been given to all interested parties as required by law; having heard the arguments of counsel; and having found good cause therefor:

IT IS HEREBY ORDERED that this Court assumes *in rem* jurisdiction over the Scott Lyle Graves Canarelli Irrevocable Trust, dated February 24, 1998 ("Irrevocable Trust"), and any and all trusts created within such trust;

IT IS HEREBY FURTHER ORDERED that Edward Lubbers is hereby confirmed as the Family Trustee and the Independent Trustee of the Irrevocable Trust and any and all trusts created within the Irrevocable Trust;

IT IS HEREBY FURTHER ORDERED that Edward Lubbers, the Family and Independent Trustee of the Irrevocable Trust, shall prepare and produce to Scott Canarelli, Settlor and Beneficiary of the Irrevocable Trust, an inventory and an accounting of the Irrevocable Trust from February 24, 1998, the date of the Irrevocable Trust's creation, through the present date within sixty (60) days of entry of this order;

IT IS HEREBY FURTHER ORDERED that Lawrence Canarelli and Heidi Canarelli, former Family Co-Trustees of the Irrevocable Trust, shall provide Edward Lubbers and Scott Canarelli with any and all information and documents in their possession or control as may be appropriate to provide

SOLOMON DWIGGINS & FREER, LTD.
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TEL. (702) 853-5483 | FAX: (702) 853-5485

Scott Canarelli with an inventory and an accounting of the Irrevocable Trust from February 24, 1998, the date of the Irrevocable Trust's creation, through the present date;

IT IS HEREBY FURTHER ORDERED that the Irrevocable Trust is hereby authorized and directed to retain a neutral valuator on behalf of Scott Canarelli to value the assets held by the LLCs and the Corporations that were subject to the Purchase Agreement, dated May 31, 2013, and that Edward Lubbers, Lawrence Canarelli and Heidi Canarelli shall fully cooperate with and facilitate such valuation;

IT IS HEREBY FURTHER ORDERED that the hearing regarding the determination of whether Western Valuation Advisors, the valuator proposed by Scott Canarelli, shall be retained to valuate the assets held by the LLCs and the Corporations that were subject to the Purchase Agreement, dated May 31, 2013, shall be and hereby is continued to Friday, November 1, 2013, at 9:30 a.m., unless Scott Canarelli and Edward Lubbers can agree regarding the same and then such parties shall so stipulate in advance of such hearing and vacate the same;

IT IS HEREBY FURTHER ORDERED that Edward Lubbers, the current Family and Independent Trustee of the Irrevocable Trust, and Lawrence Canarelli and Heidi Canarelli, the former Family Co-Trustees of the Irrevocable Trust, shall provide to Scott Canarelli any and all information and documentation within his or her knowledge or control concerning the Purchase Agreement, dated May 31, 2013, including, without limitation, any and all information and documents in his or her

///

///

///

///

///

///

///

SOLOMON DWIGGINS & FREER, LTD.
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TEL: (702) 853-5483 | FAX: (702) 853-5485

control regarding the advisability, necessity, fairness and reasonableness of all aspects of the transaction and whether it was in the best interest of the Irrevocable Trust.

**DATED** October 2nd, 2013.

DISTRICT COURT JUDGE

Submitted by:
SOLOMON DWIGGINS & FREER, LTD.

By:
MARK A. SOLOMON, ESQ.
Nevada State Bar No. 00418
BRIAN P. EAGAN, ESQ.
Nevada Bar No. 09395
9060 West Cheyenne Avenue
Las Vegas, Nevada 89129

Attorneys for Petitioner, Scott Canarelli

SOLOMON DWIGGINS & FREER, LTD.
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TEL.: (702) 853-5483 | FAX: (702) 853-5485

# EXHIBIT 3

EXHIBIT 3

BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
MICAELA RUSTIA MOORE, ESQ.
Nevada Bar No. 9676
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: 702.262.6899
Facsimile: 702.597.5503
Email: baxelrod@foxrothschild.com
mmoore@foxrothschild.com
*Counsel for American West Development, Inc.*

Electronically Filed June 25, 2013

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re

AMERICAN WEST DEVELOPMENT, INC., a Nevada corporation,

fdba Castlebay 1, Inc.
fdba Development Management, Inc.
fdba Fairmont 1, Inc.
fdba Glen Eagles 3, Inc.
fdba Heritage 1, Inc.
fdba Inverness 5, Inc.
fdba Kensington 1, Inc.
fdba Kingsbridge 1, Inc.
fdba Promontory Estates, LLC
fdba Promontory Point 4, Inc.
fdba Silverado Springs 1, Inc.
fdba Silverado Springs 2, Inc.
fdba Tradition, Inc.
fdba Windsor 1, Inc.

Debtor.

Case No.: 12-12349-MKN

Chapter 11

***AMENDED* MOTION FOR FINAL DECREE TO CLOSE CASE**

Hearing Date: July 23, 2013
Hearing Time: 10:00 a.m.

American West Development, Inc. ("AWDI" or "Reorganized Debtor"), reorganized debtor in the above-captioned chapter 11 bankruptcy case (the "Chapter 11 Case"), by and through its counsel, Fox Rothschild LLP, hereby submits this Amended Motion for Final Decree

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

to Close Case ("Motion"). This Motion is supported by the Declaration of Jackie Nares (the "Nares Declaration"), the papers and pleadings on file herein and any oral arguments of counsel at the hearing on the Motion. AWDI respectfully represents and states as follows:

Bankruptcy Code section 350(a) and Rule 3022 of the Federal Rules of Bankruptcy Procedure (the "Rule") provide that the in a chapter 11 reorganization case, a court shall enter a final decree closing the case "after an estate is fully administered."

According to 3 Collier on Bankruptcy 350.02 [2], the Advisory Committee Note to the Rule lists the following factors to be considered in determining whether an estate has been fully administered: (a) whether the order confirming the plan has become final; (b) whether deposits required by the plan have been distributed; (c) whether the property proposed by the plan to be transferred has been transferred; (d) whether the debtor or the successor of the debtor under the plan has assumed the business of the management of the property dealt with by the plan; (e) whether payments under the plan have commenced; and (f) whether all motions, contested matters and adversary proceedings have been finally resolved.

As established in greater detail below, the aforementioned factors of full administration of the estate have all been met, to wit: (a) the confirmation order has not only become final but, on March 15, 2013, it became effective, thereby allowing the plan to be substantially consummated; (b) the $10 million new value contribution was fully funded thereby, among other things, enabling the deposit of the Confirmation Funds to be made with the disbursing agent (which included a $1.5 million deposit for payment of allowed Class 3 claims and another $1.5 million deposit with the Construction Defect Trust); (c) the non-cash items required to be transferred to the Construction Defect Trust occurred by operation of law on the effective date of the plan; (d) the Construction Defect Trust has assumed the liabilities as required under the plan and has commenced dealing with the corpus of the Construction Defect Trust by making the cash out payment to those members of Class 4 who made the cash out election; (e) the Reorganized Debtor's management has deployed the assets with which the Reorganized Debtor was revested in the ongoing business of the Reorganized Debtor; (f) payments under the plan have

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

commenced via payment of (i) allowed administrative and priority claims, (ii) the fees of the U.S. Trustee, (iii) the cash out payment to electing members of Class 4 and (iv) cash payments to members of Class 3 who entered into settlements of their price promise claims; and (g) all motions, contested matters and adversary proceedings have been completed at the bankruptcy court level with any right to appeal to expire or be exercised prior to the hearing on the Motion.

Enumerated below is greater detail concerning the full administration of the estate:

1. AWDI filed the voluntary petition commencing this Chapter 11 Case on March 1, 2012 (the "Petition Date"). Subsequently, the undersigned was employed as counsel for Debtor, and the initial 11 U.S.C. § 341(a) meeting in this Chapter 11 Case was held on April 4, 2012.

2. On April 3, 2012, the Court entered an order (the "Bar Date Order") in the Chapter 11 Case establishing June 29, 2012, at 5:00 p.m. (the "General Bar Date") and July 30, 2012, at 5:00 p.m. (the "Supplemental Bar Date," together with the General Bar Date, the "Bar Dates"), as the deadlines for filing an original, written proof of any claim against AWDI (the "Proof of Claim"). The Bar Dates apply to all claims against AWDI that arose before the Petition Date, except the Excluded Claims set forth in the Supplemental Bar Date Notice.

3. On February 14, 2013, the Court entered its *Order Confirming Debtor's First Amended Chapter 11 Plan of Reorganization (Dated October 15, 2012)* [Docket No. 853] (the "Confirmation Order") confirming the *First Amended Chapter 11 Plan of Reorganization (Dated October 15, 2012)* [Docket No. 714], as modified by the *Errata to Debtor's First Amended Chapter 11 Plan of Reorganization* [Docket No. 784] (the "Plan").[1] Pursuant to the Confirmation Order, the Plan went effective and was consummated on March 15, 2013 (the "Effective Date").

4. In accordance with the Plan, on or before the Effective Date:

(a) The Bar Dates passed;

(b) The Disclosure Statement Order was entered [Docket No. 785] and became a Final Order;

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

(c) The Confirmation Order was entered and became a Final Order, and provides, among other things, that: (i) Debtor, Reorganized Debtor, the Secured Lenders and the DIP Lender have acted in good faith; (ii) the Distributions and/or consideration received by the DIP Lender and Reorganized Debtor shall not be subject to avoidance, turnover or disgorgement in any subsequent insolvency proceeding by any Person or Entity; and (iii) the Liens securing the New Secured Loan constitute valid first priority Liens, subject only to any Permitted Encumbrances, and shall not be subject to avoidance, turnover or disgorgement in any subsequent insolvency proceeding by any Person or Entity;

(d) AWDI timely sent the Notice of Confirmation;[2]

(e) The Construction Defect Trust Declaration was executed and delivered;[3]

(f) The Construction Defect Trust Contribution and the Construction Defect Actions were transferred to the Construction Defect Trust;

(g) All Old Equity Interests were extinguished, canceled, terminated and have no force and effect thereafter;

(h) Reorganized Debtor was vested with all of Debtor's Assets, free and clear of all Claims, Liens and Old Equity Interests (except for Liens provided or authorized pursuant to the Plan);

(i) The New Capital Contribution in the aggregate amount of approximately $10,000,000 was fully funded and the amount of $4,300,000 was paid to Reorganized Debtor,[4] to be distributed in accordance with the Plan;

---

[2] Notice of Confirmation was sent on February 19, 2013. (See Docket No. 861).

[3] (See Nares Decl., ¶ 7).

[4] (See Nares Decl., ¶ 4, Ex. 1).

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

(j) Reorganized Debtor funded the Construction Defect Trust with $1,500,000,[5] to be distributed in accordance with the Plan and the TDP, as applicable;

(k) The required amount of Confirmation Funds has been paid and turned over to the Distribution Agent for Distribution in accordance with the Plan;

(l) The Confirmation Order authorized the assumption of all Assumed Contracts;

(m) In consideration of the New Capital Contribution in the aggregate amount of approximately $10,000,000, one hundred percent (100%) of the New Equity Interests in Reorganized Debtor was issued to the DIP Lender (subject to a pledge thereof in favor of the Secured Lenders to secure any obligations of Reorganized Debtor under the New Secured Loan);

(n) The New Secured Loan closed and the New Secured Loan Documents became effective. Each Secured Lender, as a Holder of an Allowed Secured Claim, received, in full satisfaction, settlement, release and exchange for its Allowed Secured Claim, payments from and performance by Reorganized Debtor under the New Secured Loan according to the terms and conditions of the New Secured Loan Documents. The New Secured Loan is evidenced by the New Secured Notes, in the aggregate principal amount of $49,635,000, which were executed by Reorganized Debtor and payable to the order of each Secured Lender according to such Secured Lender's pro rata interest in the New Secured Loan. The New Secured Loan is secured by Liens on the Secured Lenders' collateral pursuant to the New Secured Loan Documents. Pursuant to the terms of the Lock-Up and Settlement Letter Agreement, the Secured Lenders

[5] (See Nares Declaration, ¶ 8, Ex. 4).

