_____
Honorable Mike K. Nakagawa
United States Bankruptcy Judge



Entered on Docket
April 12, 2018

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

| | |
|---|---|
| In re: ) | Case No. 12-12349-MKN |
| ) | Chapter 11 |
| AMERICAN WEST DEVELOPMENT, ) | |
| INC., ) | Date:  March 21, 2018 |
| Debtor. ) | Time:  9:30 a.m. |
| _____ ) | |

**ORDER ON MOTION TO STRIKE PORTIONS OF REPLY TO OPPOSITION TO REORGANIZED DEBTOR'S MOTION (I) TO REOPEN CHAPTER 11 CASE; AND (II) FOR AN ORDER TO SHOW CAUSE WHY SCOTT LYLE GRAVES CANARELLI AND HIS COUNSEL SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING PLAN DISCHARGE, EXCULPATION, RELEASE AND INJUNCTIVE PROVISIONS; OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATIONS[1]**

On March 21, 2018, the court heard the Reorganized Debtor's Motion (I) to Reopen Chapter 11 Case; and (II) for an Order to Show Cause Why Scott Lyle Graves Canarelli and His Counsel Should Not Be Held in Contempt for Violating Plan Discharge, Exculpation, Release and Injunctive Provisions ("OSC Motion"). Additionally, the court heard a Motion to Strike Portions of Reply to Opposition to Reorganized Debtor's Motion (I) to Reopen Chapter 11 Case; and (II) for an Order to Show Cause Why Scott Lyle Graves Canarelli and His Counsel Should Not Be Held in Contempt for Violating Plan Discharge, Exculpation, Release and Injunctive Provisions; or, in the Alternative, Motion for Leave to File Supplemental Declarations ("Strike

---

[1] In this Order, all references to "ECF No." are to the numbers assigned to the documents filed in the case as they appear on the docket maintained by the clerk of the court. All references to "Section" are to the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All references to "FRBP" are to the Federal Rules of Bankruptcy Procedure. All references to "FRE" are to the Federal Rules of Evidence. All references to "Local Rule" are to the Local Rules of Practice for the United States District Court for the District of Nevada.

1

Motion"). The appearances of counsel were noted on the record. After arguments were presented, the matters were taken under submission.

## BACKGROUND

On March 1, 2012, American West Development, Inc. ("AWD") commenced a voluntary Chapter 11 proceeding.

On October 26, 2012, AWD filed its proposed First Amended Chapter 11 Plan of Reorganization ("Plan"). (ECF No. 714).

On February 14, 2013, an order was entered confirming its Plan. (ECF No. 853).

On March 15, 2013, a notice was filed that the confirmed Plan was effective as of March 15, 2013. (ECF No. 868).

On September 5, 2013, an order was entered for a final decree closing the case. (ECF No. 1039).

On February 8, 2018, AWD, as the reorganized debtor, filed the OSC Motion. (ECF No. 1081).[2] The motion was noticed to be heard on March 21, 2018. (ECF No. 1087).

On March 7, 2018, opposition ("Opposition") to the OSC Motion was filed on behalf of Scott Lyle Graves Canarelli ("Scott Canarelli"). (ECF No. 1093).[3] On the same date, a joinder in the Opposition was filed on behalf of the law firm of Solomon Dwiggins & Freer, Ltd. ("SDF Firm"). (ECF Nos. 1095, 1096).

On March 14, 2018, AWD filed a reply ("Reply") to the Opposition. (ECF No. 1098).

On March 15, 2018, Scott Canarelli filed the instant Strike Motion, objecting to portions of the Reply. (ECF No. 1100).[4] Along with the Strike Motion, he filed an ex parte application

---

[2] The OSC Motion is accompanied by supporting declarations from Robert M. Evans, Edward C. Lubbers, Lawrence D. Canarelli, Katina Brountzas, and Jennifer L. Braster. (ECF Nos. 1082, 1083, 1084, 1085, 1086).

[3] The Opposition is accompanied by the declaration of attorney Dana Dwiggins. (ECF No. 1094).

[4] Attached to the Strike Motion are two exhibits consisting of the declaration of attorney Candace C. Carlyon ("Carlyon Declaration") and another declaration from Ms. Dwiggins ("Second Dwiggins Declaration").