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

waived any respective entitlement to receive or recover from Debtor or Reorganized Debtor any interest accruing at the default rate under the Term Loan Documents prior to the Effective Date to the extent (and only to the extent) that such default rate interest would be triggered under the Term Loan Documents by the commencement of the Chapter 11 Case;

(o) (i) AWDI's obligations as co-borrower under the Term Loan were deemed replaced by its obligations as borrower under the New Secured Loan; (ii) Reorganized Debtor was deemed to be the sole owner of all of Debtor's re-vested assets, including the Receivable and contract rights under each of the Design Build Agreements and the Marketing and Administrative Services Agreements, free and clear of all Liens and interests except the Secured Lenders' Liens and interests under the New Secured Loan Documents; and (iii) all Liens and security interests in the Receivable automatically was deemed to secure only Reorganized Debtor's obligations to the Secured Lenders under the New Secured Loan Documents;

(p) The Secured Lenders waived their Deficiency Claims in the amount of $112,412,145.37[6] since Class 3 voted in favor of the Plan;

(q) Any outstanding US Trustee Fees were paid in full;[7] and

(r) The channeling injunction contained in Section 12.5(d) was issued.

5. Pursuant to the Plan, on or before the Effective Date, the Reorganized Debtor made payments totaling $3,000,000.00 to holders of Allowed Class 3 Claims and the Construction Defect Trust, as detailed on Exhibit 5 attached to the Nares Declaration. (See also Amended Post-Confirmation Quarterly Reporting For the Period From February 14, 2013

[6] This amount was calculated as of October 9, 2012 and is the amount that is included in the *Master Disclosure Statement* [Docket No. 721].

[7] (See Nares Decl., ¶ 5, Ex. 2).

through March 31, 2013 [Docket No. 926]). A true and correct copy of the Amended Post-Confirmation Quarterly Report is attached hereto as **Exhibit A** for the Court's convenience.

6. On or after the Effective Date, $1,462,235.80 in distributions were made to Holders of Allowed Class 3 Claims, thereby effectuating the settlements with the Pricing Commitment claimants. (See Nares Decl., ¶ 9, Ex. 5).

7. AWDI placed $37,764.20 in a disputed claims reserve account pending resolution of its objection to Proof of Claim No. 30 by Interstate Plumbing & Air Conditioning, Inc. (See Nares Decl., ¶ 6, Ex. 3).

8. Pursuant to the Plan, the deadline for the Reorganized Debtor to file objections to Claims was no later than thirty (30) days after the Effective Date. (See Plan, § 7.3). AWDI timely filed one *Objection to Proof of Claim No. 30 brought by Interstate Plumbing & Air-Conditioning, Inc.* [Docket No. 878]. On June 11, 2013, the Bankruptcy Court entered an order sustaining the Reorganized Debtor's objection to the proof of claim and disallowed the claim. (See Docket No. 958).

9. Pursuant to the Plan, Construction Defect Claims shall be liquidated, resolved, paid and satisfied by the Construction Defect Trust, rather than by objection in the Bankruptcy Court, unless the Construction Defect Trustee Files an objection to any Construction Defect Claim in the Bankruptcy Court within thirty (30) days after the Effective Date. (See Plan, § 7.3). The Construction Defect Trustee did not file objections to any Construction Defect Claims in the Bankruptcy Court. Instead, Construction Defect Claims will be administered pursuant to the Trust Distribution Procedures. The Construction Defect Trustee set a bar date of July 15, 2013 for submitting Construction Defect Claims. The Construction Defect Trust's website for information is located at http://www.AWDCONSTRUCTIONDEFECT.com.

10. Within sixty (60) days of the Effective Date, thirty-three (33) Holders of Construction Defect Claims who made the Cash Out Election received a Cash Out Payment, mailed by the Construction Defect Trustee (funded from the Construction Defect Trust

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Contribution) to the address to which the Class 4 Ballot was mailed unless a different address was provided on such Holder's completed Class 4 Ballot.

11. Notice of the occurrence of the Effective Date of the Plan and notice of the Administrative Claim Bar Date was Filed with the Bankruptcy Court and served upon all Creditors and all potential Holders of Administrative Claims known to Debtor (whether or not disputed). (See Docket No. 875).

12. The Reorganized Debtor paid to the United States Trustee all post-confirmation quarterly fees through March 30, 2013, as invoiced by the United States Trustee pursuant to 28 U.S.C. § 1930. (See Ex. A; Nares Declaration, Ex. 2).

13. All Professional Fee Claims allowed on a final basis have been paid.

14. Pursuant to the New Secured Loan, AWDI timely made payments to California Bank and Trust on March 29, 2013, April 30, 2013, May 31, 2013 and June 24, 2013. (See Nares Decl., ¶ 11, Ex. 6).

15. AWDI assumed approximately 177 executory contracts and unexpired leases and such counterparties are continuing to do business with AWDI thereunder in reliance on the Confirmation Order. (See Nares Decl., ¶ 12).

16. At least two vendors have extended credit to AWDI in reliance on the Confirmation Order. (See Nares Decl., ¶ 13).

17. Class 5 Bond Claims were unimpaired and continued to extend bonding in reliance on the Confirmation Order. (See Nares Decl., ¶ 14)

18. The Nevada Contractors Board and Nevada Real Estate Division were provided with the Confirmation Order, upon their request. (See Nares Decl., ¶ 15).

19. From March 16, 2013 to June 21, 2013, AWDI closed 199 homes. (See Nares Decl., ¶ 16).

20. As set forth above, the terms of the Plan have been substantially consummated and the assets of AWDI's estate have been fully administered. Accordingly, this Chapter 11 Case can and should be closed.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

WHEREFORE, in light of the foregoing, AWDI respectfully requests (i) that the Court enter a final decree closing the Chapter 11 Case, and (ii) for such other and further relief as is just and proper.

DATED this 25th day of June, 2013.

**FOX ROTHSCHILD LLP**

By *__/s/Brett A. Axelrod__*
BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
MICAELA RUSTIA MOORE, ESQ.
Nevada Bar No. 9676
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
*Counsel for American West Development, Inc.*

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

# EXHIBIT 4

EXHIBIT 4

United States Bankruptcy Court
District of Nevada

Case No. 12-12349-mkn
Chapter 11

In re: (Name of Debtor)
AMERICAN WEST DEVELOPMENT, INC.
fdba HERITAGE 1, INC.
fdba SILVERADO SPRINGS 1, INC.
fdba SILVERADO SPRINGS 2, INC.
fdba KINGSBRIDGE 1, INC.
fdba INVERNESS 5, INC.
fdba CASTLEBAY 1, INC.
fdba PROMONTORY ESTATES, LLC
fdba DEVELOPMENT MANAGEMENT, INC.
fdba FAIRMONT 1, INC.
fdba WINDSOR 1, INC.
250 PILOT ROAD, STE 140
LAS VEGAS, NV 89119

# ORDER ENTERING FINAL DECREE

It appearing that this Court's continuing jurisdiction is no longer necessary and that the case has been fully administered,

IT IS HEREBY ORDERED that a Final Decree is entered closing this case without prejudice to the reopening of this case for further administration.

Dated: 9/5/13

BY THE COURT

Mary A. Schott
Mary A. Schott
Clerk of the Bankruptcy Court

# EXHIBIT 5

EXHIBIT 5

BRETT A. AXELROD (NV BAR NO. 5859)
MARK J. CONNOT (NV BAR NO. 10010)
CHARLES D. AXELROD *(Admitted Pro Hac Vice)*
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway. Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
mconnot@foxrothschild.com
caxelrod@foxrothschild.com
*Counsel for American West Development, Inc.*

Electronically Filed June 24, 2015

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In Re

American West Development, Inc.,

Debtor.

Case No. BK-S-12-12349-MKN

Chapter 11

**AMERICAN WEST DEVELOPMENT, INC.'S OPPOSITION TO MOTION OF ZURICH AMERICAN INSURANCE COMPANY AND ITS AFFILIATE INSURERS TO DETERMINE AND DECLARE THAT THE DEBTOR'S DISCHARGE DOES NOT EXTEND TO CERTAIN IDENTIFIED NON-DEBTORS, OR, IN THE ALTERNATIVE, TO MODIFY DISCHARGE INJUNCTION**

Hearing date: July 8, 2015
Hearing time: 9:30 A.M.
Place: Bankruptcy Courtroom No. 2

## I. Introduction

As set forth herein, American West Development, Inc. ("AWDI" or "Reorganized Debtor") opposes the Motion of Zurich American Insurance Company and Its Affiliate Insurers (collectively, "Zurich") to Determine and Declare that the Debtor's Discharge Does Not Extend to Certain Identified Non-Debtors, or, in the Alternative, to Modify Discharge Injunction [dkt. # 1056] (the "Motion").

///

///

II. **Pertinent Procedural Background**

**A. The Bankruptcy Proceedings**

An Order Confirming Debtor's First Amended Chapter 11 Plan of Reorganization was entered on February 14, 2013 [dkt. # 853] (the "Confirmation Order"). The First Amended Chapter 11 Plan [dkt. # 714] (as corrected with an Errata [dkt. # 784]) ("First Amended Plan") was approved at a confirmation hearing on January 15, 2013.

Zurich did not oppose confirmation of the First Amended Plan once the Confirmation Order was modified to contain the following specific provisions revisions dealing with Zurich in paragraph 8 thereof:

> 8. Insurance Matters. The following matters previously agreed by and between Debtor, on the one hand, and Zurich American Insurance Company, Steadfast Insurance Company, and their affiliate insurers (collectively, "Zurich"), on the other hand, shall remain in full force and effect with respect to the Plan: (a) no debt or obligation owed to Zurich by any non-debtor, including but not limited to obligations owed to Zurich by American West Homes, Inc., shall impair, decrease, or otherwise affect any insurance policy or proceeds payable under such policy; (c) Zurich shall not assert that the Construction Defect Trust, the Debtor, the Reorganized Debtor, or the Estate is liable or responsible for debts owed to Zurich by non-debtor American West Homes, Inc. or any other non-debtor; (d) Zurich shall not assert that any non-debtor is liable or responsible for debts owed to Zurich by Debtor; and (e) Zurich agrees not to assert that the Construction Defect Trust, the Debtor, the Reorganized Debtor, or the Estate are jointly-and-severally liable for amounts owed by American West Homes, Inc. or any other non-debtor.

Zurich was an active participant in AWDI's Chapter 11 proceedings. On September 21, 2012, Zurich objected to confirmation of the AWDI's original proposed Plan of Reorganization [dkt. # 263] (as modified by the original Plan's supplement [dkt. #643]). *See* Objection of [Zurich] to Debtor's Plan Supplement and Confirmation of Debtor's Plan of Reorganization [dkt. # 668] (the "Zurich Objection"). The Zurich Objection dealt primarily with: so-called "insurance neutral" language, purported limitations of Zurich's rights to litigate claims and the transfer of rights to the Construction Defect Trust, and the allegation that among other things AWDI's original plan modified the self-insured retention ("SIR") obligations under governing policies.

The Zurich Objection did not concern, mention, or attach the Zurich Policy, which is the sole subject of the Motion. Rather, it attached and solely related to one of the so-called "AWD

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Policies." Zurich specifically states that the "AWD Policies" are not at issue in its Motion. *Compare* Motion at 3:19-3:22 and Zurich Objection at 2, FNs 2 and 3 (identifying seven policy numbers, none of which is the Zurich Policy, which Zurich refers to as "the relevant AW Homes Policy" in the Motion at 4:8-9).

After Zurich filed its objection, AWDI and Zurich worked through and resolved Zurich's issues. The result was the above-cited compromise language in paragraph 8 of the Confirmation Order. Accordingly, Zurich did not further oppose the First Amended Plan nor did its counsel make an appearance at the confirmation hearing in January 2013.[1] Indeed, Zurich did not vote on AWDI's First Amended Plan. *See* declaration of Jeffrey S. Stein of Garden City Group, Inc., containing the results of voting on the First Amended Plan [dkt. #871].

Zurich failed to request or secure the relief it now seeks in the Motion in connection with confirmation of the First Amended Plan and entry of the Confirmation Order. Paragraph 8 of the Confirmation Order, which AWDI and Zurich specifically negotiated in response to Zurich's concerns, does not contain language specifically authorizing Zurich to pursue non-debtors or stating that the discharge objection does or does not prohibit Zurich's proposed actions against various non-debtors.

On September 5, 2013, the Court entered its Order Entering Final Decree [dkt. # 1039] (the "Case Closure Order"). The Case Closure Order states that:

> It appearing that this Court's continuing jurisdiction is no longer necessary and that the case has been fully administered, IT IS HEREBY ORDERED that a Final Decree is entered closing this case without prejudice to the reopening of this case for further administration.

No one, including Zurich, has moved to reopen the proceedings.