2

1  for an order shortening time ("OST Application").  (ECF No. 1101).

2       On March 16, 2018, an order shortening time ("OST") was entered allowing the Strike

3  Motion to be heard at the same time as the OSC Motion.  (ECF No. 1104).[5]

4       On March 16, 2018, the SDF Firm filed a joinder in the Strike Motion.  (ECF No. 1108).

5       On March 20, 2018, AWD filed an objection ("Strike Objection") to the Strike Motion in

6  accordance with the deadline set forth in the OST.  (ECF No. 1111).[6]

### DISCUSSION

8       The Reply filed in support of the OSC Motion refers to communications amongst counsel

9  leading to the creation of a proposed order to resolve the OSC Motion ("Proposed Order") after

10 AWD received the Opposition.  See Reply at 2:15 to 4:26.  To the extent those communications

11 embody settlement discussions inadmissible under FRE 408, Scott Canarelli and the SDF Firm

12 seek to strike those references from the Reply, or, in the alternative, to admit the Carlyon

13 Declaration and Second Dwiggins Declaration into evidence.  See Strike Motion at 5:10 and

14 7:10-14.  The express purpose of admitting the Carlyon Declaration and Second Dwiggins

15 Declaration is to overcome "the false impression that Debtor, and not Scott Canarelli, have

16 attempted a 'pragmatic solution' with respect to the subject matter of the [OSC] Motion . . . "  Id.

17 at 7:11-14.

18      In arguing that the latter declarations should be considered to rebut the portions of the

19 Reply, Scott Canarelli and the SDF Firm allege that "Counsel for Debtor (not Ms. Axelrod)

20 engaged in <u>an abusive and sexist tirade</u> against Scott's counsel, including <u>telling her to read the

21 Plan 'again slowly' before speaking to him, and stating that she 'might not be understanding how

22 the term sheet is intended to work</u>.'"  Strike Motion at 5:26 to 6:2 (emphasis added).[7]  In support

---

[5] On March 16, 2016, after the order shortening time was entered, AWD filed a statement in response to the OST Application along with a Declaration of Nathan A. Schultz ("First Schultz Declaration").  (ECF No. 1106).

[6] The Strike Objection is accompanied by another declaration from Mr. Schultz ("Second Schultz Declaration").  (ECF No. 1112).

[7] The phrase "abusive and sexist tirade" appears in the Strike Motion signed by Ms.

3

of that allegation, Ms. Dwiggins, on behalf of Scott Canarelli and the SDF Firm, attests:

> However, when I attempted to discuss the scope of the discharge and asked opposing counsel (Nathan Schultz) to explain why he believed that the Probate Action was precluded by the Plan, <u>he told me that I should "read it again, slowly" before talking to him</u>. He sent a proposed "term sheet" is hereto attached as Exhibit A [sic]. When I pointed out that the term sheet would expand the scope of the bankruptcy discharge and limited my client's ability to conduct discovery and otherwise prove damages, <u>he indicated that I must not "understand" it. Throughout our discussions, Mr. Schultz exhibited a lack of respect and repeated demeaning statements</u>.

Second Dwiggins Declaration at ¶ 5 (emphasis added).

AWD responded to the Strike Motion by denying that the Reply included references to inadmissible settlement communications. <u>See</u> Strike Objection at 3:4:24. AWD then suggests that opposing counsel should be held responsible for what it characterizes as "baseless and offensive personal attacks" against Mr. Schultz. <u>Id.</u> at 4:10-14. In support of the Strike Objection, the Second Schultz Declaration includes copies of a series of email messages between AWD's attorneys and Scott Canarelli's attorneys, occurring on February 14, February 19, and February 20, 2018.[8]

The February 14 email is a transmittal from a paralegal for AWD's counsel to Ms. Dwiggins. The February 19 email is from Ms. Dwiggins to, among other individuals, AWD's lead counsel (Brett Axelrod), and includes the phrase "otherwise, I will be sending you a Rule 11 letter this week." There are eleven subsequent emails that occurred the next day (February 20), and all of them are between Mr. Schultz on behalf of AWD and Ms. Dwiggins on behalf of Scott Canarelli.[9]

Email 1 is Mr. Schultz's response to Ms. Dwiggins' previous email to Ms. Axelrod. That email begins with the sentence "You are missing the point in several respects" and concludes

---

Carlyon but does not appear in the Second Dwiggins Declaration.