Zurich waited to file the Motion until nearly 28 months after the Confirmation Order was entered, from February 2013 to June 2015, and nearly 21 months after the Case Closure Order

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

[1] Local Rule 3020 requires parties opposing confirmation of a Chapter 11 plan to file declarations in opposition to confirmation seven days or more before confirmation hearing. The confirmation hearing in this matter occurred on January 15, 2013.

was entered.[2] In its Motion, Zurich fails to explain why it failed to raise the issues set forth in the Motion in connection with confirmation of the First Amended Plan or before the entry of the Case Closure Order. While Zurich's Motion contains vague and unsupported statements about how AWDI "has asserted that its confirmed chapter 11 plan discharges debts owed to Zurich by certain non-debtor entities" (Motion at 1:24-25), the accompanying declaration of Nancy Dow does not discuss AWDI's alleged statements, including who made them or when they were made. More importantly, Zurich fails to identify why it did not seek the requested relief in 2012 or 2013 when plan confirmation proceedings were occurring. This is even more puzzling based on Zurich's representations about when the underlying losses were reported to it as the insurer: January 1, 2001 for one claim and January 2, 2001 for the other four claims, each more than 14 years ago. *See* Motion at 5-8 and at Exhibit B (Dow declaration) at ¶¶ 4-8. Indeed, Zurich asserts that all but one of the "Due Date[s] of SIR" for the claims were well before the Confirmation Order was entered: December 20, 2010, February 5, 2012 (two claims), June 2, 2011, and January 3, 2014. *Id.*[3]

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

**B. The Underlying Claims Relating to the AWDI and the Zurich Policy**

Zurich's descriptions of the five claims in its Motion are cursory and uninformative. Zurich fails to provide any meaningful detail or crucial facts about the claims, such as who were the named defendants in the underlying litigation, where the actions were filed, or case numbers. The only information Zurich provides is the alleged "Date Loss Reported" (itself an unclear, undefined term), the Zurich Policy number (which is the same for all five alleged claims according to Zurich and which Zurich identifies as the "relevant AW Homes Policy"), the amount of Zurich's alleged payments, the amount of alleged SIR due, the alleged due date of the

[2] In August 2013, six months after plan confirmation, Zurich's counsel sent a letter to counsel for the AWDI about Zurich's claims. Counsel thereafter discussed Zurich delaying its pursuit of the subject of its Motion until the August 12, 2013 adversary complaint between the Office of the United States Trustee for Region 17 and the AWDI was resolved.

[3] How Zurich determines the "Due Date of SIR" for purposes of the Motion is unclear and AWDI does not concede either that any SIR is or was due or when any such SIR would have been due. Reorganized Debtor further does not concede any other facts in relation to the claims discussed in the Motion, including when the date of loss was reported, the applicable policy or policy number, what payment(s) Zurich made, to whom Zurich made payments, or who is obligated or liable to pay any particular SIR.

SIR, and identical lists of the 25 Named Insureds from the Zurich Policy (omitting only AWDI, another "Named Insured", as discussed more below).

The Reorganized Debtor has limited information about the claims and litigation. It has discerned the following details about three of the claims:

| Claim | Case Number | Date Complaint Filed |
|---|---|---|
| Backman Claim | EJDC[4] A633888 | January 24, 2011 |
| Stacy Spring Claim | EJDC A575959 | March 11, 2009[5] |
| Medina Claim | EJDC A558243 | March 3, 2008 |

American West Homes and AWDI were named as defendants in all of these actions. Conversely, none of the so-called "non-debtor SIR Obligors" were named as defendants in any of the actions. Importantly, each of the complaints was filed well before the confirmation proceedings.

AWDI is unaware of the details of the so-called "Classic Development Claim" identified on page 6 of the Motion and the "DJ Claim" identified on page 8 of the Motion. Zurich's counsel has not responded to requests for additional information about the claims.[6]

## III. ARGUMENT

### A. Zurich's Motion is Procedurally Flawed and Factually Inaccurate

#### 1. Zurich's Motion is Delinquent And Should be Denied

Zurich's Motion asks the Court either to interpret or modify the discharge provisions of the Confirmation Order and its resulting injunction, but Zurich provides no procedural basis for its Motion. Zurich cites only substantive bases in support of its request that the Court interpret or modify the Confirmation Order. This notable omission has a likely explanation: whatever

---

[4] EJDC refers to the Eighth Judicial District Court of the State of Nevada in and for County Clark.

[5] American West Homes, Inc. was named as a defendant in the original November 18, 2008 complaint. AWDI was added as a defendant in the amended complaint, filed on March 11, 2009.

[6] Edward Lubbers, an attorney who represents the Reorganized Debtor, requested on June 16, 2015 that Zurich's attorney Ann Marie Hansen provide the date Zurich received each claim or notice of claim, the date or dates alleged in each claim, and if lawsuits were filed, the court case numbers. *See* Declaration of Edward Lubbers, filed concurrently herewith ("Lubbers Declaration"). Mr. Lubbers also mentioned that the Reorganized Debtor is unaware of the "DJ" claim discussed in the Motion. *Id.* As of the preparation of this response, Ms. Hansen had not replied to Mr. Lubbers' request. *Id.*

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

procedural basis Zurich could potentially choose to rely upon (whether, Federal Rules of Bankruptcy Procedure ("FRBP") 5010 or 9024, Federal Rule of Civil Procedure ("FRCP") 60, or 11 U.S.C. § 1144 or 350), the Motion is fatally flawed. Each possible procedural basis is discussed and rejected in turn below.

Zurich's Motion seeks either a partial revocation or amendment of the Confirmation Order. The Motion is, however, filed well after the expiration deadline to revoke an order confirming a plan, and is unreasonably late under the standard for general motions for relief from orders.

FRBP 9024 governs motions for relief from orders and judgments:

> Rule 60 F.R.Civ.P. applies in cases under the Code except that (1) a motion to reopen a case under the Code or for the reconsideration of an order allowing or disallowing a claim against the estate entered without a contest is not subject to the one year limitation prescribed in Rule 60(c), (2) a complaint to revoke a discharge in a chapter 7 liquidation case may be filed only within the time allowed by § 727(e) of the Code, and (3) a complaint to revoke an order confirming a plan may be filed only within the time allowed by § 1144, § 1230, or § 1330. In some circumstances, Rule 8008 governs post-judgment motion practice after an appeal has been docketed and is pending.

11 U.S.C. §1144 in turn provides that:

> On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall-
>
> (1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and
> (2) revoke the discharge of the debtor.

Because the Confirmation Order was entered on February 12, 2013, Zurich's deadline to seek an order revoking the Confirmation Order was August 12, 2013. There is no dispute that Zurich failed to seek such relief by August 12, 2013. Moreover, no procurement of the Confirmation Order by fraud is even alleged by Zurich.

The Motion is untimely under FRCP 60. FRCP 60 contains two main categories of relief from orders/judgments and enumerates various subcategories. Generally speaking, a Court may always correct a "clerical mistake or a mistake arising from oversight or omission whenever one

is found in a judgment, order, or other part of the record" at any time. FRCP 60(a). Courts may enter such relief with or without a motion and with or without notice. While there is apparently no deadline for such motions, Zurich does not argue that there has been a clerical mistake or an oversight or omission and accordingly FRCP 60(a) is inapplicable.

FRCP 60(b) permits a court to relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

Motions under FRCP 60(b) must be made "within a reasonable time", and motions under FRCP 60(1), (2), and (3) must be brought no more than one year after entry of the judgment/order. FRCP 60(c).[7]

Zurich fails to specify which provision of FRCP 60(b) might theoretically apply to its Motion. Zurich likewise fails to supply any evidence (or argument, for that matter) in support of any of the bases for relief from the Confirmation Order under FRCP 60(b). Regardless, if considered a request under any of FRCP 60(b)'s subparts, the Motion is untimely because it is not brought within a reasonable time.

As noted above, the Confirmation Order was entered in February 2013, following multiple iterations of the plan. Zurich participated in revisions to AWDI's original plan. The

[7] The Ninth Circuit has held that "What constitutes 'reasonable time' depends upon the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to the other parties." *Lemoge v. United States*, 587 F.3d 1188, 1196 (9th Cir. 2009). All of these factors weight against the relief Zurich seeks, which is presumably why Zurich fails to discuss any of them in its Motion.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Motion, filed more than two years after the First Amended Plan was confirmed and the Confirmation Order was entered, filed years after complaints were filed in relation to most or all of the underlying claims, and filed *14 ½ years* after Zurich claims the losses were originally reported, cannot be deemed to meet a reasonable time criteria.

Zurich's Motion is also procedurally defective to the extent it seeks to recover professional fees after the applicable claim bar date. Professional fee claims were due by June 15, 2013.[8] Zurich retained counsel to represent AWDI in relation to the underlying claims, and those expenses at least in part make up the SIR. *See*, *e.g.*, letter from Susan Gummow to Edward Lubbers, attached to the Lubbers Declaration as Exhibit 1 (including "legal fees and other expenses" under the list of claims relating to the SIR).

In addition, the Motion should be denied under the doctrine of laches. *See*, *e.g.*, *In re Beaty*, 306 F.3d 914, 924 (9th Cir. 2002) (holding that laches applies to FRBP 5010 and 9024/FRCP 60(b) actions). "The affirmative defense of laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Id.* at 926. As discussed above, Zurich fails to explain the considerable delay in bringing this issue to the Court's attention. AWDI is prejudiced by the need to respond to this Motion and the potential adverse implications of a modification of the discharge injunction, among other things.

Finally, as noted above, AWDI's chapter 11 case was closed on September 5, 2013. Zurich has not filed a motion to reopen these proceedings under Federal Rule of Bankruptcy Procedure 5010 ("A case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b) of the Code), Local Rule 5010[9], or 11 U.S.C. § 350(b) ("A case may be

[8] *See* First Amended Plan [dkt. # 714] at 4 (paragraph 2.2(a)(3)(A) , which provides that applications for professional fee claims were due within 90 days of the Effective Date. The Effective Date of the First Amended Plan was March 15, 2013. *See* Notice of: (I) Effective Date, of Debtor's First Amended Chapter 11 Plan of Reorganization (Dated October 15, 2012); and (II) Deadline for Filing Requests for Payment of Administrative Claims [dkt. # 868].

[9] LR 5010 requires anyone seeking to reopen a matter to make a disclosure about fees owed in the underlying matter and in some cases requires the party seeking to reopen the matter to pay certain fees. Zurich neither moved to reopen AWDI's Chapter 11 proceedings nor did it make the requisite fee disclosure.

Case 12-12349-mkn Doc 1062 Entered 06/24/15 14:08:27 Page 9 of 35

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause"). "Procedure requires that a motion be filed" for a bankruptcy court to reopen a closed matter even if the bankruptcy court had jurisdiction to hear a specific motion. *In re Elias*, 215 B.R. 600, 604 (B.A.P. 9th Cir. 1997) *aff'd.* 188 F.3d 1160 (9th Cir. 1999).

While the Ninth Circuit has held that reopening a case is "typically ministerial and presents only a narrow range of issues", including whether further administration appears to be warranted (*In re Lopez*, 283 B.R. 22, 26 (B.A.P. 9th Cir. 2002)), motions to reopen are not granted as a matter of right. *See In re Elias*, 215 B.R. at 604 (the Court's decision to reopen is entirely within its sound discretion, based on the circumstances of each case). A party seeking to reopen a bankruptcy case must present prima facie proof that the estate has not been fully administered. *Id.* at 27. Zurich has failed to present such proof. Reopening the AWDI case is a threshold prerequisite to the Court considering Zurich's Motion. Because Zurich failed to move to reopen AWDI's case, it has failed to establish that, *inter alia*, it is a "party in interest" or whether it meets any of the criteria of section 350(b).[10] Therefore, regardless of whether Zurich's Motion falls under FRCP 60, FRBP 5024[11], or 11 U.S.C. §1144, Zurich has failed to satisfy a condition precedent for the Court's consideration of its request.

**2. <u>Zurich's Attempts to Extend the Deadline to Seek Modification of the Court's Order is Improper</u>**

Zurich cites 11 U.S.C. § 105, 28 U.S.C. § 2201 (the Declaratory Judgment Act), and "this Court's inherent authority to interpret its own orders" as supporting the Court's authority to resolve this "dispute." While the Court may possess authority to issue declaratory relief in some circumstances (and usually in the context of an adversary proceeding, see *infra*), requests for declaratory relief may not be used to circumvent other deadlines or to obviate the Motion's other procedural defects.

---

[10] AWDI preemptively objects to any attempt Zurich may make to discuss these issues for the first time in its reply brief.