[8] All of these emails were exchanged after the OSC Motion was filed on February 8, 2018, but before the Opposition was filed on March 7, 2018. The Reply asserts that the Proposed Order was created by AWD's counsel after reviewing the Opposition.

[9] The emails from Ms. Dwiggins that respond to emails from Mr. Schultz appear to have time stamps that are three hours later than the actual times the emails were sent.

4

1   with the sentence "Threatening a Rule 11 letter in response to a settlement proposal . . . is not
2   going to get you anywhere." Email 2 is Ms. Dwiggins' response that begins with the sentence
3   "With all due respect, I am not missing the point." Email 3 is Mr. Schultz's response, the final
4   two sentences of which state "From your comments it appears that <u>you might not be</u>
5   <u>understanding how the term sheet is intended to work</u>.  I would be happy to go over it with you
6   on a call." (Emphasis added). Email 4 is Ms. Dwiggins' reply stating "If I were willing to
7   withdraw the subpoena to AWDI in its entirety, would this resolve the issue? If not, let's have a
8   conference call." Email 5 is Mr. Schultz's response, the last sentence of which is "I could speak
9   before noon today or at 3:30 pm."

10          Email 6 is Ms. Dwiggins' response stating: "To make this a productive call, would you
11  please provide me with a comprehensive list of the 'released parties,' or 'discharge, exculpation
12  and injunctive provisions'? I think we need to be clear that we are talking about the same parties
13  and entities." Email 7 is Mr. Schultz's response stating that "Both of those things are very
14  carefully and specifically set forth in the Bankruptcy Court motion - do you need me to send you
15  a copy? I am happy to walk you through all of that on a call as well, but we might need to
16  schedule at least an hour if that's where we are going to start." Email 8 from Ms. Dwiggins
17  begins with a sentence including the phrase "the documents referred to your motion are not
18  'carefully and specifically set forth" and concludes with "It will not take an hour to explain it to
19  me and avoiding the games will go a long way."

20          Email 9 from Mr. Schultz begins with "I am personally offended," states "I am certainly
21  not playing any games" and concludes with: "If you want to have a call, then tell me when and
22  let's do it.  I think it would be most productive and reasonable for you to have <u>carefully read</u> the
23  Motion beforehand, but that's up to you." (Emphasis added). Email 10 from Ms. Dwiggins
24  begins with "Your constant jabs at me in your emails are likewise offensive and not productive"
25  and concludes with: "I have read the relevant documents. I can speak at 1:00 today if your
26  schedule is conducive." Email 11 from Mr. Schultz begins with "I am sorry that you are
27  interpreting it that way" and ends with "My window before noon has now closed, but I am
28  available again at 3:30 pm."

5

Apparently, a subsequent telephone call between Mr. Schultz and Ms. Dwiggins actually did occur. See Second Schultz Declaration at ¶ 4. It is not clear, however, whether that call occurred on February 20 or some later date. Neither of the declarations from Mr. Schultz describes what occurred during the telephone conversation with Ms. Dwiggins or whether anyone other than these two attorneys were present. The First Schultz Declaration, however, includes a copy of Mr. Schultz's email dated March 15, 2018, at 7:19 p.m., to Ms. Carlyon, rather than Ms. Dwiggins. That email voices Mr. Schultz's objection to the contents of the Strike Motion, in particular the allegation that he had engaged in an "abusive and sexist tirade." That email from Mr. Schultz objects to "the made-up quote" in the Strike Motion.[10] The other emails attached to the First Schultz Declaration consist of a March 12, 2018 email between Ms. Axelrod and Ms. Carlyon, among others, and four other emails on March 15, 2018, among Mr. Schultz, Ms. Axelrod, and Ms. Carlyon.