[11] As noted above, FRBP 5024 provides that motions to reopen bankruptcy matters need not be brought within the one-year deadline for certain FRCP 60 motions. Because Zurich failed to move to reopen AWDI's Chapter 11 proceedings, this provision is inapplicable.

11 U.S.C. § 105(a) grants bankruptcy courts the authority to:

> Issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

The Motion does not seek to "enforce or implement" this Court's Confirmation Order or to carry out the provisions of the Bankruptcy Code. The Motion instead seeks to modify the Confirmation Order. Accordingly, section 105 is inapplicable.

Even if the Motion did fall within the scope of section 105, courts frown upon attempts to use declaratory relief actions as a means to extend deadlines which have expired. For example, in *Willms v. Sanderson*, 723 F. 3d 1094, 1102 (9th Cir. 2013), the Ninth Circuit rejected a party's attempts to treat a motion under Rule 4004 as arising under Rule 4007(c) through the exercise of equitable powers under 11 U.S.C. § 105, noting that "[section] 105(a) is not a 'roving commission to do equity.'" Zurich cannot obtain an extension of time to seek relief from the Confirmation Order by framing its Motion as one for declaratory relief.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

### 3. Zurich's Motion Should Be Denied Because It Must Bring an Adversary Complaint to Seek its Requested Relief

Finally, and perhaps most importantly, Zurich's Motion is an improper attempt to evade the requirement that it file an adversary complaint. Bankruptcy Rule 7001 defines what types of actions are adversary proceedings. Subparts 5, 6, and 9 of Bankruptcy Rule 7001 all arguably relate to Zurich's requested relief:

> An adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings:
>
> . . .
>
> (5) a proceeding to revoke an order of confirmation of a chapter 11, chapter 12, or chapter 13 plan;
>
> (6) a proceeding to determine the dischargeability of a debt;
>
> . . .
>
> (9) a proceeding to obtain a declaratory judgment relating to any of the foregoing.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Zurich's Motion seeks either an order declaring that the discharge does not extend to certain non-debtors, or an order modifying the discharge injunction. These requests both seek to at least implicitly (and partially) revoke the Confirmation Order and to determine the dischargeability of a debt. If any one of those subparts of Rule 7001 apply, and the Reorganized Debtor submits that both apply, then Zurich's request for declaratory judgment relating to them must be brought as an adversary proceeding.

Zurich chose to file the Motion instead of instituting an adversary action. By doing so, Zurich made a procedural error. "A motion procedure cannot be used to circumvent the requirement of an adversary proceeding." *In re Loloee*, 241 B.R. 655, 660 (B.A.P. 9th Cir. 1999). By filing a motion instead of initiating an adversary proceeding, Zurich has, among other things, deprived the Reorganized Debtor of the 30 day period to respond to adversary complaints under FRBP 7012(a).[12] It has also deprived the Reorganized Debtor (and potentially the "non-Debtor SIR Obligors", none of whom were served with the Motion) the opportunity to perform discovery.

**B. Zurich's Theory of Liability Renders the Motion Self-Defeating**

Zurich's Motion is self-defeating based on the plain language of the Confirmation Order. Zurich asserts that all of the "Named Insureds" under the AW Homes Policies fall within the scope of the terms "you" and "your" in the Zurich Policy and therefore that each of the "Named Insured" is jointly and severally liable for the SIR. Motion at 4, FN 5. Zurich defines 25 of these "Named Insureds" as "SIR Obligors" under each of the five claims mentioned in the Motion.

Zurich's argument undercuts itself. AWDI is a "Named Insured" on the so-called "AW Homes Policies."[13] *See* Exhibit A to Motion at page 6 of 72.[14] Zurich repeatedly uses the phrase

---

[12] While some Courts have found that a bankruptcy court's ruling on a motion that should have been brought as an adversary proceeding is non-reversible error, such error is only excused when "the record has been adequately developed." *In re Laskin*, 222 B.R. 872, 874 (B.A.P. 9th Cir. 1998). As noted herein, the record is not fully developed as Zurich has failed to provide critical information about the underlying claims, among other things.

[13] The use of the self-serving phrase "AW Homes Policies" in the Motion is misleading and therefore disputed because AWDI is identified as a "Named Insured" in the Zurich Policy.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

"non-debtor SIR Obligors" in an attempt to construct a fiction whereby AWDI is removed from the list of parties liable for the SIR. This is done most obviously because AWDI has been discharged. Perhaps Zurich recognizes that AWDI's inclusion on the "Named Insureds" list, combined with the Confirmation Order's language in paragraph 8(d), precludes it from pursuing the other 25 "Named Insureds" under a theory of joint and several liability regardless of whether those "Named Insureds" had anything to do with the underlying claim.

The Reorganized Debtor disputes that the "Named Insureds" on the Zurich Policy are jointly and severally liable for the SIRs, but that issue is beyond the scope of this Motion and the Court should refrain from ruling on it (see *infra*). The other "Named Insureds" presumably also dispute liability. Zurich's concealment of AWDI as a "Named Insured" appears to be deliberately intended to circumvent a contextual argument which undermines Zurich's arguments based on Zurich's theory of joint and several liability. As noted above, paragraph 8(d) of the Confirmation Order provides that "Zurich shall not assert that any non-debtor is liable or responsible for debts owed to Zurich by Debtor." Under Zurich's theory that all of the "Named Insureds" are jointly and severally liable for the SIR, it would necessarily assert that AWDI owes a debt to Zurich for the SIR. Merely omitting AWDI from an otherwise faithful recitation of every other person and entity listed as a "Named Insured" in the Zurich Policy does not alter the fact or rectify the issue.

Paragraph 8(d) would be rendered moot if Zurich could simply exclude AWDI from an analysis of whether a debt is owed by both AWDI and non-debtors.[15]

---

[14] Curiously, Zurich's recitation of the "Named Insureds" on pages 4-5 of its Motion omits reference to AWDI.

[15] While outside of the scope of the Motion and this response, it is worth noting that holding 25 individuals and entities liable for SIRs relating to actions in which the 25 were not even parties and were not even arguably related to the underlying dispute would be highly inequitable. There is also no indication that any of the 25 "Named Insureds" other than American West Homes agreed to be bound by the Zurich policies.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

**C. The Court Should Refrain From Ruling on Insurance-Specific Substantive Issues**

The Court should refrain from entering any substantive rulings on the underlying insurance issues, including whether or not any non-debtors are liable for the alleged SIRs.

**1. <u>This Court Did Not Retain Jurisdiction to Rule on the Substance of the Zurich Policy or the Liability of Non-Debtors As Against Third Parties</u>**

Paragraph 26 of the Confirmation Order ("Retention of Jurisdiction") states that "the Court shall retain jurisdiction as provided in Article XI the Plan. Without limiting the generality of the foregoing, the Court shall retain jurisdiction to enter appropriate orders in aid of implementation of the Plan pursuant to Bankruptcy Code section 1142." Confirmation Order at 23.

Article XI of the First Amended Plan, specifically subsection 11.1 and its 21 subparts, describe the types of disputes and issues for which the Court retained jurisdiction. None of those subcategories relate to the adjudication of the liabilities of non-debtors to other third parties. An exhaustive recitation of each of the categories under subsection 11.1 is unnecessary and impractical in the context of this Opposition, and it is unclear whether Zurich even contends that this Court would possess jurisdiction over actions initiated by it against the non-debtors identified in its Motion. Suffice it to say that the Court never reserved jurisdiction over matters such as Zurich's proposed actions against non-debtors. To the extent Zurich asserts in a reply that this Court possesses such jurisdiction, the Reorganized Debtor will seek leave to file a sur-reply.

**2. <u>The Court has Limited Post-Confirmation Jurisdiction</u>**

Buttressing that the Court did not expressly retain jurisdiction over insurance disputes involving non-debtors and third parties is the fact that bankruptcy courts possess limited jurisdiction following the confirmation of a plan. The Ninth Circuit has held that a bankruptcy court's post-confirmation jurisdiction is limited to "matters affecting the interpretation, implementation, consummation, execution, or administration of the confirmed plan [which] will typically have the requisite close nexus to the bankruptcy plan or proceeding." *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1193 (9th Cir. 2005) (adopting the Third Circuit's standard after

noting that "post-confirmation bankruptcy court jurisdiction is necessarily more limited than pre-confirmation jurisdiction").

*In re Washington Mutual (Washington Mutual v. XL Specialty Insurance)*, Bankr. D. Del., case no. 08-12229, Oct. 4, 2012, is instructive.[16] The court held that a declaratory judgment action brought by the reorganized debtor (and later the liquidating trust that substituted in for the debtor) to determine insurance coverage on a pre-petition state court claim would, at best, implicate a bankruptcy court's pre-confirmation jurisdiction over matters "related to" chapter 11 proceedings. The court then held that, similar to the Ninth Circuit's view in *In re Pegagus Gold Corp.*, that:

> After confirmation of a chapter 11 plan, however, the scope of the bankruptcy court's 'related to' jurisdiction diminishes." *Astropower Liquidating Trust v. Xantrex Tech, Inc. (In re AstroPower Liquidating Trust)*, 335 B.R. 309, 323 (Bankr. D. Del. 2005). Post-confirmation, a bankruptcy court only has jurisdiction over a claim that has "a close nexus to the bankruptcy plan or proceeding" such as one which "affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 168-69 (3d Cir. 2004). *See also EXDS, Inc. v. Richard Ellis, Inc. (In re EXDS, Inc.)*, 352 B.R. 731, 735 (Bankr. D. Del. 2006); *AstroPower*, 335 B.R. at 323.

*Id.* at 6-7.

Zurich's hypothetical claims against 25 non-debtors lack any substantial nexus to AWDI's confirmed plan of reorganization or AWDI's pre-confirmation proceedings. Zurich itself is at pains to repeatedly state in its Motion that it does not seek to pursue the AWDI, and is only interested in addressing its potential claims against non-debtors.

### 3. **<u>Ruling On Hypothetical Claims Between Zurich and Non-Debtors Would Constitute an Improper Advisory Opinion</u>**

It is well-established that "federal courts . . . are prohibited from rendering advisory opinions." *In re Elias*, 215 B.R. at 604 (citing *Muskrat v. United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911); *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *American State Bank v. Marks (In re MacNeil),* 907 F.2d 903, 904 (9th Cir.1990)). *See also In re Family Services*, 130 B.R. 314, 317 (B.A.P. 9th. Cir. 1991) (noting that "[t]he oldest and most

[16] A copy of the decision is attached hereto as Exhibit A.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

consistent thread in the federal law of justiciability is that federal courts will not give advisory opinions", including when a "dispute" has not been properly framed and requires further proceedings).

Were this Court to attempt to rule on the merits of the underlying hypothetical insurance claims, it would be impermissibly dabbling in the realm of advisory opinions. Further proceedings are required, including discovery about, *inter alia*: (1) whether the "Named Insureds" agreed to be bound by the terms of the Zurich Policy; (2) whether the "Named Insureds" can be held jointly and severally liable for the SIRs regardless of their level of involvement in the underlying disputes, if any; among (3) what other legal and equitable defenses the "Named Insureds" would have in response to a claim by Zurich for the SIRs, and the facts relating thereto. Zurich's apparent theory of liability – that by being identified as a "Named Insured" on an insurance policy one becomes liable for the entire amount of every SIR that accrues under that policy – is a tenuous and doubtful proposition which the "Named Insureds" are sure to vigorously dispute.

This is neither the time nor the place to adjudicate these and the other issues which Zurich's hypothetical claim against the "Named Insureds" would raise. It would constitute an impermissible advisory opinion for the Court to enter an order which includes any language even suggesting that the "Named Insureds", or any of them, may be potentially liable for the SIRs discussed in Zurich's Motion.

Dated this 24th day of June, 2015

**FOX ROTHSCHILD LLP**

By: *Is/Brett Axelrod*
BRETT AXELROD (5859)
MARK CONNOT (10010)
CHARLES AXELROD *(Admitted Pro Hac Vice)*
3800 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
*Attorneys for Reorganized Debtor/ Defendant*
*AMERICAN WEST DEVELOPMENT, INC.*

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| WASHINGTON MUTUAL, INC., et al., | ) | Case No. 08-12229 (MFW) |
| Debtors. | ) | Jointly Administered |
| WASHINGTON MUTUAL, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 12-50422 (MFW) |
| XL SPECIALTY INSURANCE COMPANY, et al.,[1] | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION[2]

Before the Court is the Defendants' Motion to Dismiss the Complaint filed by the WMI Liquidating Trust (the "Trust"), as successor in interest to Washington Mutual, Inc. (the "WMI"). For the reasons set forth below, the Court will grant the Motion.