Because the February 20 emails between Mr. Schultz and Ms. Dwiggins are gender neutral on their face, the sometimes condescending and sometimes aggressive language used by both participants unfortunately may be representative of what occurs when humans communicate through keyboards rather than engage in face to face conversation. In their context, the emails do not appear to be "abusive" because both counsel appear to be only advocating the legal positions of their respective clients albeit through the occasional use of condescending or threatening language. On their face, the emails do not appear to be "sexist" because there are, for example, no pejorative terms used toward either participant, and no outward indication that the condescending or threatening language is used because of the gender of the opposing party.[11]

---

[10] The only actual quotes attributed to Mr. Schultz are that Ms. Dwiggins should read the confirmed Plan "again slowly" and that Ms. Dwiggins "might not be understanding how the term sheet is intended to work." See Strike Motion at 6:1-2; Second Dwiggins Declaration at 2:17 and 2:21. The former quoted language appears to be similar to the language appearing in Email 9. The latter quotation appears to be from Email 3. The record does not reflect whether the same or similar words were used in the subsequent telephone conversation between counsel.

[11] At one time, a person's "sex, like race and national origin" was viewed as "an immutable characteristic determined solely by the accident of birth..." Frontiero v. Richardson, 411 U.S. 677, 688 (1973) (Brennan, J.) As the concept of "gender fluidity" develops, see

6

1  Instead, the emails appear to be "gender neutral" because reversing the genders of the
2  participants would not change the condescending or threatening nature of the language.  Finally,
3  the emails do not appear to conform at all to the dictionary definition of a "tirade," i.e., "a long,
4  angry speech of criticism or accusation."  Oxford Living Dictionaries (Oxford University Press
5  2018).

6  Because the emails alone would not support a finding that an abusive and sexist tirade
7  occurred and that such conduct somehow supports the admission of the Carlyon Declaration and
8  Second Dwiggins Declaration[12], the only path to such a finding would be to conduct an
9  evidentiary hearing.  Presumably, Mr. Schultz and Ms. Dwiggins would testify for the purpose
10 of: (1) establishing the words actually used during the telephone conversation, and (2)
11 determining whether the words (along with the emails) constituted something akin to an
12 "abusive and sexist tirade."  Because the outcome of the hearing would depend almost entirely
13 on the credibility of each witness, the court likely would permit discovery and the introduction of

---

Merriam-Webster Dictionary (2018) ("gender-fluid: of, relating to, or being a person whose gender identity is not fixed"), the accuracy of the Court's observation in Frontiero may be questioned.  Moreover, it may be more difficult to predict or even know what the term "sexist" entails in the future.  Compare Oxford Living Dictionaries (Oxford University Press 2018) ("Sexist" is an adjective "Characterized by or showing prejudice, stereotyping or discrimination, typically against women, on the basis of sex.").  Apparently, even the science of genetics has not prevented exploration of the concept of "racial fluidity."  See, e.g., "Choosing your own: Definition of race becoming fluid," by Jesse J. Holland, Associated Press, June 16, 2015 (available at https://www.seattletimes.com/nation-world/choosing-your-own-definition-of-race-becoming-fluid/, last visited on April 9, 2018).  Presumably, an individual's national origin will remain an immutable characteristic unless the concepts of geography, history or time also become "fluid."  In this Order, the attorneys involved are addressed formally as "Ms." or "Mr." inasmuch as they do identify themselves as a particular gender.  If they did not do so, the court would be inclined to use the honorific "Mx." instead.  See Oxford Living Dictionaries, supra ("Mx." - "A title used before a person's surname or full name by those who wish to avoid specifying their gender or by those who prefer not to identify themselves as male or female.")

[12] Neither the Carlyon Declaration nor the Second Dwiggins Declaration offered copies of emails between Ms. Dwiggins and Mr. Schultz other than those exchanged on February 20, 2018.

7

impeachment evidence.[13] Until such a hearing is conducted, if at all, <u>the court concludes that the present record is insufficient to establish that Mr. Schultz directed an "abusive and sexist tirade" toward Ms. Dwiggins.</u>

But the court concludes that there is no need to conduct such a hearing. The outcome of the OSC Motion is not dependent upon nor materially affected by the content or submission of the Proposed Order. Whether the Proposed Order was the product of settlement negotiations or not, nothing would have prevented AWD from suggesting the content of the Proposed Order in its Reply. Moreover, the Reply refers only to the fact that counsel for the parties attempted to resolve the OSC Motion, but not to the content of any settlement discussions. Thus, that portion of the Reply does not violate FRE 408 and will not be stricken.