---

[1] The Defendants include XL Specialty Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, Columbia Casualty Company, Axis Insurance Company, ACE American Insurance Company, Arch Insurance Company, RSUI Indemnity Company, Chartis Property Casualty Company, formerly known as "AIG Casualty Company," London, Subscribing to Policy No. B0509QA027908, also known as "Lloyd's Underwriter Syndicate No. 2488 AGM London," Allied World Assurance Company Ltd., and Scottsdale Indemnity Company. Because Allied World Assurance Company Ltd. was not served, it did not participate in the submission of the Motion to Dismiss.

[2] The Court is not required to state findings of fact or conclusions of law pursuant to Rule 7052(a)(3) of the Federal Rules of Bankruptcy Procedure.

I. BACKGROUND

WMI is a bank holding company that formerly owned Washington Mutual Bank ("WMB"). In early 2008, WMI purchased from the Defendants $250 million of coverage under twelve insurance policies (the "2008-09 Policies") to provide coverage to WMI and its directors and officers for claims made from May 1, 2008, to May 1, 2009.

As a result of a downgrade in WMI's and WMB's credit ratings and the global credit crisis, a bank run ensued resulting in more than $16 billion in deposits being withdrawn from WMB in a ten-day period beginning on September 15, 2008. On September 25, 2008, the Office of Thrift Supervision (the "OTS") seized WMB and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver. On the same day, the FDIC sold substantially all of WMB's assets to JPMorgan Chase ("JPMC").

On September 26, 2008, WMI and WMI Investment Corp. (collectively, the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code. After the commencement of the case, the Official Committee of Unsecured Creditors (the "Committee") investigated a downstream capital contribution of $500 million made by WMI to WMB shortly before the seizure of WMB by the OTS (the "September 2008 Downstream"). On October 13, 2011, WMI and the Committee sent a demand letter to the directors and officers of WMI (collectively, the "D&Os"), asserting claims

related to the September 2008 Downstream. (Adv. D.I. 25 at Ex. L.)[3] In response to the demand letter, several of the D&Os and WMI sought coverage for the asserted claim under the 2008-09 Policies. On December 22, 2011, XL Speciality denied coverage. (Adv. D.I. 35 at Ex. 3.)

In its Seventh Amended Plan of Reorganization (the "Plan"), WMI agreed to establish a contingent reserve of $65 million for the D&Os. (D.I. 9178.) Of the $65 million reserved for the D&O claims, $55 million was set aside for defense costs associated with the September 2008 Downstream claims. The Plan was confirmed on February 24, 2012. (D.I. 9759.)

On March 15, 2012, the Trust filed a Complaint against the issuers of the 2008-09 Policies (the "Defendants") for (1) breach of contract, (2) tortious breach of the duty of good faith and fair dealing, (3) a declaratory judgment that the Defendants are not subrogated to the indemnity claims of the D&Os, and (4) equitable subordination of any subrogated claims the Defendants may have.

On May 7, 2012, the Defendants filed a Motion to Dismiss the Trust's Complaint on several grounds. First, the Defendants argue that with respect to the breach of contract and breach of fiduciary duties counts, the Complaint fails to state a claim

[3] Citations to pleadings in the bankruptcy case are "D.I. #" and to pleadings in the adversary proceeding are "Adv. D.I. #."

over which this Court has subject matter jurisdiction or upon which relief can be granted. In addition, the Defendants argue that there is no "case or controversy" between WMI and the Defendants on any of the counts.

II. JURISDICTION

This Court has jurisdiction to determine whether it has subject matter jurisdiction over this adversary proceeding. BWI Liquidating Corp. v. City of Rialto (In re BWI Liquidating Corp.), 437 B.R. 160, 163 (Bankr. D. Del. 2010) (citing Chicot Cnty. Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 376-77 (1940) (holding that a federal court has authority to determine whether it has subject matter jurisdiction over a dispute)).

III. DISCUSSION

A. Breach of Contract and of Fiduciary Duty

The Defendants seek dismissal of the breach of contract and breach of fiduciary duty counts for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(1); Fed. R. Bank. P. 7012.

A bankruptcy court may exercise jurisdiction over four categories of matters: "(1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a case under

title 11, and (4) proceedings related to a case under title 11."

In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 264 (3d Cir.

1991).

In this case, the Trust concedes that the only category

under which the Trust's claims may fall is "related to"

jurisdiction.[4]  (Adv. D.I. 50 at 12.)  The majority of bankruptcy

courts to address this issue agree.  See, e.g., Allied Prod.

Corp. v. Hartford Accident & Indem. Co., 02 C 8436, 2003 WL

503805, at *2 (N.D. Ill. Feb. 24, 2003) (withdrawing the

reference in an adversary proceeding for determination of

insurance coverage, stating that "[t]he court fails to see how

the insurance dispute at the heart of the adversary proceeding

arises under or is in any way related to the Bankruptcy Code");

In re Ramex Int'l, Inc., 91 B.R. 313, 315 (E.D. Pa. 1988)

---

[4]  The Bankruptcy Court may not enter a final order in a
"related to" matter and instead is required to "submit proposed
findings of fact and conclusions of law to the district court,
and any final order or judgment shall be entered by the district
judge after considering the bankruptcy judge's proposed findings
and conclusions and after reviewing de novo those matters to
which any party has timely and specifically objected."  28 U.S.C.
§ 157(c)(1).  The Court may, however, hear and enter
interlocutory orders, such as on motions to dismiss.  See, e.g.,
In re Trinsum Grp., Inc., 467 B.R. 734, 739 (Bankr. S.D.N.Y.
2012) ("After Stern v. Marshall, [related] the ability of
bankruptcy judges to enter interlocutory orders in proceedings .
. . has been reaffirmed . . . ."); Boyd v. King Par, LLC, Case
No. 11-CV-1106, 2011 WL 5509873, at *5 (W.D. Mich. Nov. 10, 2011)
("[U]ncertainty regarding the bankruptcy court's ability to enter
a final judgment . . . does not deprive the bankruptcy court of
the power to entertain all pretrial proceedings, including
summary judgment motions.").

(finding that trustee's action for declaratory judgment on coverage under insurance policy issued pre-petition was only "related to" the bankruptcy case); In re PRS Ins. Grp., Inc., 445 B.R. 402, 405 (Bankr. D. Del. 2011) (holding that declaratory judgment action involving breach of two reinsurance agreements arose under state law and was "related to" case); G-I Holdings, Inc. v. Hartford Accident & Idem. Co. (In re G-I Holdings, Inc.), 278 B.R. 376, 380 (Bankr. D. N.J. 2002) (same).

A declaratory judgment action to determine insurance coverage on a pre-petition state law contract does not involve the bankruptcy petition itself or any steps or sub-action within the bankruptcy case and therefore is not a case under title 11, a proceeding arising under title 11, or a proceeding arising in a case under title 11. The breach of contract and breach of fiduciary duty claims are ordinary state law causes of action of the type that are brought in state courts across the country with no connection to the Bankruptcy Code or a bankruptcy case. Therefore, the Court concludes that it has, at most, "related to" jurisdiction over those counts.

"After confirmation of a chapter 11 plan, however, the scope of the bankruptcy court's 'related to' jurisdiction diminishes." Astropower Liquidating Trust v. Xantrex Tech, Inc. (In re AstroPower Liquidating Trust), 335 B.R. 309, 323 (Bankr. D. Del. 2005). Post-confirmation, a bankruptcy court only has

jurisdiction over a claim that has "a close nexus to the bankruptcy plan or proceeding" such as one which "affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement." Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 168-69 (3d Cir. 2004). See also EXDS, Inc. v. Richard Ellis, Inc. (In re EXDS, Inc.), 352 B.R. 731, 735 (Bankr. D. Del. 2006); AstroPower, 335 B.R. at 323.

In this case, the Trust argues that Counts I and II bear a "close nexus" to the bankruptcy case because (1) the creditors will receive more money sooner from the $55 million held in reserve, (2) the Confirmation Order addresses an important issue in dispute in the adversary proceeding, and (3) the retention of jurisdiction provisions in the Plan include the adversary proceeding.

1. $55 Million Escrow

The Trust contends that creditors will receive more money sooner if the Defendants are required to pay the D&Os' defense costs and the $55 million in reserve is released. The Trust concedes that under Resorts the "mere possibility of a gain or loss of trust assets" is not sufficient to confer post-confirmation bankruptcy jurisdiction over related matters. Nonetheless, the Trust argues that the impact on claims and the existence of the plan reserve are additional contributing factors

that meet the "close nexus" standard.

The Defendants reply that the mere possibility of additional recovery to augment the assets of the Trust is insufficient standing alone to establish the required "close nexus." See, e.g., Resorts, 372 F.3d at 170 ("[T]he potential to increase the assets of the Litigation Trust and its beneficiaries does not necessarily create a close nexus sufficient to confer 'related to' bankruptcy court jurisdiction post-confirmation."); PRS Ins. Grp., 445 B.R. at 405 ("The mere potential to increase the assets of a post-confirmation trust is insufficient to establish the required 'close nexus.'"); BWI Liquidating Corp., 437 B.R. at 166 (finding that "the potential to increase recovery for creditors" is "insufficient to establish a close nexus").

In the case at bar, the Plan called for approximately $7 billion to be distributed to creditors and shareholders. Most notably, the Plan provided payment in full (with interest) to most unsecured creditors. Thus, even in the worse-case scenario where the Trust is forced to pay the D&Os' defense costs without insurance coverage, creditors under the Plan will largely be unaffected. Further, the release of the reserve (even if paid to creditors or shareholders) will provide only a de minimus additional recovery over the almost $7 billion to be distributed under the Plan. Therefore, the Court concludes that the assets of the Trust will not be augmented (or diminished) significantly

by any decision on the extent of coverage of the 2008-09 Policies. As the Third Circuit stated in Resorts, "if the mere possibility of a gain or loss of trust assets sufficed to confer bankruptcy court jurisdiction, any lawsuit involving a continuing trust would fall under the 'related to' grant. Such a result would widen the scope of bankruptcy court jurisdiction beyond what Congress intended . . . ." 372 F.3d at 170.

2. Confirmation Order

The Trust argues, however, that the potential to increase recovery of trust assets is augmented by other contributing factors, namely that the suit is related to the Plan and Confirmation Order. AstroPower, 335 B.R. at 324. See also Lefkowitz v. Mich. Trucking, LLP (In re Gainey Corp.), 447 B.R. 807, 814 (Bankr. W.D. Mich. 2011) ("[P]ostconfirmation subject matter jurisdiction will always exist when a bankruptcy court is called upon to interpret its prior orders."). In the denial of coverage letter, the Defendants state that they may deny coverage based on an "Insured v. Insured exclusion" in the 2008-09 Policies. The Trust notes that the Confirmation Order provided that "the Creditors' Committee was authorized to prosecute claims or causes of action . . . [including the] D&O claims . . . ." (D.I. 9759.) Therefore, the Trust asserts that the Bankruptcy Court must interpret its own Order to conclude that the "Insured v. Insured exclusion" is not applicable.

While the Trust may have a valid claim based on the interpretation of the Plan and Confirmation Order, the Court concludes that that assertion is not the type of plan interpretation sufficient to confer jurisdiction, because the interpretation is not essential to the integrity of the Plan and its implementation. See Resorts, 372 F.3d at 170 (holding that the plan and trust agreement which provided the bare factual context of the state law claims was insufficient to confer jurisdiction and did not require the court to interpret the plan).

Further, the Plan and Confirmation Order can be interpreted by other courts of competent jurisdiction. "[S]tate courts are qualified to interpret the language of bankruptcy plans and orders and routinely engage in such interpretation." In re Kmart Corp., 307 B.R. 586, 596 (Bankr. E.D. Mich. 2004). See also, Icco v. Sunbrite Cleaners, Inc. (In re Sunbrite Cleaners, Inc.), 284 B.R. 336, 342 (N.D.N.Y. 2002) ("Because contract interpretation is an issue of state law . . . the state courts are perfectly well-suited to interpret the First Amended Plan."); In re Landreth Lumber Co., 393 B.R. 200, 205 (Bankr. S.D. Ill. 2008) ("[T]he state court had concurrent jurisdiction to interpret a provision of the confirmed plan as a matter of contract law . . . .").