That would be the end of the matter except for AWD's apparent request that "the court should hold Scott Canarelli's counsel responsible for their reckless and baseless personal attack on AWDI's counsel." Strike Objection at 4:10-11. AWD maintains that opposing counsel's allegedly false allegations violated multiple provisions of the Nevada Rules of Professional Conduct, including Rules 3.3, 3.4, 3.5, and 8.4. <u>See</u> Strike Objection at 6:5-14. AWD requests no specific remedy for holding opposing counsel "responsible" but suggests that a corrective apology, at least, should be put on the record. <u>Id.</u> at 7:1-3.

If in fact the Nevada Rules of Professional Conduct have been violated, an attorney practicing in this district may be subject to disbarment, suspension from practice, reprimand, or other proper discipline. <u>See</u> Local Rule IA 11-7(a).[14] Additionally, the oath of attorneys

---

[13] There are obvious limits in accurately recreating what occurred during an oral conversation. Even a written transcript of the words used in a telephone conversation cannot duplicate the expressive characteristics used by the participants, such as speaking volume, vocal inflections and intonation, e.g., yelling, sarcasm, snickering, etc. Likewise, if a telephone conversation is conducted through Skype, FaceTime, or similar platforms, accurate facial expressions, e.g., eye rolling, smirking, etc., likely could not be duplicated through live witness testimony.

[14] This Local Rule applies in bankruptcy proceedings pursuant to Bankruptcy Local Rule 1001(b)(2). Violations of a local rule may serve as a basis for imposing sanctions on counsel as long as the grounds stated under the rule apply. <u>See, e.g.</u>, <u>U.S. v. Wunsch</u>, 84 F.3d 1110 (9th Cir. 1995) (sanctions for sexist remarks by criminal defense attorney to assistant U.S. attorney

admitted to practice in Nevada provides, in pertinent part, that "I will conduct myself in a civil and professional manner, whether dealing with clients, opposing parties and counsel, judicial officers or the general public, and will promote the administration of justice . . . " Nev. Sup. Ct. Rule 73 (effective April 4, 2014).[15] Violation of the attorney's oath may be the basis for professional discipline. See Bull v. McCuskey, 615 P.2d 957, 962 (Nev. 1980) (An attorney's "obligation to present his client's cause vigorously does not contemplate violation of the attorney's oath or the standards of conduct.").

A bankruptcy court also has inherent authority to regulate the practice of attorneys appearing before it, but any sanction must be preceded by a specific finding of bad faith. See Shalaby v. Mansdorf (In re Nakhuda), 544 B.R. 886, 899 (B.A.P. 9th Cir. 2016), aff'd, 703 Fed.Appx. 621 (9th Cir. Nov. 22, 2017).[16] The same inherent authority exists for other federal

---

reversed because the remarks to counsel did not impugn the integrity of the court nor interfere with the administration of justice as required by the local rule).

[15] Judge Pappas of the Idaho bankruptcy court recently turned to a civility provision of the court's local rules of practice in addressing a personal dispute between two experienced practitioners. See In re Bianchi, 2018 WL 1417695, at *7 (Bankr. D. Idaho March 20, 2018). His observation regarding the use of emails is prescient: "In this Court's experience, when it comes to promoting the civil and courteous practices and conduct exemplified in the Local Rule, electronic communications are frequently a poor substitute from more personal contacts between lawyers, either by phone or in person. Whether due to human nature or for some other reason, the Court has observed that lawyers who seem anxious to lob an ill-considered electronic bomb at their adversary, would never consider such an approach in the presence of one another. That emails may be more efficient than personal meetings or telephone conversations should not render the usual rules of courtesy and professionalism inapplicable." Id. at n.11. In the instant case, the language used in the emails between counsel may have set the stage for an unfortunate phone conversation that may have escalated the existing tensions.