3. Reservation of Jurisdiction in Plan

The Trust also contends that the Court has jurisdiction because the Plan expressly provides that the Bankruptcy Court would retain jurisdiction "to determine any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date . . . ." (D.I. 9178.) The Trust argues that this Plan provision is "more than adequate" to confer jurisdiction over the breach of contract and breach of fiduciary duty claims.

The Defendants respond that "a Plan must specifically describe a cause of action in order to retain related to jurisdiction" over it. (Adv. D.I. 54.) Because the Plan in this case did not specifically identify this adversary proceeding, the Defendants argue that the provision cited by the Trust is insufficient to confer post-confirmation jurisdiction. BWI Liquidating Corp., 437 B.R. at 166.

The Court agrees with the Defendants that the Debtors cannot be permitted to "write [their] own jurisdictional ticket" by merely including a generic retention clause in the Plan. Resorts, 372 F.3d at 161. If including a retention of jurisdiction clause in a Plan was sufficient, the limitation on post-confirmation jurisdiction would be easily eliminated. Rather, to have a sufficiently close nexus to retain post-confirmation jurisdiction, the plan must "specifically describe[]

an action over which the Court had 'related to' jurisdiction pre-confirmation and expressly provide[] for the retention of such jurisdiction to liquidate that claim for the benefit of the estate's creditors. . . ." See AstroPower, 335 B.R. at 325. Such specific language helps ensure that "bankruptcy court jurisdiction would not raise the specter of unending jurisdiction" post-confirmation. Id. See also Resorts, 372 F.3d at 176.

The Trust argues that a specific reference to the claim in the Plan is not necessary for there to be post-confirmation jurisdiction. See, e.g., U.S. Trustee v. Gryphon at Stone Mansion, Inc., 216 B.R. 764, 769 (W.D. Pa. 1997) (holding that "the absence of a provision retaining jurisdiction in a confirmed plan does not deprive the court of jurisdiction."). The Trust contends that where a close nexus exists on independent grounds, it is appropriate to give effect to the Plan's jurisdictional grant.

The Court agrees that even when a plan clearly and unambiguously reserves jurisdiction for a specific cause of action, the Court will not have post-confirmation jurisdiction unless a substantial nexus is established. See, e.g., Resorts, 372 F.3d at 169 (holding that "jurisdictional retention plans cannot confer jurisdiction greater than that granted under 28 U.S.C. § 1334 or 28 U.S.C. § 157"); BWI Liquidating Corp., 437

Case 12-12349-mkn Doc 1062 Entered 06/24/15 14:08:27 Page 29 of 35

B.R. at 166 ("Plan provisions that purport to preserve the bankruptcy court's jurisdiction are not alone sufficient to establish post-confirmation jurisdiction; instead the court must determine whether a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan.") (internal citations omitted); Fairchild Liquidating Trust v. New York (In re The Fairchild Corp.), 452 B.R. 525, 532 (Bankr. D. Del. 2011) (holding that general retention of jurisdiction provision was not sufficient to retain jurisdiction over a claim by the liquidating trust).

The Court, however, has found no close nexus here. Therefore, because there is no close nexus to the Plan (and no specific reference in the Plan), the Court concludes that it has no subject matter jurisdiction over the breach of contract and breach of fiduciary duty claims and the motion to dismiss them will be granted.[5]

B. Declaratory Relief

Counts III and IV of the Complaint seek a declaratory judgment that the Defendants are not subrogated to the D&Os' indemnity claim or that, in the event they are subrogated, those claims must be equitably subordinated.

---

[5] Accordingly, the Defendants' remaining arguments for dismissal of the breach of contract and breach of fiduciary duty claims – that there is no "case or controversy" between WMI and the Defendants and that the Complaint failed to state a claim upon which relief can be granted – need not be addressed.

Pursuant to the Declaratory Judgment Act of 1934, the Court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration" when there is a "case of actual controversy." 28 U.S.C. § 2201(a). Courts have interpreted the remedy to be "limited to cases and controversies in the constitutional sense." Wyatt, V.I., Inc. v. Gov't of the Virgin Islands, 385 F.3d 801, 805 (3d Cir. 2004). For there to be a "case of actual controversy" in the constitutional sense, the controversy must be "definite and concrete, touching the legal relations of parties having adverse legal interests." Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240-41 (1937). The controversy must also be "real and substantial" as opposed to "advising what the law would be upon a hypothetical state of facts." Id. In order to provide declaratory relief, the controversy must be ripe for judicial intervention. "It cannot be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." Wyatt, 385 F.3d at 806 (citing Public Serv. Comm'n v. Wycoff Co., Inc., 344 U.S. 237 (1952)).

In the case at bar, the Defendants cannot currently assert a claim for subrogation because it exists only to the extent of actual payment under those policies, and the Defendants have

refused to pay.  (D.I.A. 5 at Ex. A.)  See, e.g., In re Darosa,
318 B.R. 871, 878-79 (B.A.P. 9th Cir. 2004) (holding that only
when the actual payment of all or part of the claim is made does
the right to subrogation become available); Handex of Md., Inc.
v. Waste Mgmt. Disposal Serv., 458 F. Supp. 2d 266, 275 (D. Md.
2006) (holding that the right to subrogation arises only after
actual payment).  Accordingly, the Trust's request for a
declaratory judgment for disallowance of the subrogation claim is
premature because it requires the assumption of future,
hypothetical events that have yet to occur.  Pryor v. Nat'l
Collegiate Athletic Ass'n, 288 F.3d 548, 561 (3d Cir. 2002) ("In
cases where a plaintiff seeks . . . declaratory relief . . .
standing will not lie if adjudication . . . rests upon contingent
future events that may not occur as anticipated or indeed may not
occur at all.").

        Further, the Defendants have not even filed proofs of claim
in this case, nor have those claims been allowed.  Section 510(c)
of the Bankruptcy Code permits equitable subordination of "all or
part of an allowed claim . . . or all or part of an allowed
interest."  11 U.S.C. § 510(c).  "The great weight of authority
is that Section 510(c) does not permit subordination absent an
allowed claim."  In re Dreier LLP, 452 B.R. 391, 451 (Bankr.
S.D.N.Y. 2011).

Thus, the Court concludes that the Trust's subrogation and equitable subordination claims are far too hypothetical and speculative to constitute an actual controversy at this stage. Accordingly, Counts III and IV do not allege a "case of actual controversy" and must be dismissed for lack of jurisdiction.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant the Defendants' Motion to Dismiss the instant adversary proceeding.

An appropriate order is attached.

Dated: October 4, 2012

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

Case 12-12349-mkn Doc 1062 Entered 06/24/15 14:08:27 Page 33 of 35

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| WASHINGTON MUTUAL, INC., et al., | ) | Case No. 08-12229 (MFW) |
| Debtors. | ) | Jointly Administered |
| WASHINGTON MUTUAL, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 12-50422 (MFW) |
| XL SPECIALTY INSURANCE COMPANY, et al., | ) | |
| Defendants. | ) | |

ORDER

**AND NOW**, this **4th** day of **OCTOBER**, **2012**, upon consideration of the Motion to Dismiss filed by the Defendants and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Motion to Dismiss is **GRANTED**.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc: Mark D. Olivere, Esquire[6]

[6] Counsel shall distribute a copy of this Order and the accompanying Memorandum Opinion to all interested parties and file a Certificate of Service with the Court.

**SERVICE LIST**

Mark D. Olivere, Esquire
Paul D. Brown, Esquire
Scott D. Cousins, Esquire
Cousins Chipman & Brown, LLP
1007 North Orange Street, Suite 1110
Wilmington, DE 19801
Counsel for WMI Liquidating Trust

Charles C. Lemley, Esquire
Daniel J. Standish, Esquire
John E. Howell, Esquire
Wiley Rein LLP
1776 K Street NW
Washington, DC 20006
Counsel for XL Specialty Insurance Company and Columbia Casualty Company

Thomas G. Macauley, Esquire
Macauley LLC
300 Delaware Avenue, Suite 760
Wilmington, DE 19801
Counsel for XL Specialty Insurance Company and Columbia Casualty Company

Edward M. McNally, Esquire
Patricia Winston, Esquire
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899
Counsel for National Union Fire Insurance Co. of Pittsburgh, PA and Chartis Property Casualty Company

Anthony G. Flynn, Esquire
Timothy Jay Houseal, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Counsel for Axis Insurance Company

Francis J. Murphy, Esquire
Kelley M. Huff, Esquire
Murphy & Landon
1011 Centre Road, Suite 210
Wilmington, DE 19805
Counsel for ACE American Insurance Company, Arch Insurance Company, and Lloyd's Underwriter Syndicate No. 2488 AGM

Howard A. Cohen, Esquire
Drinker Biddle & Reath LLP
1100 North Market Street, Suite 1000
Wilmington, DE 19801
Counsel for Houston Casualty Company

General Counsel
Allied World Assurance Company Holdings, AG
Lindenstrasse 8
6340 Baar
Zug, Switzerland
Counsel for Allied World Assurance Company Ltd.

General Counsel
RSUI Group, Inc.
945 East Paces Ferry Road, Suite 1800
Atlanta, GA 30326-1160
Counsel for RSUI Indemnity Company

General Counsel
Scottsdale Insurance Company
8877 N. Gainey Center Drive
Scottsdale, AZ 85258
Counsel for Scottsdale Indemnity Company

# EXHIBIT 6

EXHIBIT 6

Electronically Filed
03/29/2016 01:09:34 PM

CLERK OF THE COURT

STIP
MARK A. SOLOMON, ESQ.
Nevada Bar No. 000418
DANA A. DWIGGINS, ESQ.
Nevada Bar No. 007049
Email: ddwiggins@sdfnvlaw.com
SOLOMON DWIGGINS & FREER, LTD.
Cheyenne West Professional Centré
9060 West Cheyenne Avenue
Las Vegas, Nevada 89129
Telephone: (702) 853-5483
Facsimile: (702) 853-5485

Attorneys for Scott Canarelli

SOLOMON DWIGGINS & FREER, LTD.
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TEL (702) 853-5483 | FAX: (702) 853-5485

**DISTRICT COURT**

**COUNTY OF CLARK, NEVADA**

| In the Matter of the<br><br>THE SCOTT LYLE GRAVES CANARELLI IRREVOCABLE TRUST, dated February 24, 1998. | Case No.: P-13- 078912-T<br>Dept. No.: XXVI/PROBATE<br><br>Hearing Date: n/a<br>Hearing Time: n/a |
|---|---|

**STIPULATION AND ORDER TOLLING TIME PERIOD TO ASSERT CLAIMS**

Scott Lyle Graves Canarelli ("SCOTT"), by and through his attorneys, Mark A. Solomon and Dana A. Dwiggins of the law firm of Solomon Dwiggins & Freer, Ltd., and Edward Lubbers, Family Trustee and Independent Trustee of The Scott Lyle Graves Canarelli Irrevocable Trust, dated February 24, 1998 (the "Trust") and Lawrence Canarelli and Heidi Canarelli, as Former Trustees of the Trust, Trustee(s) of The Jeffrey Lawrence Graves Canarelli Irrevocable Trust; The Stacia Leigh Lemke Irrevocable Trust; and The Alyssa Lawren Graves Canarelli Irrevocable Trust and Manager/Member of SJA Acquisitions, LLC, The Jeffrey Lawrence Graves Canarelli Irrevocable Trust, The Stacia Leigh Lemke Irrevocable Trust, The Alyssa Lawren Graves Canarelli Irrevocable Trust and SJA Acquisitions, LLC, by and through their attorney, J. Colby Williams of the law firm Campbell & Williams, hereby stipulate as follows:

///

1. On February 24, 1998, SCOTT established the Trust as settlor.

2. Larry and Heidi were appointed as the initial "Family Trustees" of the Trust with Corey Adcock as the initial Independent Trustee. Corey Adcock thereafter resigned as Independent Trustee in or about 2005 and Edward Lubbers ("Lubbers") was appointed by Larry and/or Heidi in his stead.

3. Pursuant to Articles 8.02 and 8.04 of the Trust, Larry and Heidi resigned as Co-Family Trustees of the Trust and jointly appointed Lubbers as their successor. Such resignation identifies an effective date of May 24, 2013, at 5:00 p.m. ("Effective Date"). Thus, as of the Effective Date, Lubbers began serving and continues to serve as both the Family Trustee and the Independent Trustee of the Trust.