[16] Judge Klein of the Eastern District of California bankruptcy court disqualified a Chapter 11 debtor's counsel and ordered disgorgement of fees based on his unwillingness to work with a female attorney representing the Office of the United States Trustee. See In re Plaza Hotel Corp., 111 B.R. 882 (Bankr. E.D. Cal. 1990). Remarkably, some of the inappropriate remarks by counsel were actually made in the presence of the court. Judge Klein observed that "Gender-biased remarks are unworthy of counsel who appear in federal court, interfere with the orderly conduct of federal litigation in an atmosphere of equal justice, and are as sanctionable as the casting of racial or ethnic epithets and slurs among counsel...This court is greatly disappointed that a lawyer would think that it could brook such remarks and arguments sounding in gender bias. All counsel appearing in this court need to understand that such offensive

9

courts, as well as the requirement of a specific finding of bad faith. See, e.g., Claypole v. Cnty. of Monterey, 2016 WL 145557, at *5 (N.D. Cal. Jan. 12, 2016) (specific finding of bad faith was entered based on sexist comments of counsel made during a deposition).[17]

Both monetary and non-monetary sanctions are available at the request of a party under FRBP 9011, but the "safe harbor" provision of the rule requires the requesting party to give 21-days notice before filing a request for sanctions. A court also may consider the issuance of sanctions *sua sponte* under FRBP 9011(c)(1)(B), but only after issuing an order to show cause and then making a finding of bad faith, or knowing and intentional misconduct. See In re Nakhuda, 544 B.R. at 901-902.

Issuance of sanctions under any of the foregoing authorities first requires a factual determination that significant misconduct actually occurred. When inappropriate statements are made, or offensive conduct occurs, in the presence of the court, factual findings can be made with dispatch. When, as in this case, the alleged misconduct, if any, has occurred outside the presence of the court, an evidentiary hearing is required. The standard of proof at such a hearing would depend on the legal authority under which relief is sought.

Because AWD requests an order to hold opposing counsel "responsible" for making untrue statements in the Strike Motion, issuance of any such order would require an evidentiary hearing to determine if the statements are in fact untrue.[18]

---

remarks will be dealt with forcefully - he will be disqualified from representing the debtor." Id. at 892.

[17] The record before Judge Grewal in the Claypole proceeding included a deposition transcript wherein defendant's counsel, Mr. Bertling, directed gender specific comments to opposing counsel: "Move on with your next question and don't raise your voice at me. It's not becoming of a woman or an attorney who is acting professionally under the rules of professional responsibility." 2016 WL 145557, at *4 n.37. As previously discussed at 6-7, supra, the February 20 emails in the current case do not contain gender-specific language.

[18] If any counsel, regardless of gender, engages in "an abusive and sexist tirade" towards other counsel, it would not be tolerated in this court, nor should it be tolerated in any court. As the court in Claypole observed: "When an attorney makes these kinds of comments, 'it reflects not only on the attorney's lack of professionalism, but also tarnishes the image of the entire legal profession and disgraces our system of justice.'" 2016 WL 145557, at *5 & n.40, quoting Cruz-Aponte v. Carribean Petroleum Corp., 2015 WL 5006213, at *3 (D.P.R. Aug. 17, 2015). Other

At this point, AWD has not identified a specific legal basis for issuance of an order imposing any type of relief. If it intends to pursue such relief from this court, from any other court of competent jurisdiction under the same or other legal theories, or from the State Bar, it will have to identify the actual legal basis to permit opposing counsel to respond. The request in the Strike Objection is insufficient. Under these circumstances, AWD's request will be denied without prejudice.

**IT IS THEREFORE ORDERED** that the Motion to Strike Portions of Reply to Opposition to Reorganized Debtor's Motion (I) to Reopen Chapter 11 Case; and (II) for an Order to Show Cause Why Scott Lyle Graves Canarelli and His Counsel Should Not Be Held in Contempt for Violating Plan Discharge, Exculpation, Release and Injunctive Provisions; or, in the Alternative, Motion for Leave to File Supplemental Declarations, Docket No. 1100, be, and the same hereby is, **DENIED**.

Copies sent to all parties via CM/ECF ELECTRONIC FILING

# # #

---

full-time and recall bankruptcy judges in Nevada, as well as the visiting chief bankruptcy judge from the District of Alaska, join in this view.