SOLOMON DWIGGINS & FREER, LTD.
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TEL: (702) 853-5483 | FAX: (702) 853-5485

4. On or about May 31, 2013, the Family Trustee purported to enter into an agreement ("Purchase Agreement") for the sale of the Trust's interest in certain interests in limited liability companies ("LLCs") and corporations ("Corporations") to (i) SJA Acquisitions, LLC ("SJA"), a Nevada limited liability company and (ii) mirror irrevocable trusts for the benefit of SCOTT's three siblings, to wit: the Jeffrey Lawrence Graves Canarelli Irrevocable Trust; the Stacia Leigh Lemke Irrevocable Trust; and the Alyssa Lawren Graves Canarelli Irrevocable Trust (collectively "Sibling Trusts").

5. The Purchase Agreement was executed on May 31, 2013, and has an effective date of March 31, 2013.

6. The Purchase Agreement provides, in pertinent part, that the Trust's interests in the LLCs shall be sold to and purchased by SJA Acquisitions (the "LLC Sale Interests") and the Trust's interests in the Corporations shall be purchased by the Sibling Trusts (the "Corporation Sale Interests"). The LLC Sale Interests purchase price was $15,801,913.00 and the Corporation Sale Interests purchase price was $9,454,861.00, for a total purchase price of $25,256,774.00. Such amounts were based on the Trust's purported interest in the LLCs and the Corporations and the purported value thereof as set forth on the schedule attached to the Purchase Agreement as Exhibit A. The Purchase Agreement also

provides that the LLC Sale Interests Purchase Price and/or the Corporation Sales Interests Purchase Price "shall be increased, but not decreased, based upon a review of the enterprise value of each LLC and each Corporation by a third party analyst, to be conducted not less than 120 days after the date of this Agreement."

7. A dispute has arisen between SCOTT, as the settlor and beneficiary of the Trust, on the one hand, and Larry and Heidi, as the former Family Trustees of the Trust, Lubbers, as the Family Trustee and Independent Trustee of the Trust, the Siblings Trusts and their trustees thereunder, and SJA Acquisitions and its managers and members thereunder, on the other hand (collectively, "Adverse Parties"), relating to the Purchase Agreement ("Purchase Agreement Claim").

8. A dispute has further arisen between SCOTT, as the settlor and beneficiary of the Trust, on the one hand, and Larry and Heidi, as the former Family Trustees of the Trust, and Lubbers, as the Family Trustee and Independent Trustee, on the other hand (collectively, "Trust Trustees"), relating to the administration of the Trust ("Trust Administration Claim"), including but not limited to alleged fiduciary accounting issues.

9. That the parties agree that any and all time limitations relating to the Purchase Agreement Claim and Trust Administration Claim shall be tolled against all Adverse Parties and Trust Trustees until such time as written notice is provided by SCOTT or counsel for the Adverse Parties and Trust Trustees and served upon counsel for SCOTT, the Adverse Parties and Trust Trustees, as the case may be, notifying such counsel that a resolution cannot be reached between the parties and that the time limitations under the law shall no longer be tolled. Upon receipt of such written notice, SCOTT shall have sixty (60) days in which to bring a suit against the Adverse Parties and Trust Trustees.

///

///

///

SOLOMON DWIGGINS & FREER, LTD.
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TEL (702) 853-5483 | FAX (702) 853-5485

10. Nothing in this Stipulation shall be construed in favor of or against any party, and each such party expressly reserves all of its respective rights, claims, and defenses other than those associated with any time limitations as addressed herein.

**DATED** this 16th day of March, 2016.

SOLOMON DWIGGINS & FREER, LTD.

By: [signature]
MARK A. SOLOMON, ESQ.
DANA A. DWIGGINS, ESQ.
9060 West Cheyenne Avenue
Las Vegas, Nevada 89129

Attorneys for Petitioner, Scott Canarelli

CAMPBELL & WILLIAMS

By: [signature]
J. COLBY WILLIAMS, ESQ.
700 South Seventh Street
Las Vegas, Nevada 89101

Attorney for Edward Lubbers, Lawrence and Heidi Canarelli, SJA Acquisitions, LLC and the Siblings Trusts

SOLOMON DWIGGINS & FREER, LTD.
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TEL (702) 853-5483 | FAX (702) 853-5485

**ORDER**

**IT IS HEREBY ORDERED** that any and all time limitations relating to the Purchase Agreement Claim and Trust Administration Claim, as defined herein, shall be tolled against all Adverse Parties and Trust Trustees until such time as written notice is provided by SCOTT or counsel for the Adverse Parties and Trust Trustees and served upon counsel for SCOTT, the Adverse Parties and Trust Trustees, as the case may be, notifying such counsel that a resolution cannot be reached between the parties and that the time limitations under the law shall no longer be tolled. Upon receipt of such written notice, SCOTT shall have sixty (60) days in which to bring a suit against the Adverse Parties and Trust Trustees.

**DATED** this 29th day of March, 2016.

[signature]
DISTRICT COURT JUDGE

Submitted by:
SOLOMON DWIGGINS & FREER, LTD.

By: [signature]
MARK A. SOLOMON, ESQ.
DANA A. DWIGGINS, ESQ.
Attorneys for Petitioner, Scott Canarelli

# EXHIBIT 7

EXHIBIT 7

FILED
DEC 27 2017
CLERK OF COURT

ORDR

Dana A. Dwiggins (#7049)
Alexander G. LeVeque (#11183)
Tess E. Johnson (#13511)
SOLOMON DWIGGINS & FREER, LTD.
9060 West Cheyenne Avenue
Las Vegas, Nevada 89129
Telephone: (702) 853-5483
Facsimile: (702) 853-5485
ddwiggins@sdfnvlaw.com
aleveque@sdfnvlaw.com
tjohnson@sdfnvlaw.com

*Attorneys for Petitioner, Scott Canarelli*

SOLOMON DWIGGINS & FREER | TRUST AND ESTATE ATTORNEYS
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TELEPHONE (702) 853-5483
FACSIMILE (702) 853-5485
WWW.SDFNVLAW.COM

DISTRICT COURT

CLARK COUNTY, NEVADA

| In the Matter of the THE SCOTT LYLE GRAVES CANARELLI IRREVOCABLE TRUST, dated February 24, 1998. | Case No.: P-13-078912-T<br>Dept. No.: XXVI/Probate<br><br>Hearing Date: September 28, 2017<br>Hearing Time: 10:30 a.m. |
|---|---|

ORDER

This matter came on for hearing before this Court on September 28, 2017, regarding Petitioner Scott Canarelli's ("Petitioner") Petition to Surcharge Trustee and Former Trustees for Breach of Fiduciary duties, conspiracy and Aiding and Abetting; Petition for Breach of fiduciary Duty for Failure to Properly Account; Petition to Compel Trustee to Enforce Rights of Trust Under Purchase Agreement, Promissory Note and Guaranty; Petition to Accelerate Promissory Notes; Declaration of Principal and Interests Payments Due and owing Under Purchase Agreement; Petition for Constructive Trust; Petition to Remove Trustee and Appoint Independent Trustee; Petition Precluding the Trustee and Former Trustees from Paying Attorneys' Fees and Costs from the Trust; Petition Directing Trustee to Immediately Seek Full Reimbursement of Retainer paid to Dickinson Wright; and Petition for an Award of Attorneys Fess, Accountant Fees and Costs, filed June 27, 2017 ("Petition to Surcharge"). Dana A. Dwiggins, Esq. and Alexander G. LeVeque, Esq. of the law firm Solomon Dwiggins & Freer, Ltd. appeared on behalf of the Petitioner, and J. Colby Williams, Esq. of the law firm Campbell & Williams and Elizabeth

Brickfield, Esq. of the law firm Dickinson Wright, PLLC appeared on behalf of the Respondents Edward Lubbers, Lawrence Canarelli, and Heidi Canarelli (collectively "Respondents").

Having considered the papers on file herein, and the arguments of counsel at the hearing,

THE COURT HEREBY FINDS that Petitioner and Respondent Edward Lubbers, as Trustee of The Scott Lyle Graves Canarelli Irrevocable Trust, dated February 24, 1998 ("SCIT"), are in a conflict position during the pendency of these litigation proceedings.

THE COURT FURTHER FINDS that, despite Respondent Edward Lubbers' current conflict with Petitioner as a result of the litigation, his involuntary removal as Trustee of the SCIT is not warranted at this time. The Court will conduct an evidentiary hearing to determine, among other issues, whether there has been any breach of fiduciary duty.

THE COURT FURTHER FINDS that Respondent Edward Lubbers should nevertheless be suspended as Trustee given the aforementioned litigation conflict, and a professional trustee should be appointed during the pendency of these proceedings.

THE COURT FURTHER FINDS that the disputed amount of $1,873,678.00 relating to the Purchase Agreement should be set aside by the Buyer(s) identified in the Purchase Agreement dated May 31, 2013 (effective March 31, 2013) in an account mutually agreeable to the Parties and with the amount being separate and apart from the Buyers' trusts and/or business entities.

THE COURT FURTHER FINDS that the attorneys' fees the Respondents incur from September 28, 2017 and going forward in the litigation proceedings should be advanced by Respondents.

THE COURT FURTHER FINDS that there is still a question as to whether the attorney's fees incurred by Respondents from the date Petitioner filed the Petition to Surcharge (*i.e.*, June 27, 2017) through September 28, 2017 is properly paid from the SCIT or by Respondents at this time.

THE COURT FURTHER FINDS that, upon the Court's ultimate findings of fact and conclusions of law on the allegations set forth in the Petition to Surcharge, the issue as to whether any party shall be required to reimburse any other party for any attorney's fees previously paid or otherwise incurred in this proceeding shall be deferred.

SOLOMON DWIGGINS & FREER | TRUST AND ESTATE ATTORNEYS
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TELEPHONE (702) 853-5483
FACSIMILE (702) 853-5485
WWW.SDFNVLAW.COM

Based on the above findings of this Court,

IT IS HEREBY ORDERED that Respondent Edward Lubbers is SUSPENDED from his position as Trustee of the SCIT during the pendency of these litigation proceedings.

IT IS FURTHER HEREBY ORDERED that Petitioner's counsel shall provide Respondents' counsel with recommendations for a professional trustee to manage the SCIT during the pendency of these proceedings by Friday, October 6, 2017.

IT IS FURTHER HEREBY ORDERED that Respondents shall cause $1,873,678.00, plus interest incurred from March 31, 2013, the effective date of the Purchase Agreement, to the present, to be SEQUESTERED in an account mutually agreeable to the parties, separate and apart from the assets of Respondents, their business entities, or the Buyer(s) identified in the Purchase Agreement.

IT IS FURTHER HEREBY ORDERED that the parties shall meet for a status check on October 12, 2017 at 10:30 a.m. to address the professional trustee(s) recommended by Petitioner's counsel and the Respondents' objections thereto, if any, as well as Respondents' sequestration of the above-ordered funds.

IT IS FURTHER HEREBY ORDERED that, from September 28, 2017 going forward, Respondents may not have their litigation expenses paid from the SCIT, including but not limited to attorneys' fees and costs, until further order of the Court.

IT IS HEREBY FURTHER ORDERED that all other matters pertaining to the payment of attorney's fees and costs from the SCIT at this time to counsel for Respondents from the date Petitioner filed the Petition to Surcharge (*i.e.*, June 27, 2017) through September 28, 2017, shall be continued until October 26, 2017, or such further date agreed to by the Parties.

///

///

///

///

///

SOLOMON DWIGGINS & FREER TRUST AND ESTATE ATTORNEYS
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TELEPHONE (702) 853-5483
FACSIMILE (702) 853-5485
WWW.SDFNVLAW.COM

///

///

///

///

IT IS HEREBY FURTHER ORDERED that, upon the Court's ultimate findings of fact and conclusions of law on the allegations set forth in the Petition to Surcharge, the issue as to whether the any party shall be required to reimburse any other party for any attorney's fees previously paid or otherwise incurred in this proceeding shall be deferred.

DATED this 22 of December, 2017

JUDGE GLORIA STURMAN

Respectfully submitted by:

Dana A. Dwiggins, Esq., Bar No. 7049
Alexander G. LeVeque, Esq., Bar No. 11183
Tess E. Johnson, Esq., Bar No. 13511
SOLOMON DWIGGINS & FREER, LTD.
9060 West Cheyenne Avenue
Las Vegas, Nevada 89129
Telephone: (702) 853-5483
Facsimile: (702) 853-5485
*Attorneys for Petitioner, Scott Canarelli*

Approved as to content by:

J. Colby Williams, Esq., Bar No. 5549
CAMPBELL & WILLIAMS
700 S. Seventh Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540
*Attorneys for Respondents Edward Lubbers, Lawrence Canarelli, and Heidi Canarelli*
*and*
DICKINSON WRIGHT, PLLC
Elizabeth Brickfield, Esq., Bar No. 6236
Kendal Weisenmiller, Esq., Bar No. 11946
Var E. Lordahl, Esq., Bar No. 12028

SOLOMON DWIGGINS & FREER TRUST AND ESTATE ATTORNEYS 9060 WEST CHEYENNE AVENUE LAS VEGAS, NEVADA 89129 TELEPHONE (702) 853-5483 FACSIMILE (702) 853-5485 WWW.SDFNVLAW.COM

8363 W. Sunset Road, Suite 200
Las Vegas, Nevada 89113
Telephone: (702) 550-4400
Facsimile: (702) 670-6009
*Attorneys for Respondents Edward Lubbers, Lawrence Canarelli, and Heidi Canarelli*

SOLOMON DWIGGINS & FREER
TRUST AND ESTATE ATTORNEYS
9060 WEST CHEYENNE AVENUE
LAS VEGAS, NEVADA 89129
TELEPHONE (702) 853-5483
FACSIMILE (702) 853-5485
WWW.SDFNVLAW.COM

# EXHIBIT 8

EXHIBIT 8

Case 12-12349-mkn Doc 1071 Entered 07/24/15 10:28:59 Page 1 of 6

Honorable Mike K. Nakagawa
United States Bankruptcy Judge

Entered on Docket
July 24, 2015

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

| | |
|---|---|
| In re:<br><br>AMERICAN WEST DEVELOPMENT, INC.,<br><br>Debtor. | Case No.: 12-12349-MKN<br>Chapter 11<br><br>Date: July 22, 2015<br>Time: 9:30 a.m. |

**ORDER ON MOTION OF ZURICH AMERICAN INSURANCE COMPANY AND ITS AFFILIATE INSURERS TO DETERMINE AND DECLARE THAT THE DEBTOR'S DISCHARGE DOES NOT EXTEND TO CERTAIN IDENTIFIED NON-DEBTORS, OR, IN THE ALTERNATIVE, TO MODIFY DISCHARGE INJUNCTION[1]**

On July 22, 2015, the court heard the Motion of Zurich American Insurance Company and Its Affiliate Insurers to Determine and Declare that the Debtor's Discharge Does Not Extend to Certain Identified Non-Debtors, or, in the Alternative, to Modify Discharge Injunction ("Motion"). The appearances of counsel were noted on the record. After arguments were presented, the matter was taken under submission.

## BACKGROUND

On March 1, 2012, American West Development, Inc. ("Debtor") filed a voluntary Chapter 11 petition. (ECF No. 1). On October 26, 2012, Debtor filed its first amended Chapter 11 plan of reorganization ("Plan"). (ECF No. 714).

On February 14, 2013, an order was entered confirming the Debtor's first amended

---

[1] In this Order, all references to "ECF No." are to the numbers assigned to the documents filed in the case as they appear on the docket maintained by the clerk of the court. All references to "Section" are to the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All references to "FRCP" are to the Federal Rules of Civil Procedure.

Chapter 11 plan of reorganization ("Confirmation Order"). (ECF No. 853).

On September 5, 2013, a final decree was entered closing the case. (ECF No. 1039).

On June 1, 2015, the instant Motion was filed by Zurich American Insurance Company ("Zurich"). (ECF No. 1056). The Motion was noticed to be heard on July 8, 2015. (ECF No. 1057). Zurich filed a Certificate of Service indicating the parties that were given notice of the Motion. (ECF No. 1059).

On June 24, 2015, Debtor filed opposition to the Motion ("Opposition") (ECF No. 1062), accompanied by the Declaration of Edward Lubbers (ECF No. 1063).

On June 30, 2015, an order was entered approving a stipulation to continue the hearing to July 22, 2015. (ECF No. 1066).

On July 15, 2015, Zurich filed its reply to the Debtor's opposition ("Reply"). (ECF No. 1069).

**DISCUSSION**

By its Motion, Zurich seeks a determination that confirmation of the Debtor's Plan did not discharge the obligations of twenty-five non-Debtor parties regarding certain self-insured retentions. Those 25 parties include individuals, corporations, limited liability companies, trusts, and unspecified forms. They are identified in the Motion as:

1. American West Homes, Inc.
2. Whitney Ranch, Inc.
3. Gowan Properties, Inc.
4. El Capitan, Inc.
5. Federal Land Management, LLC
6. Cactus Sand & Gravel, Inc.
7. Pinnacle Peaks, LLC
8. West Mesa, LLC
9. Coronado Hills, LLC
10. Adaven Management, Inc.
11. Section 31, LL
12. The Canarelli Family Trust Dated September 14, 1990
13. The Lawrence and Heidi Canarelli 1993 Irrevocable Trust
14. The Stacia Leigh Lemke Irrevocable Trust
15. The Scott Lyle Graves Canarelli Irrevocable Trust
16. The Jeffrey Lawrence Graves Canarelli Irrevocable Trust
17. The Allysa Lauren Graves Canarelli Irrevocable Trust
18. Lawrence D. Canarelli
19. Heidi Canarelli
20. The SLG Canarelli 1993 Retained Annuity Trust
21. The ALG Canarelli 1993 Retained Annuity Trust

22. The SL Canarelli 1993 Retained Annuity Trust
23. The JLG Canarelli 1993 Retained Annuity Trust
24. Silverado Crossing
25. Silverado Canyone

See Motion at 10:18 to 11:3. Zurich alleges that it made demand for reimbursement on some or all of the identified non-Debtor parties, but that the Debtor asserted that confirmation of its Plan bars Zurich's claims for reimbursement. Id. at 5:5 to 9:8.[2] Zurich argues that the Debtor's discharge does not extend to the non-Debtor entities and seeks an order from the court either declaring that the discharge does not bar its claims against the specified non-Debtor parties, or modifying the discharge injunction to permit Zurich to pursue its claims.

Debtor objects to the relief on numerous grounds. First, it maintains that Zurich is time-barred from seeking revocation or modification of the Plan Confirmation Order. See Opposition at 6:5 to 8:4. Second, Debtor argues that reimbursement from the non-Debtor parties of any professional fees incurred in the bankruptcy proceeding are barred by the June 15, 2013 deadline for professional fee requests in the Chapter 11 proceeding. Id. at 8:5-10. Third, it argues that Zurich is precluded from any equitable relief under the doctrine of laches. See Opposition at 8:11-18. Fourth, it argues that the Motion is improper because the Chapter 11 case was closed by the final decree on September 5, 2013, and Zurich never brought a motion to reopen the case prior to filing the instant Motion. Id. at 8:19 to 9:16. Fifth, Debtor argues that the court lacks authority under Section 105(a) to extend any applicable deadlines that already have expired. Id. at 9:19 to 10:15. Sixth, it maintains that the relief requested must be sought through an adversary proceeding. Id. at 10:18 to 11:14. Seventh, Debtor argues that any joint and several liability of named insureds under the subject policies would include the Debtor and the Debtor's discharge, therefore, prevents Zurich from pursuing the non-Debtor parties. Id. at 11:16 to 12:20. Finally, Debtor maintains that the court lacks jurisdiction to grant the relief requested by Zurich. Id. at 13:4 to 15:19.

Zurich's response generally repeats that it is simply seeking a declaration regarding the

[2] Attached to the Motion is the Declaration of Nancy Dow ("Dow Declaration") to authenticate copies of certain exhibits, but which does not attest to any demands being made on non-Debtor entities, nor to the Debtor's response on behalf of the non-Debtor entities.

Case 12-12349-mkn Doc 1071 Entered 07/24/15 10:28:59 Page 4 of 6

scope of the Confirmation Order, rather than to extend any deadlines to obtain relief from the order. See Reply at 1:24 to 3:20. It essentially asserts that an adversary proceeding is not required to obtain a clarification of the Confirmation Order, see id. at 3:22-28, but does not address the specific arguments raised by the Debtor..

The court having considered the written and oral arguments of counsel, together with the record, concludes that the Motion must be denied for a variety of reasons.

First, Zurich has failed to provide competent evidence that the Debtor is even asserting the Confirmation Order on behalf of the non-Debtor parties. The Dow Declaration makes no reference to a demand being made on the non-Debtor entities nor of any response made by the Debtor. It appears that the declarant has no personal knowledge whatsoever of such events. Thus, the Motion fails for lack of evidence.

Second, Zurich has failed to demonstrate a case in controversy. No evidence has been offered that a non-Debtor entity has asserted the Confirmation Order as a defense to a demand for reimbursement. Even if Zurich commenced litigation against a non-Debtor party, however, a bankruptcy discharge arguably is an affirmative defense that must be raised in an answer or it is waived. For example, Rule 8(c) of the Nevada Rules of Civil Procedure ("NRCP") lists the affirmative defenses that must be asserted by a defendant in answering a civil complaint. "Discharge in bankruptcy" is one of the defenses that NRCP 8(c) requires to be pled affirmatively.[3] Under Nevada law, the failure to plead an affirmative defense may result in its waiver, see Webb v. Clark Cnty. School Dist., 125 Nev. 611, 619-20, 218 P.3d 1239, 1245 (Nev. 2009), although the trial court may allow an amendment. See Whealon v. Sterling, 121 Nev. 662, 665-66, 119 P.3d 1241, 1244 (Nev. 2005).[4] Thus, to the extent that Zurich fears a non-

[3] To the extent a non-Debtor party does not assert a bankruptcy discharge as a defense, but instead asserts estoppel, res judicata, waiver or some other basis for avoidance of liability, those concepts also must be asserted as affirmative defenses under NRCP 8(c).

[4] In contrast, the requirement of asserting a bankruptcy discharge as an affirmative defense in a federal civil action was eliminated from FRCP 8(c)(1) effective December 1, 2010, because Section 524(a)(1) and Section 524(a)(2) voids any judgment determining the personal liability of a debtor with respect to a discharged debt. See FED. R. CIV. P. 8 advisory committee's note (2010 Amendments). Even prior to the 2010 amendment, the Bankruptcy

Debtor entity asserting the Debtor's discharge as a defense there is no evidence that any such defense would be raised by a party with standing to do so.

Third, Zurich's concern regarding a possible violation of the discharge injunction against an act to pursue a debt as "a personal liability of the debtor" under Section 524(a)(2) ignores the nature of its purported claims against the non-Debtor entities. Section 524(e) makes clear that a debtor's discharge does not affect the liability of any other entity for the same debt. As such non-debtor entities do not receive a discharge, the discharge injunction simply does not apply. Whether a bankruptcy court order provides some other basis for relief to a non-debtor is unrelated to the protection of the discharge.[5]

Finally, Zurich has failed to provide sufficient notice of the relief it seeks to the non-Debtor entities. If in fact the non-Debtor entities are protected in some fashion by the Confirmation Order or terms of the confirmed Plan, then clearly the relief sought by Zurich directly affects their interests. Unfortunately, the Certificate of Service accompanying the Motion does not identify which of the 25 non-Debtor entities, if any, were served.

For these reasons, Zurich has failed to demonstrate that the relief requested by its Motion is warranted.

**IT IS THEREFORE ORDERED** that the Motion of Zurich American Insurance Company and Its Affiliate Insurers to Determine and Declare that the Debtor's Discharge Does Not Extend to Certain Identified Non-Debtors, or, in the Alternative, to Modify Discharge Injunction, Docket No. 1056, be, and the same hereby is, **DENIED**.

---

Appellate Panels for this circuit concluded that the bankruptcy discharge is an absolute, nonwaivable defense to postdischarge collection activity. See Lone Star Sec. & Video, Inc. v. Gurrola (In re Gurrola), 328 B.R. 158, 170 (B.A.P. 9th Cir. 2005). States such as Arizona have taken steps to eliminate the bankruptcy discharge as an affirmative defense in light of amendments to FRCP 8(c), see, e.g., 16 A.R.S. Rules of Civil Procedure, Rule 8(c) (effective January 1, 2013), but Nevada has not.

[5] At the hearing on the Motion, counsel for the Debtor correctly acknowledged that the non-Debtor parties did not obtain a bankruptcy discharge of the claims asserted by Zurich. Thus, there would be no violation of a discharge injunction.

Copies sent via BNC to:

BRETT A. AXELROD
FOX ROTHSCHILD LLP
3800 HOWARD HUGHES PKWY, STE 500
LAS VEGAS, NV 89169

ANN MARIE HANSEN
BALLARD SPAHR, LLP
100 N. CITY PARKWAY, SUITE 1750
LAS VEGAS, NV 89106

# # #